IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MELTON PROPERTIES, LLC; FLOYD M. MELTON, JR.; FLOYD M. MELTON III; MOSS B. MELTON; McMILLAN ACRES; DANNY HARGETT; JANE HART McMILLAN HARGETT; DAVID HARGETT — PLAINTIFFS

VS. — CIVIL ACTION NO. 4:18cv079-DMB-JMV

ILLINOIS CENTRAL RAILROAD COMPANY; CANADIAN NATIONAL RAILWAY; UNION TANK CAR COMPANY, INC.; JOHN DOES 1-5 — DEFENDANTS

---

**Complaint**

---

**JURY TRIAL DEMANDED**

COME NOW Melton Properties, LLC, a Mississippi limited liability company; Floyd M. Melton, Jr.; Floyd M. Melton III; Moss B. Melton (collectively the "Melton Plaintiffs"); McMillan Acres, a Mississippi Partnership; Danny Hargett; Jane Hart McMillan Hargett; and David Hargett, and file this Complaint for damages, fees, and such other relief as the Court deems proper against Illinois Central Railroad Company, Canadian National Railway, Union Tank Car Company, Inc., and John Does 1-5 as follows:

## I. Parties

1. Plaintiff Melton Properties, LLC, is a Mississippi limited liability company in good standing, with its principal place of business at 107 1/2 East Market Street, Greenwood, Mississippi 38930.

2. Plaintiffs Floyd M. Melton, Jr., Floyd M. Melton III, and Moss B. Melton are individual resident citizens of Mississippi. They can be found at 107 1/2 East Market Street, Greenwood, Mississippi 38930.

3. Plaintiff McMillan Acres, a Mississippi partnership, is a farming operation with its principal place of business at 38155 CR 550, Minter City, Mississippi 38944.

4. Plaintiffs Danny Hargett, Jane Hart McMillan Hargett and David Hargett are individual resident citizens of Mississippi. They can be found at 38155 CR 550, Minter City, Mississippi 38944.

5. Defendant Illinois Central Railroad Company ("Illinois Central") is a foreign corporation, incorporated under the laws of the State of Illinois, doing business in Mississippi, with its principal place of business at 17641 South Ashland Avenue, Homewood, Illinois 60430. It is a wholly-owned subsidiary of Defendant Canadian National Railway. It can be served with process via its registered agent, Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, Mississippi 39211.

6. Defendant Canadian National Railway ("Canadian National") is a publicly-traded foreign corporation, incorporated under the laws of Quebec, Canada, with its principal place of business at 935 De La Gauchetiere Street West, Montreal, Quebec, Canada H3B 2M9. It is the parent company of Defendant Illinois Central Railroad Company. It is not registered to do business in Mississippi and has no registered agent in the State of Mississippi. It can be served with process via the procedures set forth in Fed. R. Civ. P. 4(f) and 4(h)(2).

7. Defendant Union Tank Car Company, Inc. ("Union Tank Car") is a foreign corporation, incorporated under the laws of the State of Delaware, with its principal place of business at 175 West Jackson Boulevard, 21st Floor, Chicago, Illinois 60604. It can be served

with process via its registered agent, Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, Mississippi 39211.

8. John Does 1-5 are past or present owners, generators, and/or contributors of hazardous waste that spilled onto Plaintiffs' property when a train owned and operated by Illinois Central and/or Canadian National derailed on tracks owned and operated by Illinois Central and/or Canadian National.

## II. Jurisdiction and Venue

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists. The Plaintiffs are all domiciled in Mississippi, and the Defendants are all domiciled in foreign jurisdictions. The amount in controversy exceeds $75,000.00.

10. Additionally, and/or alternatively, this Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs' Clean Water Act and Resource Conservation and Recovery Act claims arise under the laws of the United States.

11. Additionally, and/or alternatively, this Court further has federal subject matter jurisdiction relating to Plaintiffs' Clean Water Act claim pursuant to 33 U.S.C. § 1365(a).

12. This Court has personal jurisdiction over the parties under Mississippi's long-arm statute, Miss. Code Ann. § 13-3-57. Defendants Illinois Central and Union Tank Car are registered to do business in Mississippi and committed a tort in Mississippi, and Defendant Canadian National does business in Mississippi and committed a tort in Mississippi.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as the events or omissions giving rise to Plaintiffs' claims took place within the jurisdiction of the Northern District of Mississippi.

