IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**MELTON PROPERTIES, LLC., et al.**                                               **PLAINTIFFS**

**V.**                                                                                     **NO. 4:18-CV-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD**
**COMPANY, et al.**                                                                              **DEFENDANTS**

**ORDER**

Before the Court is Canadian National Railway's motion to dismiss for lack of personal jurisdiction or, alternatively, for failure to state a claim. Doc. #80.

**I**
**Procedural History**

On March 27, 2018, Melton Properties, LLC; Floyd M. Melton, Jr.; Floyd M. Melton III; Moss B. Melton (collectively, "Melton Plaintiffs"); McMillan Acres; Danny Hargett; Jane Hart McMillan Hargett; and David Hargett filed this action in the United States District Court for the Northern District of Mississippi against Illinois Central Railroad Company; Canadian National Railway; Union Tank Car Company, Inc.; and certain fictitious parties. Doc. #1. The complaint, as amended,[1] asserts state and federal claims arising from a toxic spill caused by a March 30, 2015, derailment of a railcar owned by Union Tank, which was being transported by "Illinois Central and/or Canadian National" on tracks "owned by Illinois Central and/or Canadian National." Doc. #92 at ¶¶ 14–15, 36–114. The plaintiffs, all property owners near the site of the spill in Leflore County, Mississippi (known as the Minter City site), also assert claims related to the remediation of the spill. *Id*. at ¶¶ 69–72.

---

[1] On November 6, 2019, the Court directed the plaintiffs to file an amended complaint to correct deficiencies in the jurisdictional allegations. Doc. #91. The plaintiffs filed the amended complaint two days later. Doc. #92. But for the corrections to the jurisdictional allegations, the two pleadings are identical.

On August 23, 2018, Canadian National filed a motion to dismiss for lack of personal jurisdiction or, alternatively, for failure to state a claim. Doc. #31. Approximately a month later, United States Magistrate Judge Jane M. Virden, on the plaintiffs' motion, authorized the following jurisdiction-related discovery:

> Plaintiffs will be allowed to propound up to 20 Interrogatories, 20 Requests for Production, and 20 Requests for Admission to each Defendant, and the Defendants shall respond thereto within thirty (30) days, in accordance with the Federal Rules of Civil Procedure. Should it desire to do so, Canadian National Railway Company may propound a similar number of written discovery items in compliance with the provisions of this paragraph.
>
> The Plaintiffs will also be allowed to depose under Rule 30(b)(6), Fed.R.Civ.P., the corporate representative(s) of Illinois Central Railroad Company (Illinois Central") and Canadian National Railway Company during the discovery period.
>
> Prior to taking a Rule 30(b)(6) deposition of Canadian National Railway Company and/or Illinois Central, Plaintiffs may depose, and/or subpoena documents as may be necessary from the following individuals: Nathan Judice, Anthony Dale, David Smith, Charles Brown, and Patrick Waldron. Based upon Canadian National Railway Company's discovery responses and/or the depositions or subpoena responses of all or some of the above-named individuals and/or Canadian National Railway Company and/or Illinois Central, Plaintiffs and Defendants may agree to additional discovery within the discovery period. However, if no agreement is possible, Plaintiffs may seek relief from the Court by motion.
>
> Defendant Canadian National Railway Company will be allowed to depose at its discretion Floyd Melton, III during the 60-day discovery period, since he submitted an Affidavit in Opposition to the Motion to Dismiss. The parties may obtain documents from third parties by subpoena as deemed necessary.

Doc. #40 at 3–4. Due to the ongoing jurisdictional discovery, this Court denied without prejudice Canadian National's motion to dismiss. Doc. #51.

On March 26, 2019, after the close of jurisdictional discovery, Canadian National filed a motion to dismiss for lack of personal jurisdiction or, alternatively, for failure to state a claim.

Doc. #80.  The motion has been fully briefed.  *See* Docs. #81, #83, #90.[2]

## II
## Personal Jurisdiction Standard[3]

To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff, in the absence of an "evidentiary hearing," "bears the burden of establishing only a *prima facie* case of personal jurisdiction."  *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019).  In making this determination, a court must "accept the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor."  *Id*.  When there has been an evidentiary hearing, the plaintiff must establish jurisdiction by a preponderance of the evidence.  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008).  A party receives an evidentiary hearing when it is "allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue," and when a hearing with live testimony is provided if warranted and "requested."  *Id*.; *see In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 583 n.7 (5th Cir. 2014) (affirming district court "determin[ation] that it had held an evidentiary hearing on discovery because it relied on discovery evidence, including depositions"); *see generally SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 356 (6th Cir. 2014) ("When … the district court allows discovery on the motion, the court should consider the facts offered by both parties and rule according to the preponderance of the evidence.").  Live testimony is warranted if it "would help resolve factual disputes dispositive of the jurisdictional question …."  *Walk Haydel*, 517 F.3d at 242.