## III. Facts

14. On or about March 30, 2015, railcars being transported by Illinois Central and/or Canadian National derailed at mile post 102.6 on tracks owned by Illinois Central and/or Canadian National, which run through certain agricultural and forested property near Minter City in Leflore County, Mississippi (the "Spill Site"). The agricultural property is owned, leased, and/or farmed by the Plaintiffs.[1]

15. The derailment spilled over 17,000 gallons of Resin Oil Heavies (the "Spill") from a tank car owned by Union Tank Car. The main constituent of Resin Oil Heavies is dicyclopentadiene ("DCPD"), which is a flammable hazardous material that can cause irritation when inhaled or when in contact with skin or eyes, and may damage kidneys and affect lungs with high or repeated exposure. Resin Oil Heavies also contain naphthalene; indene; styrene; vinyl toluene; 1,2,4-trimethylbenzene; alpha-methyl styrene; 1,3,5-trimethylbenzene; 1,2,3-trimethylbenzene; ethyl benzene; and xylene.

16. The Spill Site is comprised of an area of over 150 acres, the majority of which consists of Plaintiffs' property. Prior to the Spill, Plaintiffs' property was used to grow corn, wheat, cotton, milo and soybeans for use and consumption by both humans and livestock.

17. Soil and groundwater samples taken at various points throughout the Spill Site have shown DCPD and several other hazardous constituents remain present at levels which pose a significant threat to human health and the environment.

18. The Spill has caused the Spill Site property to be unfit, unusable, and unsafe for its usual purposes and has harmed the Plaintiffs' ability to sell, transfer, lease or mortgage the

[1] This Complaint periodically refers to the subject property as "Plaintiffs' property" or similar formulations. The affected property is owned by the Melton Plaintiffs and has at various times been leased and/or farmed by the other Plaintiffs. Accordingly, referring to the property as "Plaintiffs' property" is intended to note that all Plaintiffs have an ownership or other interest in the affected property.

subject property. The presence of DCPD and other hazardous substances in the soil and groundwater impairs Plaintiffs' ability to market any crops grown in the affected area due to concerns about plant uptake. Similar contamination concerns apply to game hunted on the property.

19. Beyond the boundary of Plaintiffs' own property, DCPD and other hazardous substances pose a present and ongoing threat of contamination of the waters of the State. Sampling results evidence that these substances have leached, and are continuing to leach, into the groundwater under the Spill Site. The hazardous substances from the Spill have contaminated the primary irrigation source for the Plaintiffs' property and agricultural activities, and have contaminated, or pose a real and significant threat of contamination to both the primary irrigation source and the Mississippi River Alluvial Aquifer – an important groundwater aquifer in the area.

20. In the immediate aftermath of the Spill, Defendants Illinois Central and/or Canadian National undertook certain "cleanup" efforts. Those "cleanup" efforts, however, were negligently or intentionally under-designed and/or under-performed, and in fact caused additional contamination at the affected site. Defendants Illinois Central and/or Canadian National caused the Spill Site, and a large area surrounding it, to be strewn with contaminated metal, wood, and plastic debris. Illinois Central and/or Canadian National also, unlawfully and without permission, trespassed upon Plaintiffs' property and placed foreign soils and rocks on Plaintiffs' property as part of this "cleanup" effort, which has caused Plaintiffs additional damages by further impairing Plaintiffs' ability to prepare and utilize their land for growing crops.

21. As part of the "cleanup," Illinois Central and/or Canadian National further removed or destroyed a number of trees on Plaintiffs' property, depriving Plaintiffs of the use and enjoyment of the trees. During the "cleanup," Defendants also intentionally changed drainage patterns in the affected area. This caused and continues to cause inordinate amounts of water to pool in areas where it previously would not have, which in turn has drowned and continues to drown a number of trees on Plaintiffs' property.

22. Three years after the Spill, Defendants have still not placed Plaintiffs in any semblance of the position they would have been in had the Spill never taken place. Plaintiffs have missed three full planting seasons due to the combination of contaminated soil and improper replacement soil which makes farming the affected area impossible. The hazardous waste which the Spill released onto and into the ground continues to prevent Plaintiffs from using, enjoying, and/or profiting from their property.