---

[2] Canadian National was directed to re-file its reply brief in compliance with Local Rule 7(b)(5)'s page limit requirements.  *See* Doc. #89.

[3] A court should resolve a motion to dismiss for lack of personal jurisdiction before addressing a motion to dismiss for failure to state a claim.  *Pervasive Software Inc. v. Lexware GmbH & Co. Kg*, 688 F.3d 214, 232 (5th Cir. 2012).

Here, the parties were granted substantial and largely unfettered jurisdictional discovery over a two-month period, which included the right to conduct Rule 30(b)(6) depositions and to issue twenty requests for admission, twenty interrogatories, and twenty requests for production. Jurisdictional discovery was conducted within the allowed parameters during that two-month period and beyond.[4] No party has objected to the adequacy of this discovery or has requested a live evidentiary hearing. Furthermore, the record as presented reveals no disputed dispositive issue of fact which live testimony would help resolve. Accordingly, under these circumstances, the Court concludes that an evidentiary hearing was afforded and that, therefore, the preponderance of evidence standard applies.

## III
## Jurisdictional Facts

As discussed below, jurisdiction over Canadian National involves two factual inquiries: (1) Canadian National's corporate structure and general involvement in Illinois Central's operations and (2) Canadian National's specific involvement in the cleanup of the spill at issue here.

### A. Corporate Structure and Operation

Canadian National is a Canadian corporation operating as a railroad in Canada which maintains its principal place of business in Montreal, Canada. Doc. #80-1 at ¶¶ 3–4. The entity is not registered to do business in Mississippi, has no employees in Mississippi, owns no land or tracks in Mississippi, and does not maintain an agent for service in Mississippi. *Id*.

Illinois Central is an Illinois corporation with its principal place of business in Illinois. *Id*. at ¶ 5. Illinois Central is connected to Canadian National through the following corporate

---

[4] *See* Docs. ##41–47, #49, #50, ##52–56, #77, #78.

structure: (1) Illinois Central is a wholly-owned subsidiary of Illinois Central Corporation; (2) Illinois Central Corporation is a wholly-owned subsidiary of CN Financial Services VIII LLC; (3) CN Financial is a wholly-owned subsidiary of Grand Trunk Corporation; (4) Grand Trunk is a wholly-owned subsidiary of North American Railways, Inc.; (5) North American Railways is a wholly-owned subsidiary of Canadian National. *Id*. at ¶ 6.

From approximately 1998 until July of 2004, Illinois Central did business under the names "Canadian National/Illinois Central Railroad" or "CN/IC." *Id*. at ¶ 8. It does, however, use and operate under the trade name "CN" and utilize a "CN" logo. *Id*. Notwithstanding utilization of the CN trade name, Illinois Central maintains its own articles of incorporation and corporate records, conducts meetings with its board of directors, and makes required corporate filings. *Id*. at ¶ 10.

Canadian National and its wholly owned subsidiaries (collectively, "CN Entities") together operate rail operations in Canada and the United States "as one business segment." Doc. #83-14 at 13. To this end, the CN Entities utilize a shared "Safety Management System (SMS)." Doc. #83-15 at 113. As a part of the shared operations, which are conducted under the CN name, the CN Entities employ "Wi-Tronix," "a locomotive telemetry system" which transmits train information to a shared regional operations center in Homewood, Illinois. *Id*. at 28; Doc. #83-16 at 22. In addition to SMS, the CN Entities maintain a CN portal website,[5] owned and operated by Canadian National, which allows customers to access services provided by the CN Entities as a whole. Doc. #83-17 at 1; Doc. #83-18 at 4; Doc. #83-16 at 12. Although it appears various subsidiaries employ their own police forces, "administrative responsibility for oversight" of the

---

[5] Illinois Central employees also appear to use the Canadian National domain for their e-mail addresses. *See* Doc. #83-1 at ¶ 5.

police force rests with a Canadian National employee.[6] Doc. #83-16 at 12–14.