23. Both Plaintiffs and Illinois Central/Canadian National have employed experts to analyze the effects of the Spill since the date of its occurrence. Defendants' own samples taken in July 2017 indicate DCPD in Plaintiffs' soil and the groundwater underneath, including one groundwater sample showing 550 µg/l of DCPD (over 1,250 times greater than the Environmental Protection Agency ("EPA")'s established standard for the chemical in groundwater) and a soil sample showing 523 mg/kg of DCPD (402 times the EPA standard for soil). Many samples collected from locations previously sampled show levels of DCPD continuing to increase in both soil and water.

24. Plaintiffs have expended significant time and financial resources owing to the Spill, including the hiring of engineers, consultants, and other professionals to investigate the Spill's effects and participate in the Mississippi Department of Environmental Quality

("MDEQ")'s process of overseeing the cleanup. Plaintiffs have invested a tremendous amount of their own time in the post-Spill process as well. Plaintiffs' efforts in providing their own investigative data have been reasonably necessary, if not critical, in making the MDEQ-approved corrective action plan more protective of human health and the environment. The corrective action plan remains defective for its failure to require sufficient areas and elements of the property to be properly remediated, but without Plaintiffs' efforts the plan would be even more inadequate.

25. The MDEQ-approved corrective action plan for the Spill Site is insufficient to fully protect human health and the environment, or to return the Spill Site to its prior status as property that is safe for growing crops and hunting game for human consumption. The plan does not require removal of contaminated soils from all affected areas at the Spill Site – in particular, it allows Defendants to use a much less stringent cleanup standard for soil contained within Defendants' right-of-way surrounding their railroad tracks, without requiring sufficient mechanisms for ensuring contamination on the right-of-way does not migrate to Plaintiffs' adjacent property. Arguably even more egregiously, the plan completely fails to address remediation of contaminated groundwater. Plaintiffs have filed a petition with the Mississippi Commission on Environmental Quality, seeking to have the corrective action plan strengthened to fully protect human health and the environment.

26. The contaminants still affecting the soil and groundwater on Plaintiffs' property constitute an imminent and substantial threat to human health and the environment. The Spill has also caused Plaintiffs to suffer significant money damages for their inability to use, enjoy, and/or rent their real property; their inability to produce and sell crops for livestock or human consumption; the diminished value of their real property; their expenses incurred by

investigating the Spill's ongoing effects on their real property and by requiring them to retain legal counsel to represent them in the face of Defendants' failure or refusal to properly clean up the Spill Site and place Plaintiffs in the position they would have been in but for Defendants' tortious conduct.

27. Moreover, the Spill has caused Plaintiffs potential future damages in two ways. First, crops grown on the property may remain unmarketable indefinitely either because they are themselves contaminated, or because they are perceived as potentially contaminated due to widespread knowledge of the Spill. Second, the Spill and/or the resulting inability to farm the property may cause Plaintiffs' property to be ineligible for certain federal benefits programs administered by the United States Department of Agriculture and/or other federal agencies.

***Causes of the Derailment and Spill***

28. The derailment and Spill can fairly be described as a wreck which was "waiting to happen." The stretch of railroad track on which the derailment and Spill occurred is surrounded on both sides by Plaintiffs' property. Upon information and belief, Illinois Central and/or Canadian National have known for many years that the curve in the track at or around mile post 102.6 was so sharp, elevated and/or steep as to be unsafe, and/or in need of repairs and/or safety modifications in order to prevent a train derailment.

29. Also, Defendants' easement surrounding the said curve was too narrow to allow for proper maintenance and stabilization of the track. The 50-foot wide easement adjacent to Plaintiffs' property is too narrow to permit proper maintenance and stabilization of the track. The easement surrounding the portion of the track going through the forested property adjacent to Plaintiffs' affected property is 100 feet wide, yet even that section of the track was not sufficiently stabilized at the time of the derailment.

30. Upon information and belief, Illinois Central and/or Canadian National have been aware of the foregoing dangerous and defective conditions of the railroad track at the site of the derailment and Spill for many years.