## B. Case-Specific Facts

It is undisputed that the railroad tracks and railroad right-of-way at the location of the derailment are owned by Illinois Central. Doc. #80-2. It is also undisputed that none of the ten railroad cars involved in the derailment were owned by Canadian National. Doc. #80-3. Further, it is undisputed that Canadian National did not operate the train involved in the derailment. Doc. #80-1 at ¶ 4.

During the relevant time period, primary responsibility for "emergency response and remediation actions" at the derailment site rested with three Illinois Central environmental managers—Charles Brown, Robert Strong, and Joe Phelps. Doc. #80-18 at 1–2. These employees were managed by Devin Sprinkle, Illinois Central's Regional Manager – Environment. *Id*.

In his role as regional manager, Sprinkle made "day to day decisions with regard to the … Derailment usually after consultation" with Brown, Strong, and Phelps. *Id*. at 2. Sprinkle was also responsible for liaising with Normand Pellerin, Canadian National's Assistant Vice President – Environment, on the remediation efforts. *Id*. According to Sprinkle, it was (and remains) necessary to keep Pellerin, who Sprinkle referred to as his "supervisor,"[7] advised as to Illinois Central's "intended remediation actions in order to administer a budget and to secure approval of

---

[6] In opposition to the motion to dismiss, the plaintiffs contend that "CNRC personnel … regularly visited Mississippi to direct and/or assist with responses to derailments and other emergencies" and that "it was standard operating procedure … that CNRC personnel would make final decisions regarding the companies' course of action after emergencies …." Doc. #83 at 9. As support for these assertions, the plaintiffs submitted an affidavit of James Matthew Hudson, an inspector with Illinois Central's Mississippi operations from 2004 until 2012. *See* Doc. #83-22 at ¶ 1. Canadian National argues the affidavit is "false" because "[w]hile Hudson swears that numerous unnamed CNRC employees were on site and directed response and remediation efforts at prior events, Hudson identifies only two (2) of these CNRC employees," one of whom was actually employed by Illinois Central during the relevant time period. Doc. #90 at 11–12. While the Court does not believe that a failure to recall names or the misidentification of an employee renders the affidavit false as a whole, the document, as explained below, is of limited value.

[7] Doc. #83-5.

6

the funding of such a major project." *Id*.

Throughout the course of remediation efforts, Brown made initial decisions regarding costs for mediation. Doc. #80-9 at 23–24. These decisions were reviewed by Sprinkle, who would make "technical adjustment[s]," and then forwarded to Pellerin and Stella Karnis[8] for ultimate approval. *Id*. at 23–25. For example, Pellerin was asked to authorize overtime for Illinois Central employees;[9] and to authorize soil purchases at the derailment site.[10] In this regard, Pellerin received updates on the remediation plans for the derailment site,[11] and inquired about the viability of potential courses of action.[12] When vendors submitted invoices over budget, Pellerin demanded explanations from Sprinkle.[13] Doc. #83-11; Doc. #80-18 at 5. However, according to Brown, neither Pellerin nor Canadian National as a company "made decisions or issued directives concerning remediation efforts or future remediation efforts."[14] Doc. #90-1 at 2. Indeed, despite

---

[8] Stella Karnis "manages the … financial aspects" of the "Minter City Project." Doc. #80-9 at 19, 23–25. It is unclear whether she is an employee of Canadian National or Illinois Central.

[9] Doc. #83-6.

[10] *See* Docs. #83-12, #83-13, #80-18 at 5.

[11] *See* Docs. #83-9, #83-4, #83-8, #83-10.

[12] *See* Doc. #83-7.

[13] The plaintiffs have submitted an e-mail chain in which (1) Canadian National's Accounts Payable office e-mailed Robert Strong stating, "Can you please get the approval from your Senior Manager to have this vendor [Enhanced Environmental & Emergency Response Services] created. All new vendor request [sic] under Operations now need to be approved by the Senior Manager;" (2) Strong e-mailed Sprinkle stating, "This was for the carbon setup at Minter City. Please handle for approval;" and (3) Sprinkle e-mailed Craig Williston (an employee whose position is unclear), with Pellerin and Strong copied stating, "I hereby approve the use of this vendor. I've copied Normand. Please advise if the approval must gone [sic] from his level." Doc. #83-3. The plaintiffs contend "[t]his email … illustrates Sprinkle's understanding that CNRC personnel had input into the selection of specific vendors." Doc. #83 at 2–3. The e-mail chain does not illustrate this point. Sprinkle submitted an affidavit stating that the e-mail did not refer to *selection* of a vendor but rather "concerned getting this company, who was new to the CN system, set up in the computer system such that it could submit its invoices…." Doc. #80-18 at 3. This assertion is supported by the text of the e-mail chain, which specifically refers to the *creation* of the vendor.