31. Despite this knowledge, Illinois Central and/or Canadian National made no attempt to negotiate for, or to obtain, a wider easement to allow for proper maintenance and/or stabilization work, nor have they used the easements they already hold to properly support and stabilize the track. Nor did Illinois Central and/or Canadian National timely or reasonably undertake the redesign, maintenance or stabilization of the portion of the track where the Spill occurred.

32. Illinois Central and/or Canadian National failed to properly inspect and maintain the tracks adjacent to Plaintiffs' property prior to the Spill. Only after the Spill have Illinois Central and/or Canadian National begun making long-necessary repairs to the said track, including replacing cross ties and rails in the area no fewer than two times since the derailment and Spill.

33. Illinois Central and/or Canadian National further failed to properly train and/or instruct their conductors, engineers, and/or other railroad personnel to prevent such derailments, properly operate their trains, and/or to properly and timely identify, report and remediate dangerous track conditions.

34. The derailment, Spill, and all resulting damages to Plaintiffs were proximate results of the above-described negligence, gross negligence or reckless and intentional actions or failures to act.

35. The Spill and resulting pollution and damages were additionally proximately caused or contributed to by the negligence, gross negligence, and recklessness of Union Tank

Car and/or its failure to properly design, construct or maintain its tank cars which were involved in the Spill.

**Count I: Resource Conservation and Recovery Act ("RCRA")**

36. Plaintiffs replead and reallege Paragraphs 1-35 above, as if fully set forth herein.

37. Pursuant to 42 U.S.C. § 6972(a)(1)(B), a private citizen may bring an action:

> against any person . . . including any past or present generator [or] past or present transporter . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

38. RCRA defines "disposal" as:

> the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

39. All Defendants are subject to citizen suit under RCRA because they are generators, transporters, and/or contributors to the disposal of hazardous waste in a manner which may present an imminent and substantial endangerment to health or the environment, within the meaning of the statute.

40. The Resin Oil Heavies which the Spill deposited on the affected area contain several RCRA hazardous wastes, including most prominently DCPD, but also including other chemicals (*see* 40 C.F.R. Part 261).

41. The Spill caused hazardous waste to be released onto the ground and thence to migrate over the ground and into the soil, surface water, and groundwater, contaminating all media with which it has come in contact. The hazardous waste continues to endanger and/or potentially endanger health and the environment.

42. Soil and water samples taken from Plaintiffs' affected property illustrate that hazardous wastes continue to migrate in the soil, surface water, and groundwater. Defendants have failed to eliminate this imminent and substantial endangerment to human health and the environment.

43. Accordingly, Defendants, either individually or in concert, are wholly responsible for the Spill and have caused or contributed to the wrongful disposal of hazardous wastes which presents or may present an imminent and substantial endangerment to health and the environment.

44. 42 U.S.C. § 6972(b)(2)(A) requires 90 days' notice of the endangerment to the EPA Administrator, the State in which the violation occurs, and to the prospective defendants in the lawsuit. Plaintiffs provided such notice via a letter dated December 22, 2017 (attached hereto as Exhibit "A").

45. Plaintiffs seek injunctive relief requiring Defendants to abate the threat to health and the environment caused by the Spill, as well as civil penalties, attorneys' fees, expert fees, and other appropriate relief.

**Count II: Clean Water Act ("CWA")**

46. Plaintiffs replead and reallege Paragraphs 1-45 above, as if fully set forth herein.

47. Pursuant to 33 U.S.C. § 1365(a)(1), a private citizen may bring an action against "any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter."

48. The Spill constitutes an ongoing unlawful discharge of pollutants from point source(s) into waters of the United States, in violation of the CWA. 33 U.S.C. § 1311(a). Resin Oil Heavies contain multiple hazardous constituents, including most prominently, DCPD.

49. Samples of surface water taken since the Spill have shown levels of DCPD present. Said surface water flows directly into the Tallahatchie River.

50. DCPD is also present in groundwater on the affected property, which is directly hydrologically connected to surface waters less than 1,000 feet away.

51. The presence of DCPD in surface water and groundwater samples establishes that the discharge of pollutants from point source(s) is fairly traceable from the point source(s) to navigable water(s). Site conditions support a migration of contaminated storm water and groundwater to local surface waters, including the Tallahatchie River.