[14] The plaintiffs argue the evidence shows a greater degree of control because on numerous occasions, Brown referred to business decisions, including decisions related to remediation, being made in "Montreal." Doc. #83 at 2–3 (citing Doc. #83-1 at 1–2). In response, Brown submitted an affidavit stating that his references to Montreal "concerned the fact that it is one of Devin Sprinkle's duties to keep the parent corporation advised" and that it was necessary to keep Montreal informed "in order to secure … budgetary authority for remediation activities …." Doc. #90-1 at 2. Brown's explanation for the "Montreal" references is consistent with the weight of evidence, which shows that Canadian National's involvement was limited to budgetary decisions.

7

his budgetary concerns, Pellerin never rejected a proposed expenditure from the Illinois Central employees. Doc. #80-9 at 24.

## IV
## Personal Jurisdiction

"Generally, a federal court may assert personal jurisdiction if the state long-arm statute permits jurisdiction and the exercise of such jurisdiction would not violate due process." *Conn Appliances, Inc. v. Williams*, 936 F.3d 345, 347 (5th Cir. 2019).

### A. Long-Arm Statute

Under the personal jurisdiction analysis, a court must "first examine whether [a] defendant[] [is] amenable to suit under the Mississippi long-arm statute." *ITL Int'l Inc. v. Constenla, S.A.*, 669 F.3d 493, 496–97 (5th Cir. 2012).

Mississippi's long arm statute provides in relevant part:

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13–3–57. "The three prongs of the long-arm statute are commonly referred to as the contract prong, the tort prong, and the doing-business prong." *ITL Int'l*, 669 F.3d at 497. The plaintiffs assert jurisdiction under the tort prong and the doing-business prong. *See* Doc. #83 at 12–14.

### 1. Tort prong

"Under the tort prong of the Mississippi long-arm statute, personal jurisdiction is proper if any element of the tort (or any part of any element) takes place in Mississippi." *Allred v. Moore*

8

& *Peterson*, 117 F.3d 278, 282 (5th Cir. 1997). The "long-arm statute contains no requirement that the part of the tort which causes the injury be committed in Mississippi. Rather, … a tort is committed in Mississippi when the injury results in this State." *Horne v. Mobile Area Water & Sewer Sys.*, 897 So. 2d 973, 977 (Miss. 2004) (citation omitted). However, the statute requires the existence of an actual tortious act. *See Mortensen Constr. & Util., Inc. v. Grinnell Mut. Reinsurance Co.*, 718 F. Supp. 2d 781, 784 (S.D. Miss. 2010) ("Even assuming it could be fairly said that some part of Grinnell's investigation of AT&T's claim occurred in Mississippi, that would not support an exercise of personal jurisdiction under the tort prong of the long-arm statute, as Mortensen has not alleged that Grinnell committed any tort in connection with its investigation."). The tortious act must be attributable to the defendant. *See Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1119–20 (Miss. 2012) (no personal jurisdiction over parent for acts of subsidiary).

The plaintiffs assert jurisdiction under the tort prong because "[t]he complaint alleges that CNRC committed a tort in Mississippi when CNRC, by its participation in the decision-making process, caused or contributed to the emergency response and/or remediation being performed below industry standards, and/or in a grossly negligent fashion, leaving the property contaminated rather than in its pre-accident condition." Doc. #83 at 12.

Ordinarily, a parent corporation may be said to act only if it acted on its own. *See Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 63 (Miss. 2004) (direct liability for parent when parent "actively participated" in the alleged wrongful conduct). However, courts have held that "parents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership." *Pearson v. Component Tech. Corp.*, 247 F.3d

9

471, 471 (3d Cir. 2001) (quoting *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)). To invoke this exception, the parent must have "forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct legal personality." *Id*. Activities "consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Bestfoods*, 524 U.S. at 72.

Here, the plaintiffs have offered no evidence of a specific tortious act taken by Canadian National itself. To the contrary, the evidence shows that remediation efforts which form the subject of the claims asserted against Canadian National were formally undertaken by Illinois Central. *See* Doc. #90-1 at 2–3. However, the plaintiffs, citing *Forsythe v. Clark USA, Inc.*, 864 N.E. 2d 227, 237 (Ill. 2007), authority not binding on this Court, argue that Canadian National's involvement in Illinois Central's decision-making renders it directly liable. Doc. #83 at 16–17.