52. Accordingly, Defendants, individually or in concert, are wholly responsible for the Spill and its resultant continuing discharge of pollutants from the point source(s) into waters of the United States – are in violation of applicable effluent standards or limitations under the CWA.

53. 33 U.S.C. § 1365(b)(1)(A) requires 60 days' notice of the alleged violation to the EPA Administrator, to the State in which the violation occurs, and to the prospective defendants in the lawsuit. Plaintiffs provided such notice via a letter dated January 19, 2018 (attached hereto as Exhibit "B").

54. Plaintiffs seek injunctive relief requiring Defendants to fully remediate the Spill of pollutants into waters of the United States, Plaintiffs' attorneys' fees and expert fees, maximum civil penalties of $37,500.00 for each day of the violation to be paid to the State of Mississippi, and other appropriate relief.

**Count III: Negligence**
**(Track design, construction, and maintenance)**

55. Plaintiffs replead and reallege Paragraphs 1-54 above, as if fully set forth herein.

56. Illinois Central and/or Canadian National owed a legal duty to Plaintiffs and others to properly design, construct and maintain its railway track so as to reasonably avoid derailments and spills such as occurred in this case, and if participating in or directing spill clean-ups, to properly and reasonably perform such actions in accordance with the law and industry standards.

57. Illinois Central and/or Canadian National negligently failed to properly design, construct and/or maintain the railroad track at and around mile post 102.6 near Minter City, Leflore County, Mississippi.

58. Illinois Central and/or Canadian National knew or should have known that the section of track where the Spill occurred was dangerous and in need of repair and/or redesign.

59. Illinois Central and/or Canadian National's negligence in failing to reasonably repair and/or redesign the track proximately caused Plaintiffs' injuries and damages.

60. Illinois Central and/or Canadian National also negligently failed to properly and reasonably perform their clean-up obligations.

61. The negligence of Illinois Central and/or Canadian National was the proximate cause, or a proximate contributing cause of Plaintiffs' damages as alleged herein.

62. Plaintiffs seek damages for (1) the cost to fully remediate the damage to Plaintiffs' real property; (2) depreciation; (3) the loss of use and enjoyment of their property since the Spill; (4) lost profits, including potential future lost profits due to continued crop contamination or market perception of crop contamination; (5) potential future lost revenues from Spill-related exclusion from federal agricultural programs; (6) the value of Plaintiffs' time in responding to the Spill; and (7) other appropriate relief.

**Count IV: Negligence**
**(Operation of train and equipment)**

63. Plaintiffs replead and reallege Paragraphs 1-62 above, as if fully set forth herein.

64. Illinois Central and/or Canadian National owed a legal duty to Plaintiffs and others to properly maintain and repair their trains and equipment, and to hire, train, and/or instruct their employees and agents, including conductors operating their trains (including the train which derailed on March 30, 2015 resulting in the subject Spill), to, *inter alia*, properly and reasonably maintain and operate their trains and equipment, and identify and report dangerous conditions. Illinois Central and/or Canadian National negligently failed to perform such duties, proximately causing or contributing to Plaintiffs' damages as alleged herein.

65. Defendants were negligent in inspecting, maintaining, and repairing the rail cars that derailed on Plaintiffs' property, and in allowing defective and unfit rail cars to operate on the tracks in question.

66. Illinois Central and/or Canadian National were negligent in the placement of the rail cars containing hazardous wastes in the train's consist.

67. Illinois Central and/or Canadian National were additionally or alternatively negligent in operating the subject train at an excessive or unreasonably dangerous speed for conditions then and there existing at the site while having knowledge of the deteriorating condition and other defects of the track in that area.

68. Plaintiffs seek damages for (1) the cost to fully remediate the damage to Plaintiffs' real property; (2) depreciation; (3) the loss of use and enjoyment of their property since the Spill; (4) lost profits, including potential future lost profits due to continued crop contamination or market perception of crop contamination; (5) potential future lost revenues

from Spill-related exclusion from federal agricultural programs; (6) the value of Plaintiffs' time in responding to the Spill; and (7) other appropriate relief.

**Count V: Negligence**
**(Cleanup)**

69. Plaintiffs replead and reallege Paragraphs 1-68 above, as if fully set forth herein.

70. Defendants Illinois Central and/or Canadian National, in undertaking the obligations and responsibilities of cleaning up the Spill Site after the derailment, owed Plaintiffs a legal duty to perform such work in accordance with all applicable laws and industry standards.