In *Forsythe*, the estates of mechanics killed in a refinery accident sought to impose liability against the refinery owner's parent corporation on the theory that the parent, through specific budget policies, "demanded [the subsidiary] operate its refinery pursuant to an overall business strategy that it knew would adversely affect safety by forcing reductions in training and maintenance." 864 N.E. 2d at 232. In considering this argument, the Illinois Supreme Court, relying on *Bestfoods* and other authorities, held:

> Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy and carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability. The key elements to the application of direct participant liability, then, are a parent's specific direction or authorization of the manner in which an activity is undertaken and foreseeability. If a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of

10

action are undertaken, it can be liable for foreseeable injuries.

864 N.E. 2d at 237. Applying this standard, the *Forsythe* court held that if the parent's officer "directed or authorized the manner in which the budget cuts at issue were taken, knowing that safety at the … refinery would be compromised, and did so superseding the discretion and interest of [the subsidiary], direct participant liability could attach." *Id*. at 240. Thus, to establish a direct-liability basis for liability under *Forsythe*, a plaintiff must show that (1) the parent company mandated a particular strategy; and (2) the parent company implemented the strategy by specific direction or authorization which surpassed "the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary." Assuming such a basis exists, the relevant conduct must be tortious. *See id*. at 237 (liability based on foreseeability of injury).

Assuming without deciding that Mississippi would recognize the forced-action theory of parent liability, the plaintiffs have failed to establish by a preponderance of the evidence the facts necessary for such liability. First, there is absolutely no evidence that Canadian National *mandated* a strategy to Illinois Central. Even if it had, there is no evidence such a strategy was specifically directed or authorized in a manner which exceeded the normal incident of ownership for a parent corporation. Indeed, it appears that all decisions made by Canadian National related to Illinois Central's expenditures and that Canadian National never rejected a proposed expense. *See Bestfoods*, 524 U.S. at 72 (listing "supervision of the subsidiary's finance and capital budget decisions" as activities "consistent with the parent's investor status"). Finally, the plaintiffs have not argued how the claimed injuries in this case were foreseeable from such conduct. In the absence of such evidence, the tort prong does not apply in this case.

## 2. Doing-business prong

The doing-business prong, "by its plain terms, applies to any person or corporation

11

performing any character of work in th[e] state." *Estate of Jones v. Phillips ex rel. Phillips*, 992 So. 2d 1131, 1139 (Miss. 2008). In invoking the doing-business prong, the plaintiffs argue:

> CNRC's business model, telemetry data system, CN Portal, CN Police, CN Logo, and participation in past ICRR emergency responses all illustrate that CNRC regularly does business in Mississippi. Combined with the evidence of CNRC's direct participation in the emergency response and remediation of the subject derailment and spill, these factors illustrate that CNRC is subject to Mississippi's long-arm statute under the "doing business" prong ….

Doc. #83 at 14. Beyond citing the general standard for the doing-business prong, that quoted above represents the plaintiffs' entire argument on this point. In light of this cursory briefing, the Court declines to consider the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.").

### B. Due Process

Having found no jurisdiction under the tort and doing-business prongs of Mississippi's long-arm statute, the Court need not reach the issue of due process. *See Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 621 (5th Cir. 1989) ("There being no basis for jurisdiction under Mississippi law as to any of the defendants in this case, we do not reach the question whether jurisdiction may be asserted consistent with the due process clause of the fourteenth amendment to the United States Constitution …."). The Court, however, will address due process out of an abundance of caution.

"Due process requires that the defendant have minimum contacts with the forum state (i.e., that the defendant has purposely availed himself of the privilege of conducting activities within the forum state) and that exercising jurisdiction is consistent with traditional notions of fair play and substantial justice." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 97, 101 (5th Cir. 2018) (quotation marks omitted) (emphasis omitted). "Minimum contacts can give rise to

either specific jurisdiction or general jurisdiction." *Id*. (quotation marks omitted). "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Id*. at 102.

### 1. General jurisdiction

General jurisdiction requires "continuous and systematic forum contacts and allows for jurisdiction over all claims against the defendant, no matter their connection to the forum." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig*., 888 F.3d 753, 778 (5th Cir. 2018) (quotation marks omitted). "Establishing general jurisdiction is difficult and requires extensive contacts between a defendant and a forum." *Sangha*, 882 F.3d at 101–02 (quotation marks omitted).