71. Said Defendants have breached this duty, proximately causing or contributing to Plaintiffs' injuries and damages as set forth herein.

72. Plaintiffs seek damages for (1) the cost to fully and properly remediate the damage to Plaintiffs' real property and return the real property to its pre-Spill condition; (2) depreciation; (3) the loss of use and enjoyment of their property since the Spill; (4) lost profits, including potential future lost profits due to continued crop contamination or market perception of crop contamination; (5) potential future lost revenues from Spill-related exclusion from federal agricultural programs; (6) the value of Plaintiffs' time in responding to the Spill; and (7) other appropriate relief.

**Count VI: Negligence**
**(Union Tank Car)**

73. Plaintiffs replead and reallege Paragraphs 1-72 above, as if fully set forth herein.

74. Defendant Union Tank Car owed a duty to Plaintiffs to properly and reasonably design, manufacture and maintain the tank cars which were involved in the subject Spill to reasonably protect against rupture, spillage and pollution in the event of a derailment such as occurred in this case. Union Tank Car negligently failed to properly design, construct or maintain

the tank cars involved in the Spill and said negligence was the proximate, or a proximate contributing, cause of Plaintiffs' injuries and damages as alleged herein.

75. Union Tank Car owed Plaintiffs a duty to ensure that the transporter of its tank car, which Union Tank Car knew contained hazardous materials, would do so responsibly. Its breach of this duty was the actual and proximate cause of Plaintiffs' damages.

76. Plaintiffs seek damages for (1) the cost to fully remediate the damage to Plaintiffs' real property; (2) depreciation; (3) the loss of use and enjoyment of their property since the Spill; (4) lost profits, including potential future lost profits due to continued crop contamination or market perception of crop contamination; (5) potential future lost revenues from Spill-related exclusion from federal agricultural programs; (6) the value of Plaintiffs' time in responding to the Spill; and (7) other appropriate relief.

**Count VII: Negligence Per Se**

77. Plaintiffs replead and reallege Paragraphs 1-76 above, as if fully set forth herein.

78. The Spill is a violation of certain Mississippi state laws controlling the pollution of waters of the State.

79. Defendants, individually and/or in concert, caused the Spill, which constitutes a violation of Miss. Code Ann. § 49-17-29(2)(a): "it is unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state."

80. The resulting pollution of waters of the State is the type of harm intended to be prevented by the statute. Plaintiffs are the parties intended to be protected by the statute.

81. Accordingly, Defendants' violations of the statute constitute negligence per se and Plaintiffs are entitled to all damages incurred as a result.

## Count VIII: Gross Negligence

82. Plaintiffs replead and reallege Paragraphs 1-81 above, as if fully set forth herein.

83. The negligent acts and omissions as described above by Defendants Illinois Central and Canadian National also constituted gross negligence in that, inter alia, said Defendants' acts and/or omissions were wanton, grossly careless, indifferent, and/or reckless.

84. The said Defendants knew or should have known the track at and around mile post 102.6 was poorly designed and/or maintained, such that a derailment as occurred here was both reasonably foreseeable and preventable.

85. Despite the said Defendants' knowledge of the deficient and unsafe track conditions, said Defendants caused train cars carrying hazardous wastes to navigate the section of track at the Spill Site.

86. Illinois Central and/or Canadian National negligently performed, or failed to perform, reasonable and necessary work to repair, restore or otherwise correct the damages resulting from the derailment, despite numerous requests and demands to do so. Such actions or inactions evidence Defendants' negligence, gross negligence, and bad faith. Therefore, in addition to all actual damages caused, Defendants Illinois Central and/or Canadian National are liable for Plaintiffs' attorney fees, costs and expenses, and punitive damages due to Defendants' gross negligence.

## Count IX: Private Nuisance

87. Plaintiffs replead and reallege Paragraphs 1-86 above, as if fully set forth herein.

88. Defendants, individually or in concert, are wholly responsible for the Spill and all resulting damages to Plaintiffs. The Spill, which deposited 17,000 gallons of Resin Oil Heavies

onto Plaintiffs' real property – much of which contamination remains – constitutes an invasion of Plaintiffs' interest in the private use and enjoyment of their land.