The plaintiffs argue Canadian National is subject to general jurisdiction in Mississippi based on Canadian National's (1) operation of the CN web portal; (2) use of the CN logo; (3) purported "standard operating procedure" directing response activities; and (4) invoking "the benefits and protections of the State of Mississippi by operating a private police force, whose Mississippi-based officers are ultimately supervised by [Canadian National] Chief of Police and Chief Security Officer Stephen Covey." Doc. #83 at 19–20. The plaintiffs contend exercise of jurisdiction based on the police force is particularly appropriate because railroad police "officers in Mississippi are granted police powers pursuant to Mississippi statute." *Id*. at 19 (citing Miss. Code Ann. § 77-9-501, et seq.).[15]

First, "the Fifth Circuit has rejected the argument that a defendant's internet presence

---

[15] Despite suggesting the businesses are intertwined, the plaintiffs do not seek to impute Illinois Central's contacts to Canadian National.

13

within a forum state supports general jurisdiction." *Head v. Las Vegas Sands, L.L.C.*, 760 F. App'x 281, 284 n.3 (5th Cir. 2019) (citing *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)).

Second, while presenting a "unified image to the public" may be relevant to the alter-ego theory of general jurisdiction,[16] the plaintiffs have not advanced such an argument. In the absence of alter ego evidence, courts have declined to find sufficient contacts based on a shared use of a trademark or logo. *See, e.g., Herman v. YellowPages.com, LLC*, 780 F. Supp. 2d 1028, 1034 (S.D. Cal. 2011) (shared use of AT&T logo insufficient for general jurisdiction); *U.S. ex rel Banigan v. Organon USA Inc.*, No. 07-12153, 2012 WL 1190826, at *6 (D. Mass. Apr. 9, 2012) ("Relators cite no relevant authority to support their claim that owning a trademark or logo is a 'continuous and systematic contact' for general jurisdiction purposes. To find otherwise on these facts would be to subject a parent company to potential liability whenever one of its subsidiaries uses the parent's mark or logo.") (footnote omitted).

Third, the plaintiffs have failed to introduce sufficient evidence regarding Canadian National's involvement in clean-up actions. "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 716 (5th Cir. 1999). This period is ordinarily approximately six years. *See id.* (considering time period between 1990 and 1996). The only evidence offered by the plaintiffs regarding Canadian National's clean-up involvement is an affidavit of James Matthew Hudson. To the extent Hudson left his employment in 2012, the bulk of his experience is irrelevant to the general jurisdiction inquiry. More important, while the affidavit refers to the general practice regarding Canadian National's involvement in

---

[16] *See Hoffman v. United Telecomms., Inc.*, 575 F. Supp. 1463, 1472 (D. Kan. 1983).

remediation activities, it offers no evidence as to the *frequency* of such contacts. Without such evidence, the affidavit is of little evidentiary value. *See generally Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008) ("[V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction.").

Fourth, while the plaintiffs have established evidence that Canadian National had "administrative oversight" over Illinois Central's police force in Mississippi, they have introduced no evidence as to what this oversight entailed. As with the clean-up efforts, this failure to show the *extent* of the contacts at issue precludes a finding of general jurisdiction.

In sum, the plaintiffs have introduced evidence showing some level of contacts between Canadian National and Mississippi. This evidence, however, falls far short of the standard for establishing general jurisdiction.

### 2. Specific jurisdiction

Specific jurisdiction requires only that the defendant have "purposefully direct[ed] his activities toward the state" and that the plaintiff's claim "arises out of or is related to the defendant's forum contacts." *DePuy*, 888 F.3d at 778 (quotation marks and alterations omitted). "In this circuit, specific personal jurisdiction is a claim-specific inquiry" such that "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

In arguing specific jurisdiction, the plaintiffs rely on the *Bestfoods/Forsythe* theory of direct liability, discussed above, to assert claims against Canadian National based on the remediation efforts. Doc. #83 at 16–18. For the reasons above, the Court finds no specific jurisdiction over such claims.

15

## V
## Failure to State a Claim

Having found no personal jurisdiction over Canadian National, the Court declines to address Canadian National's alternative arguments related to the merits of the plaintiffs' claims against it. *See Pervasive Software*, 688 at 232 ("[W]e see no error in the district court's decision to dispose of the personal jurisdiction issue first and in not proceeding further after concluding that it lacked personal jurisdiction over Lexware.").

## VI
## Conclusion

Canadian National's motion to dismiss [80] is **GRANTED**.

**SO ORDERED**, this 14th day of November, 2019.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**