89. Defendants' invasion of Plaintiffs' land was unreasonable, negligent and/or grossly negligent because Defendants knew or should have known the track at and around mile post 102.6 was poorly designed and/or maintained, such that a derailment as occurred here was both reasonably foreseeable and preventable. In the alternative, Defendants' invasion of Plaintiffs' land was wanton and/or reckless.

90. The harm caused by Defendants' spilling of hazardous waste on Plaintiffs' land is particular to Plaintiffs.

91. Defendants' conduct was malicious, willful, grossly negligent, and/or wanton.

92. Plaintiffs seek damages for diminution of value of their affected property; lost profits; diminution of rental and usable value of their property; lost use and enjoyment of the property; lost timber value; lost timber growth; removal and killing of trees; lost rent; incidental damages; the value of Plaintiffs' time in responding to the Spill; punitive damages; and other appropriate relief.

**Count X: Public Nuisance**

93. Plaintiffs replead and reallege Paragraphs 1-92 above, as if fully set forth herein.

94. Defendants, individually or in concert, are wholly responsible for the Spill and all resulting damages to Plaintiffs. The Spill, which deposited 17,000 gallons of Resin Oil Heavies onto the soil and water at the Spill Site – much of which contamination remains – affects an interest common to the general public. Specifically, Defendants have polluted, continue to pollute, and/or threaten to pollute public waters, including the Mississippi River Alluvial Aquifer and the Tallahatchie River.

95. Plaintiffs have suffered particular harm from this public nuisance, as Defendants' pollution of the said public waters impairs Plaintiffs' ability to safely grow crops for market on their property, or to safely consume game hunted on their property.

96. Plaintiffs seek an injunction requiring Defendants to abate the public nuisance, along with damages for lost profits; diminution of rental and usable value of their property; lost use and enjoyment of the property; lost timber value; lost timber growth; removal and killing of trees; lost rent; incidental damages; the value of Plaintiffs' time in responding to the Spill; punitive damages; and other appropriate relief.

**Count XI: Public Nuisance Per Se**

97. Plaintiffs replead and reallege Paragraphs 1-96 above, as if fully set forth herein.

98. The Spill itself, along with the dumping of solid waste during Illinois Central and/or Canadian National's "cleanup" efforts, constitute an "unauthorized dump" as defined at Miss. Code Ann. § 17-17-3(dd).

99. Pursuant to Miss. Code Ann. § 17-17-17, the "formation of unauthorized dumps is hereby declared to be a public nuisance per se, menacing public health and unlawful."

100. Plaintiffs seek an injunction pursuant to Miss. Code Ann. § 17-17-17 requiring Defendants to remove the solid and hazardous waste at the Spill Site.

**Count XII: Trespass**

101. Plaintiffs replead and reallege Paragraphs 1-100 above, as if fully set forth herein.

102. Defendants, individually, or in concert, are wholly responsible for the Spill and all resulting damages to Plaintiffs. The Spill, which deposited 17,000 gallons of Resin Oil Heavies onto Plaintiffs' real property – much of which contamination remains – constitutes interference

with Plaintiffs' right of exclusive possession of their land and is the direct result of Defendants' actions.

103. Defendants intentionally invaded Plaintiffs' land without an invitation, license, or other right to do so, and interfered with Plaintiffs' right to exclusive possession of their land.

104. Additionally, in the course of the clean-up undertaken by Illinois Central and Canadian National, said Defendants, without permission of Plaintiffs, trespassed upon Plaintiffs' property, left train-wreck debris and pieces of train track, placed foreign materials upon Plaintiffs' property outside the boundaries of Illinois Central's and/or Canadian National's easement, caused physical damages to Plaintiffs' property, expanded their railroad track bed beyond the boundaries of their right-of-way and onto Plaintiffs' property, and interfered with Plaintiffs' free use and enjoyment of their own property.

105. Additionally and/or alternatively, said Defendants' conduct was grossly negligent and in reckless disregard of Plaintiffs' rights.

106. Plaintiffs seek damages for the physical damage done to their property, including but not limited to that done by Defendants' placement of slag, rocks, clay, and other foreign materials on Plaintiffs' property; lost profits, including potential future lost profits due to continued crop contamination or market perception of crop contamination; potential future lost revenues from Spill-related exclusion from Federal agricultural programs; lost rent; lost use and enjoyment of the property; lost timber value; lost timber growth; removal and killing of trees; the value of Plaintiffs' time in responding to the Spill; punitive damages; and other appropriate relief, including injunctive relief requiring Defendants Illinois Central and/or Canadian National to remove all items wrongfully placed upon Plaintiffs' property by said Defendants.

**Count XIII: Strict Liability**

107. Plaintiffs replead and reallege Paragraphs 1-106 above, as if fully set forth herein.

108. As set forth above, the Spill constitutes a physical invasion of Plaintiffs' land for which Defendants were responsible.

109. Regardless of Defendants' negligence, Mississippi law provides for recovery under a strict liability theory where a defendant is shown to be responsible for a physical invasion of a plaintiff's property, which causes damages to the plaintiff.

110. Plaintiffs are entitled to consequential damages for Defendants' clear physical invasion of Plaintiffs' property.

**Count XIV: Injunctive Relief**

111. Plaintiffs replead and reallege Paragraphs 1-110 above, as if fully set forth herein.

112. The actions or inactions of Defendants have caused or resulted in the continued and ongoing pollution and damage to the Spill Site, and/or other portions of Plaintiffs' property.

113. Defendants, or any of them, should be ordered to remediate, abate or remove all such chemicals and/or materials which Plaintiffs have placed, or caused to be placed, upon Plaintiffs' property.

114. Accordingly, Plaintiffs request the Court to enter an injunction order requiring the Defendants, or certain of them, to fully remove, remediate or abate all such pollution, contamination or improperly placed material presently existing on Plaintiffs' property, in soil groundwater, and surface water; to take all necessary steps to ensure contamination does not migrate from adjacent property onto Plaintiffs' property; to take all necessary steps to return Plaintiffs' Property to its pre-Spill condition, including returning the Property to its pre-Spill drainage conditions and returning the soil to cultivatable condition; and other appropriate relief.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Melton Properties, LLC; Floyd M. Melton, Jr.; Floyd M. Melton III; Moss B. Melton; McMillan Acres; Danny Hargett; Jane Hart McMillan Hargett; and David Hargett, asserting claims on behalf of themselves, some of which accrued directly to them and some of which are assigned to them, respectfully request the following relief:

a. Injunctive relief requiring Defendants to fully remediate the contamination to soil, groundwater, and surface water on Plaintiffs' property;

b. Injunctive relief requiring Defendants to immediately vacate Plaintiffs' property outside of easements held by Defendants;

c. Injunctive relief requiring Defendants to repair and stabilize the railroad track that runs through Plaintiffs' property sufficient to prevent similar derailments in the future;

d. Money damages;

e. Potential future damages;

f. Punitive damages;

g. Attorneys' fees;

h. Expert fees;

i. Costs; and

j. Such other relief as the Court deems necessary and appropriate.

Respectfully submitted, this the 27th day of March, 2018.

Melton Properties, LLC, Floyd M. Melton, Jr., Floyd M. Melton III, Moss B. Melton, McMillan Acres, Danny Hargett, Jane Hart McMillan Hargett and David Hargett

By: /s/ Keith W. Turner
Keith W. Turner

OF COUNSEL:

Keith W. Turner (MSB No. 99252)
Louis B. Lanoux (MSB No. 8480)
Betty Ruth Fox (MSB No. 8360)
W. Abram Orlansky (MSB No. 104172)
Watkins & Eager PLLC
400 East Capitol Street
Jackson, Mississippi 39201
Post Office Box 650
Jackson, Mississippi 39205
Telephone: (601) 965-1900
Facsimile: (601) 965-1901
Email: kturner@watkinseager.com
llanoux@watkinseager.com
bfox@watkinseager.com
aorlansky@watkinseager.com

William C. Spencer (MSB No. 7732)
William C. Spencer, Jr. (MSB No. 10365)
Spencer Law Firm
Post Office Box 907
Tupelo, Mississippi 38802
Telephone: (662) 821-1731
Facsimile: (662) 842-6870
Email: spencerlawms@gmail.com
bspencerjr13@gmail.com