**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**MELTON PROPERTIES, LLC., et al.**                                    **PLAINTIFFS**

**V.**                                                        **NO. 4:18-CV-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD**
**COMPANY, et al.**                                               **DEFENDANTS**

## OPINION AND ORDER

Before the Court are "Illinois Central Railroad Company's Motion to Dismiss Plaintiffs' Claims Related to Remediation," Doc. #108; Illinois Central's motion to strike four exhibits the plaintiffs' submitted in response, Doc. #177; and the plaintiffs' motion to supplement their response, Doc. #180.

## I
## Procedural History

On March 27, 2018, Melton Properties, LLC; Floyd M. Melton, Jr.; Floyd M. Melton III; Moss B. Melton; McMillan Acres; Danny Hargett; Jane Hart McMillan Hargett; and David Hargett filed this action in the United States District Court for the Northern District of Mississippi against Illinois Central Railroad Company; Canadian National Railway; Union Tank Car Company, Inc.; and certain fictitious parties. Doc. #1. The complaint, as amended,[1] asserted state and federal claims arising from a toxic spill caused by a March 30, 2015, derailment of a railcar owned by Union Tank, which was being transported by "Illinois Central and/or Canadian National" on tracks "owned by Illinois Central and/or Canadian National." Doc. #92 at ¶¶ 14–15, 36–114. The plaintiffs, all property owners or farmers near the site of the spill in Leflore County, Mississippi

---

[1] On November 6, 2019, the Court directed the plaintiffs to file an amended complaint to correct deficiencies in the jurisdictional allegations. Doc. #91. The plaintiffs filed a "First Amended Complaint" two days later. Doc. #92. But for the corrections to the jurisdictional allegations, the two pleadings are identical.

(known as the Minter City site), also asserted claims related to the remediation of the spill. *Id.* at ¶¶ 69–72.

On May 22, 2018, the plaintiffs filed an unopposed motion to stay "all proceedings in this matter until such time as Plaintiffs have exhausted their administrative remedies." Doc. #20 at 4. As grounds for the stay, the plaintiffs represented that the Mississippi Commission on Environmental Quality

> has administrative authority to conduct a hearing on Plaintiffs' grievances with the MDEQ-approved Corrective Action Plan. Miss. Code Ann. §§ 49-17-13, 49-17-17, and 49-17-35. Many of Plaintiffs' claims for injunctive relief in this action, seeking adequate and proper cleanup of the harmful chemicals spilled due to the train derailment, are subject to the Commission's administrative process. *See id.* The Commission administrative process has been duly invoked and is presently running its course.

*Id.* at 2. The motion further stated, "while Plaintiffs' Complaint before this Court includes tort claims, this litigation should be subject to a general stay until the Commission's process is complete because the Complaint asserts claims which are clearly within the primary jurisdiction of the Commission." *Id.* at 3. The same day they filed the motion to stay, the plaintiffs voluntarily dismissed Union Tank Car Company. Doc. #19.

On June 6, 2018, United States Magistrate Judge Jane M. Virden granted the motion to stay in part, staying the "case for the earlier of a 60-day period from the date of this Order or the completion of the Mississippi Commission on Environmental Quality's hearing on the Plaintiffs' claims regarding the Corrective Action Plan for Plaintiffs' property." Doc. #22 at 1. Judge Virden's order noted that if the order expired as a result of the sixty-day deadline, "the parties may move for a further stay, premised on legal authorities." *Id.*

On August 3, 2018, the plaintiffs, relying on the same legal authorities as their initial motion, filed a second unopposed motion to stay. Doc. #26. Five days later, Judge Virden granted

the motion to stay in part, "in accordance with the court's discussion from the bench [at an August 7, 2018] motion hearing." Judge Virden's text order noted that "[t]he details of the stay, as granted, will be formalized in the Case Management Order."

On August 23, 2018, Canadian National filed a motion to dismiss for lack of personal jurisdiction. Doc. #31. Illinois Central answered the complaint on August 29, 2018. Doc. #34. On November 14, 2019, the Court dismissed Canadian National for lack of personal jurisdiction. Doc. #93.

On February 11, 2020, Illinois Central filed a "Motion to Dismiss Plaintiffs' Claims Related to Remediation." Doc. #108. After receiving an extension to respond to the motion to dismiss, Doc. #114, the plaintiffs filed a motion for leave to file a second amended complaint on these grounds:

> [S]ince the filing of the original Complaint, additional events have transpired including the dismissal of Canadian National Railway and Union Tank Car Company, Inc., and Defendant Illinois Central Railroad Company has failed to comply with the MDEQ-approved Corrective Action Plan. Thus, the Plaintiffs desire, and think it necessary, to reflect these additional facts and to clarify allegations previously made, pursuant to F.R.C.P. 15, which provides that leave to amend shall be freely given.

Doc. #119 at 1. On March 9, 2020, Judge Virden granted the plaintiffs' motion to amend. The second amended complaint was filed the same day. Doc. #127. The plaintiffs responded to the motion to dismiss one day later. Doc. #128.

On March 23, 2020, Illinois Central filed an answer to the second amended complaint. Doc. #139. It replied in support of its motion to dismiss two days later. Doc. #140.

On June 22, 2020, the plaintiffs filed four supplemental exhibits to their response to the motion to dismiss. *See* Docs. #176-1, #176-2, #176-3, #176-4. Illinois Central promptly moved to strike these exhibits as untimely. Doc. #177. The plaintiffs filed a response to the motion to

3

strike which conceded that the motion should be granted. Doc. #179. The plaintiffs also filed a motion for leave to file as supplemental exhibits to their response the same documents they untimely filed on June 22, Doc. #180, which Illinois Central opposes in part, Doc. #187.

## II
## Motion to Strike and Motion to Supplement

In its motion to strike, Illinois Central argues that "[t]he applicable case law dictates that once the briefing is closed on a motion a party must seek and obtain leave of court before filing a surreply or otherwise supplementing the record." Doc. #177 at 2. Because the plaintiffs do not dispute that this is the case or that the June 22 supplemental exhibits were filed without leave and should be stricken, the motion to strike these documents is granted.

Turning to the plaintiffs' motion to supplement, the plaintiffs seek leave to file four exhibits—labeled D through G and attached to the motion to supplement—in support of their motion to dismiss. Doc. #181. As grounds, the plaintiffs represent that the documents are relevant to the ongoing MDEQ regulatory proceedings relevant to this action, and that the evidence did not exist at the time their initial response was filed. *Id.* at 2–3.

Illinois Central does not oppose the motion to the extent it seeks to introduce proposed exhibits D, E, and F. Doc. #188 at 2. However, Illinois Central argues that proposed Exhibit G, which is a letter from the plaintiffs' counsel to MDEQ, is simply "a backdoor attempt to submit a surreply supporting Plaintiffs' argument concerning the alleged futility of the MDEQ administrative process." *Id.* at 3. Illinois Central argues that because there are no grounds justifying a surreply, proposed Exhibit G should not be allowed. *Id.* at 4. Illinois Central further argues that if the Court decides to allow submission of Exhibit G, it should consider two additional documents—"MDEQ's July 10, 2020 letter responding to ICRR's Pilot Study and Soil Sampling Work Plan" and MDEQ's response to proposed Exhibit G. *Id.*

4

In reply, the plaintiffs argue that proposed Exhibit G is not intended to advance a new argument but is simply intended to "illustrate[] the Meltons' good-faith attempts to seek efficient action from MDEQ and ICRR, which is an issue already argued in the briefing." Doc. #190 at 2. The plaintiffs further "agree with ICRR that the July 10, 2020 and July 21, 2020 letters from MDEQ should be added to the record as well." *Id.* at 3 (record citation omitted).

Motions to supplement the record are committed to the discretion of the district court. *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 854 (5th Cir. 2003). In considering whether to supplement the record, a court should consider "(1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the … motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted." *Id.* at 862.

Here, as explained below, the status of the ongoing MDEQ administrative proceeding is relevant to issues raised in the plaintiffs' response. Furthermore, because the letters did not exist at the time the response was filed, they were not then previously available to the plaintiffs. Finally, because the Court will also consider the MDEQ letters proffered by Illinois Central, there will be no prejudice to Illinois Central in allowing the supplementation. For these reasons, the plaintiffs' motion to supplement is granted.

### III
### Character of Illinois Central's Motion to Dismiss

Although not clearly delineated in its motion to dismiss, Illinois Central appears to seek dismissal of the remediation related claims (1) as unripe under Federal Rule of Civil Procedure 12(b)(1), Doc. #109 at 12; (2) "under the primary jurisdiction and/or *Burford* abstention doctrines," *id.* at 16; and (3) as unexhausted, *id.* As an alternative, Illinois Central seeks a stay until the

plaintiffs exhaust their administrative remedies. *Id.* at 18. Illinois Central also moves to dismiss for lack of jurisdiction the plaintiffs' claims under the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA") as improperly noticed, and to dismiss the plaintiffs' CWA claim for failure to allege an ongoing violation.[2] *Id.* at 4–5.

It is axiomatic that Federal Rule of Civil Procedure 12(b)(1) and Rule 12(b)(6) are used to raise separate defenses—lack of jurisdiction for Rule 12(b)(1) and failure to state a claim for Rule 12(b)(6). Ripeness, of course is properly raised in a Rule 12(b)(1) jurisdictional motion. *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012). The failure to allege an ongoing violation under the CWA is a jurisdictional defect. *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 395, 399 (5th Cir. 1985).

However, while "mandatory," notice requirements in citizen suit provisions, such as those in the CWA and RCRA are "not jurisdictional in the strictest sense of the term," *Lockett v. EPA*, 319 F.3d 678, 682 (5th Cir. 2003), and thus should be raised in a motion to dismiss for failure to state a claim. Similarly, despite its name, primary jurisdiction is not a jurisdictional defense, *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006), and therefore should also be raised in a Rule 12(b)(6) motion, *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 324 n.11 (S.D.N.Y. 2017) (collecting cases). Additionally, in the absence of a statute requiring exhaustion, a defense

---

[2] The filing of an amended complaint will ordinarily moot a pending motion to dismiss unless the amended complaint "on its face" fails to address the alleged defects identified in the motion to dismiss. *See McIntyre v. City of Rochester*, 228 F. Supp. 3d 241, 241–42 (W.D.N.Y. 2017) (finding motion to dismiss moot where "[a]t least on its face, the amended complaint appears to address those alleged defects" identified by motion to dismiss); *Polk v. Psychiatric Pro. Servs., Inc.*, No. 09-CV-799, 2010 WL 1908252, at *2 (S.D. Ohio Mar. 29, 2010) ("[W]hen a motion to amend only addresses a discrete issue, it may not moot the underlying motion to dismiss."). There is no argument that the filing of the second amended complaint, which occurred during the pendency of the motion to dismiss, addresses the deficiencies identified in the motion to dismiss. Accordingly, the second amended complaint did not moot the motion to dismiss.

of failure to exhaust administrative remedies is non-jurisdictional, *Hettinga v. United States*, 560 F.3d 498, 503 (D.C. Cir. 2009), and should be raised in a Rule 12(b)(6) motion.

"There is some dispute as to whether a … *Burford* abstention argument should be raised under Rule 12(b)(1) or Rule 12(b)(6)." *M.D. v. Perry*, 799 F. Supp. 2d 712, 715 n.3 (S.D. Tex. 2011). But persuasive authority holds that where an abstention doctrine allows a court to *postpone* rather than *decline* jurisdiction, the doctrine is properly considered non-jurisdictional and should be considered under Rule 12(b)(6). *Trump for President, Inc. v. Boockvar*, __ F. Supp. 3d __, No. 2:20-cv-966, 2020 WL 4920952, at *5–6 (W.D. Pa. Aug. 23, 2020). Because *Burford* allows a district court to postpone the exercise of its jurisdiction, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 720–31 (1996), the Court concludes that Illinois Central's *Burford* motion is properly characterized as one brought under Rule 12(b)(6).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "The court need not expressly warn the nonmovant that it plans to convert the motion." *Guiles v. Tarrant Cnty. Bail Bond Bd.*, 456 F. App'x 485, 487 (5th Cir. 2012) (citing *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 195 (5th Cir. 1998)). Rather, "[a] non-moving party receives adequate notice when it is aware that the movant has placed matters outside the pleadings before the district court for its review." *Id.*

Here, the plaintiffs and Illinois Central submitted numerous exhibits in support of their memorandums. Under these circumstances, the Court converts Illinois Central's Rule 12(b)(6) motions to motions for summary judgment. *See Hines v. Grand Casinos of La., LLC*, 140 F. Supp. 2d 701, 701 (W.D. La. 2001) ("Because material outside the pleadings has been filed by both

parties, the court will convert the instant motion to a motion for summary judgment under Federal Rule of Civil Procedure 56.").

## IV
### Relevant Standards

On a Rule 12(b)(1) motion, the party asserting jurisdiction "bears the burden of proof." *King v. U.S. Dep't of Veterans Affs.*, 728 F.3d 410, 413 (5th Cir. 2013). A Rule 12(b)(1) motion to dismiss may be granted based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* When a defendant's motion relies on materials outside the pleadings, the motion is said to raise a "factual" attack on the Court's jurisdiction. *Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 263–64 (5th Cir. 2020). "[W]hen a factual attack is made upon federal jurisdiction, no presumptive truthfulness attaches to the plaintiff's jurisdictional allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 264 (alterations omitted) (quoting *Evans v. Tubbe*, 657 F.2d 661, 663 (5th Cir. 1981)). Because Illinois Central's ripeness argument relies on matters outside the pleadings, it is properly considered as raising a factual attack.

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hawes v. Stephens*, 964 F.3d 412, 415–16 (5th Cir. 2020). Under this standard, "[a]ll facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings." *Id.* at 416.

8

**V**

**Factual Background**

The relevant facts are largely undisputed. On March 30, 2015, an Illinois Central train derailed, spilling contaminants, primarily Dicyclopentadine ("DCPD") onto the plaintiffs' property. Following the spill, Illinois Central made certain efforts to remediate the spill site (the efficacy of such efforts is disputed but not relevant to the disposition of this motion).

On September 28, 2015, MDEQ wrote to Illinois Central requesting "a Corrective Action Plan addressing residual soils that exist above the EPA [Regional Screening Level] and the identification and removal both of surficial and buried debris and solid waste on or before October 30, 2015." Doc. #117-1 at PageID #2123.[3] Illinois Central submitted a Supplemental Site Assessment Work Plan, which MDEQ approved on December 23, 2015, subject to certain conditions, including that "should the data support a complete conceptual site model, then [Illinois Central] will develop a comprehensive Corrective Action Plan for the removal of contaminated soils and solid waste remaining on site from the property." Doc. #117-2 at PageID #2136.

On September 22, 2016, MDEQ rejected as inadequate Illinois Central's proposal of a "Site-Specific Cleanup Level." Doc. #117-4. Approximately six months later, on March 17, 2017, MDEQ conditionally approved a Groundwater Delineation Work Plan submitted by Illinois Central. Doc. #117-7. MDEQ approved with comments Illinois Central's Corrective Action Plan ("CAP") on July 24, 2017. Doc. #117-8. On December 28, 2017, the agency approved with comments an October 26, 2017, addendum to the CAP. Doc. #117-9.

---

[3] The plaintiffs' response brief incorporates the factual background from the memorandum accompanying their response to the February 13, 2020, motion to stay. Doc. #129 at 1; *see* Doc. #118. The response memorandum refers to various exhibits attached to the response. *See* Doc. #118.

On January 12, 2018, Melton Properties, LLC, Caroline McComb Scheppe, and the Caroline McComb Scheppe Trust Number One filed a petition with MDEQ requesting "an evidentiary hearing for the Commission to consider actions taken in connection with the assessment, delineation, remediation, and cleanup of soil and groundwater contamination caused by [the] train derailment." Doc. #117-11 at PageID #2192. Consistent with the petition, MDEQ set an evidentiary hearing for November 14, 2018. *Id.* at PageIDs ##2192–93.

On March 28, 2018, MDEQ approved an extension request to move the deadline to complete remediation work to June 29, 2018, and to move the deadline to submit a final CAP to July 31, 2018. Doc. #117-12 at PageID #2198. It appears work began on the site on or about April 30, 2018. Doc. #117-10.

On August 2, 2018, MDEQ wrote to Illinois Central regarding certain deficiencies in the CAP. Doc. #117-12 at PageID #2197. The letter noted that "considering that as of August 1, 2018, the remediation and restoration activities are still on going, MDEQ will extend the completion due date to Friday, August 17, 2018, and the Corrective Action Report due date to Friday, September 7, 2018." *Id.* at PageID #2198. Due to this extension, MDEQ postponed the evidentiary hearing until further notice. *Id.* at PageID #2200.

On April 4, 2019, MDEQ approved with comments a March 1, 2019, Revised Monitoring Well Installation and Groundwater Sampling Work Plan submitted by Illinois Central. Doc. #117-13. The approval required that the "assessment activities be implemented within 45 days of receipt of this letter." *Id.* at PageID #2202.

On April 28, 2020, Illinois Central submitted to MDEQ a Fourth Quarterly Groundwater Sampling Report which, among other things, proposed "a pilot study work plan to evaluate the efficacy of various remedial strategies for miscible phase DCPD in groundwater." Doc. #180-1 at

PageID #3127. On May 15, 2020, MDEQ approved the pilot study with the requirement that it be submitted to MDEQ for review by June 15, 2020. *Id.* at PageID #3443. Illinois Central submitted the proposed pilot study on June 15, 2020. *Id.* at PageID #3445. The schedule included a completion date of October 13, 2020. *Id.* at PageID #3452.

One week after MDEQ's approval of the pilot study, counsel for the Meltons wrote to MDEQ complaining of the pace of the remediation and MDEQ's actions. *Id.* at PageID #3453–58. MDEQ approved in part the proposed pilot study plan, with comments, on July 10, 2020. Doc. #187-1. On July 21, 2020, MDEQ responded to the Meltons' counsel by letter. Doc. #187-2. Acknowledging the Meltons' counsel's concerns, the letter states that "MDEQ has only one other experience with DCPD contamination" and that "DCPD is a unique chemical and there is little data available regarding cleanup options." *Id.* at 1. The letter concludes that "MDEQ does not dictate deadlines for final site remediation unless the responsible party has been unresponsive to its requests to initiate cleanup" and that "MDEQ expects [Illinois Central] to submit the CAP and provide a schedule of remedial implementation within six to eight weeks upon completion of the Work Plan (October 13, 2020)." *Id.* at 2.

## VI
## Jurisdictional Arguments

Illinois Central's jurisdictional arguments relate to the issue of ripeness and to the presence of an ongoing CWA violation.

### A. Ripeness

The ripeness requirement flows from Article III's mandate that federal court jurisdiction be limited to "cases" or "controversies." *TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regul. Comm'n*, 859 F.3d 325, 333 (5th Cir. 2017). Illinois Central, relying exclusively on the recent opinion in *Valley Creek Land & Timber, LLC v. Colonial Pipeline Co.*, 432 F. Supp. 3d 1360 (N.D.

Ala. 2020), argues that due to the ongoing administrative proceedings, the plaintiffs' remediation-related claims are unripe. Doc. #109 at 10–12. It further contends that the plaintiffs should be judicially estopped from arguing that their claims are ripe. *Id.* at 18–19.

### 1. Judicial estoppel

"Judicial estoppel is an equitable doctrine applied in the court's discretion to prevent a party from asserting a position in a legal proceeding that is contrary to a position previously taken by him in the same or some earlier legal proceeding." *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017) (cleaned up). The "purpose of the doctrine is to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants." *Id.* (quotation marks omitted).

In this circuit, "at least two requirements must be met before a party's argument may be judicially estopped. First, the estopped party's position must be clearly inconsistent with its previous one, and second, that party must have convinced the court to accept that previous position." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (cleaned up). A court should also consider whether the party to be estopped acted inadvertently,[4] *New Hampshire v. Maine*, 532 U.S. 742, 753 (2001), and "whether the party seeking to assert [the] inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," *Zedner v. United States*, 547 U.S. 489, 504 (2006).

Illinois Central argues the plaintiffs should be judicially estopped from asserting their claims are ripe because they sought a stay based on the lack of ripeness. Doc. #109 at 4. This

---

[4] In *Farrar*, the Fifth Circuit referred to lack of inadvertence as a "requirement" to invoke judicial estoppel. 876 F.3d at 709. However, *Farrar* post-dates *Gabarick*, which held that inadvertence is only a requirement "when the judicial estoppel is based on the non-disclosure of a claim in a prior bankruptcy proceeding." 753 F.3d at 553 n.3. *Gabarick*, as the earlier panel opinion, would control over *Farrar* in this case. *See United States v. Barnes*, 953 F.3d 383, 387–88 (5th Cir. 2020).

argument must be rejected with respect to ripeness for the simple reason that neither of the plaintiffs' motions to stay argued that the case was not ripe. *See* Docs. #20, #26. The motions to stay were based on the separate doctrine of primary jurisdiction which, unlike the doctrine of ripeness, is non-jurisdictional. Accordingly, the judicial estoppel argument fails.

### 2. The facts here

"In evaluating whether a case is ripe for adjudication, [a court] balance[s] (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 456 (5th Cir. 2017) (cleaned up). "A claim is not ripe for review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *United States v. Payton*, 959 F.3d 654, 656 (5th Cir. 2020).

In addressing the ripeness issue, it is important to clarify both the plaintiffs' claims and what Illinois Central seems to mean when it seeks dismissal of claims "related" to remediation. In their second amended complaint, the plaintiffs assert (1) a claim for injunctive relief under the RCRA requiring Illinois Central "to abate the threat to health and the environment caused by the Spill by removing the illegally disposed chemicals, as well as civil penalties, attorneys' fees, expert fees, and other appropriate relief," Doc. #127 at 12; (2) a claim for injunctive relief under the CWA requiring Illinois Central "to fully remediate the Spill of pollutants into waters of the United States, [and for] attorneys' fees and expert fees, maximum civil penalties … to be paid to the State of Mississippi, and other appropriate relief," *id.* at 12–14; and (3) an array of state law negligence and nuisance claims for Illinois Central's pre-spill and post-spill actions, seeking, among other things, the costs of remediation of the property, injunctive relief requiring that Illinois Central remediate the property, and past and future actual damages to the property and business interests,

*id.* at 14–20. Illinois Central does not specify which of the plaintiffs' claims are "remediation related." However, from the context of its briefing, it appears Illinois Central seeks dismissal of any claim premised on its alleged failure to remediate properly, any claim for injunctive relief which would direct remediation, and any claim for damages which would be measured by the final remediation costs.

*Valley Creek*, the case relied on by Illinois Central, involved allegations that a gasoline spill contaminated the property of a land and timber investment company. 432 F. Supp. 3d at 1362. Following the leak: (1) the Pipeline and Hazardous Materials Safety Administration (a federal agency) issued a corrective action order to the pipeline owner requiring certain remediation steps; (2) the pipeline owner and the timber company entered into a remediation agreement requiring that the pipeline owner perform remediation work under the supervision of the Alabama Department of Environmental Management and other regulatory agencies; and (3) the pipeline owner and the timber company entered into a "Tolling Agreement" which provided "the full extent of the contamination and remediation that may be needed to correct or contain [the spill] is still being investigated." *Id.* at 1363–64. Before the expiration of the remediation agreement, the timber company filed suit seeking damages and injunctive relief based on allegations that "the contamination has not been remediated and that the remediation efforts have further damaged the property." *Id.* The timber company moved to dismiss the complaint based on the absence of ripeness. *Id.* at 1365.

In dismissing the case on ripeness grounds, the district court found the action was not fit for judicial decision because "[f]rom the face of the pleadings, it appears that [the pipeline owner] could possibly remediate all of the damage from the gasoline spill such that no devaluation or limited use of the property would occur. Further, the [remediation] Agreement compensates [the

timber company] for the time spent on remediation and for any property damage caused by those efforts." *Id.* at 1366. Accordingly, the district court concluded that "despite the occurrence of the original gasoline spill—which [the timber company] frames as a concrete injury that has already occurred—some questions remain regarding the extent to which [the timber company] suffered an actual injury resulting in damages that could justify liability." *Id.*

Illinois Central argues that "[t]his case is no different" from *Valley Creek* and that "Plaintiffs' claims for remediation related injunctive relief or damages are not sufficiently concrete at this point to make them fit for a judicial decision since they are dependent on the outcome of future remediation efforts that are subject to MDEQ's administrative oversight." Doc. #109 at 12. The plaintiffs concede that their claims for remediation-related injunctive relief would be addressed by the ongoing MDEQ remediation proceedings but argue that *Valley Creek* is factually distinguishable because there is no tolling agreement barring the initiation of a suit, the claims here are based on damages already incurred, and the plaintiffs were already using the property for its "best and intended use," not as an investment. Doc. #129 at 5–6, 8. Illinois Central replies that "[b]ased on Plaintiffs' concession and their acknowledgement that their claims for injunctive relief under RCRA and the CWA are 'contingent' on the outcome of ICRR's remediation under the MDEQ plan, it is indisputable that the claims are not ripe and the Court should dismiss them for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." Doc. #140 at 3. Illinois Central does not address the plaintiffs' arguments regarding their damages claims.

First, the fact that the relief sought in the plaintiffs' federal claims for injunctive relief may be granted in the MDEQ proceedings does not necessarily mean these claims are not ripe. To be sure, "[w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts." *Reiter v. Cooper*, 507 U.S. 258,

269 (1993). However, in the absence of a statute requiring exhaustion to bring a specific claim, the exhaustion requirement is non-jurisdictional. *See Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 475 (5th Cir. 1997) ("The jurisprudential exhaustion doctrine is not jurisdictional in nature."). Neither the CWA nor RCRA include exhaustion requirements. *See City of Santa Clarita v. U.S. Dep't of Interior*, 249 F. App'x 502, 505 (9th Cir. 2007) ("[T]he CWA's citizen suit provision … does not require exhaustion of administrative remedies."); *Cannata v. Forest Pres. Dist. of Du Page Cnty.*, No. 06 C 2196, 2006 WL 2927604, at *5 (N.D. Ill. Oct. 11, 2006) ("The RCRA does not require plaintiffs to exhaust state remedies prior to initiating federal proceedings."). Accordingly, the availability of administrative relief does not render the plaintiffs' federal injunctive relief claims unripe.[5]

As to the broader category of remediation-related claims, in *Valley Creek*, the basis for the finding of a lack of ripeness was not the general existence of state administrative action but *a specific agreement between the parties* which, if performed, would likely preclude a finding of injury to support a claim. 432 F. Supp. 3d at 1366. The possibility of this performance obviating any injury was what compelled the jurisdictional holding in *Valley Creek*. There is no contention that such an agreement exists here. Nor is there any dispute that MDEQ lacks the ability to compensate the plaintiffs for their actual losses. *See* Miss. Code Ann. § 17-17-29. Thus, the Court finds *Valley Creek*'s concerns regarding the presence of an actionable injury inapposite to this case.

---

[5] To the extent Illinois Central invokes the Mississippi jurisdictional requirement that litigants exhaust their available administrative remedies, this rule, while likely substantive and thus applicable, would not deprive the Court of jurisdiction. *See Munger v. Cascade Steel Rolling Mills, Inc.*, 332 F. Supp. 3d 1280, 1286 (D. Or. 2018) ("In federal court, … procedural issues, including the subject matter jurisdiction of the federal courts, are determined by federal law, not state law."); *Stewart v. Geostar Corp.*, 617 F. Supp. 2d 532, 538 (E.D. Mich. 2007) ("Although federal courts … apply state law in certain circumstances, under *Erie* … issues regarding subject matter jurisdiction do not lie within one of those areas."); *Byrd v. Hunt*, 136 F. Supp. 2d 511, 515 (M.D.N.C. 2001) ("[S]ubject matter jurisdiction in the federal courts is created and defined by federal, not state, law.").

Here, the plaintiffs assert various claims for relief based on the allegations that Illinois Central wrongfully spilled contaminants and then wrongfully failed to remediate the spill. While, as explained below, MDEQ's ultimate decision regarding remediation would help *inform* certain decisions, most notably the propriety of certain remedies, this is simply not a case where the *existence* of an injury depends on a future event so as to render the case unripe (like noncompliance with the remediation agreement in *Valley Creek*). At most, MDEQ's actions would have the potential to moot the plaintiffs' claims for injunctive relief but "the potential for future mootness" is not a lack of ripeness. *Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015). Similarly, the possibility that an agency action may clarify the amount of damages does not render claims unripe. *See generally Pro. Serv. Indus., Inc. v. Kimbrell*, 766 F. Supp. 1557, 1560 (D. Kan. 1991) ("The result of the EPA proceedings will only affect the extent of damages allegedly sustained by plaintiff, and they will most likely add nothing to the factual record concerning the alleged breaches by defendants."); *Hartford Cas. Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419, 421, 424 (7th Cir. 1990) (fact that amount of defendant's liability "would not be fixed until the end of the state court proceedings" more appropriately considered under abstention doctrine, rather than ripeness). Under these circumstances, the Court concludes that the case is ripe for decision as a constitutional matter.

### B. Ongoing CWA Violation

Illinois Central argues that the plaintiffs' CWA claims must be dismissed because "CWA citizens suits are not applicable to wholly past violations" and "[t]he mere continuing residual effects from a discharge are not equivalent to a continuing discharge." Doc. #109 at 22. The plaintiffs disagree. Doc. #129 at 20. Resolution of the parties' dispute centers on the Fifth Circuit's holding in *Hamker*. 756 F.2d 392.

In *Hamker*, certain plaintiffs filed a CWA suit against property owners seeking a remedial injunction based on a pipeline leak which had since been shutdown by the defendant. *Id.* at 394. The *Hamker* panel held that the CWA "does not authorize citizen suits seeking either injunctive relief or the imposition of civil penalties where the defendant is not alleged to be in violation of an effluent standard, limitation or order." *Id.* at 396. The court then held:

> [E]ven if the complaint is construed to allege a continuing seepage into groundwater of the now-dispersed leaked oil, we cannot say this amounts to a continuing violation of section 1311 [prohibiting unlicensed discharges of pollutants] because that section prohibits only "discharges of any pollutant," which in turn are defined in section 1362(12) to be "any addition of any pollutant to navigable waters, *from* any *point source*." A "point source" is a "discernible, confined and discrete conveyance, including but not limited to any pipe…." 33 U.S.C. § 1362(14). No continuing addition to the ground water from a point source is alleged, nor could it be alleged under the facts set forth in this complaint. Rather, the complaint alleges, necessarily, only that there are continuing effects from the past discharge, and such an allegation is insufficient for the purposes of section 1365.
>
> …
>
> The complaint alleges facts constituting only one "discharge" of oil from the defendant's pipe; the complaint does not allege a continuing discharge from a point source. Mere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge.

*Id.* at 397.

*Hamker* is not the only court to have held "that the migration of residual contamination from prior discharges is not an ongoing violation." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1139–40 (10th Cir. 2005) (collecting cases). However, other courts have reached the opposite conclusion. *Id.* at 1139 (collecting cases).

The plaintiffs, citing *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637 (4th Cir. 2018), argue that *Hamker* does not control when there is an allegation (as here) that the past discharge is leaking into groundwater. Doc. #129 at 20–22. It is true that in *Kinder*

18

*Morgan*, a divided Fourth Circuit panel held that "the fact that a ruptured pipeline has been repaired, of itself, does not render the CWA violation wholly past," and distinguished *Hamker* on the grounds that the complaint in *Hamker* did not involve an allegation of discharge into navigable waters. 887 F.3d at 648–49. However, this point of contention wholly ignores the *Hamker* analysis that the continuing effects from a past discharge cannot be a point source within the meaning of the CWA. Indeed, *Kinder Morgan* did not attempt to distinguish this aspect of *Hamker*, it merely held that "to the extent *Hamker's* reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant, *Hamker* contravenes our decision in *Golfarb* [*v. Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. 2015)]." *Id.* at 649 n.9. More important, *Kinder Morgan* was remanded "for further consideration in light of" the United States Supreme Court's decision in *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020). *Kinder Morgan Energy Partners, L.P. v. Upstate Forever*, 140 S. Ct. 2736 (2020).

In *County of Maui*, the Supreme Court considered the issue of whether the Environmental Protection Agency could require a permit where a point source discharges directly into groundwater (which is not covered by the CWA) but eventually reaches navigable waters (which are covered by the CWA. 140 S. Ct. at 1477. The Supreme Court ultimately held that the CWA "requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*" from the point source into navigable waters." 140 S. Ct. at 1476.

Notably, *County of Maui* did not change the definition of a "point source." Nor did it purport to address whether a single event (such as a spill or a leak) may be deemed an ongoing violation. Thus, in the absence of any intervening change in law, the Court is compelled to follow the holding in *Hamker* that a single event (such as a spill or leak) from a point source may not be

considered an ongoing violation so as to warrant CWA relief. It follows that the plaintiffs' CWA claims, which are premised on a single spill, must be dismissed for lack of jurisdiction.

**VII**
**Merits Arguments**

Illinois Central seeks dismissal of (1) the plaintiffs' RCRA and CWA claims as inadequately noticed, and (2) the plaintiffs' remediation-related claims under the judicially-created exhaustion doctrine, under the doctrine of *Burford* abstention or under the doctrine of primary jurisdiction.

**A. RCRA and CWA Notice**

Both the CWA and RCRA contain mandatory pre-suit notice requirements which require notice to an alleged violator. 33 U.S.C. § 1365(b)(1); 42 U.S.C. § 6972(b)(2)(A). Here, notices of intent to sue under the CWA and the RCRA were sent on behalf "of Floyd Melton, Jr., Floyd Melton, III, Moss Melton and Melton Properties, LLC" and "Caroline McComb Scheppe and The Caroline McComb Scheppe Trust Number One." Doc. #1-1 at PageID ##24–25 (RCRA notice); Doc. #1-2 at PageID ## 47–48 (CWA notice). Both notices were sent to "Luc Jobin, President and CEO Canadian National/Illinois Central Railroad" and "Corporation Service Company As Registered Agent for Illinois Central Railroad." Doc. #1-1 at PageID #24 (RCRA notice); Doc. #1-2 at PageID #47 (CWA notice).

Illinois Central argues that the plaintiffs failed to comply with the notice requirements in three ways: (1) McMillian Acres, Danny Hargett, Jane Hargett, and David Hargett ("McMillian/Hargett Plaintiffs") served no notice under either statute; (2) Melton Properties, LLC, Floyd Melton, Jr., Floyd Melton, III, and Moss Melton ("Melton Plaintiffs") filed this action before the RCRA's mandatory 90-day notice period; and (3) the CWA notice served by the Melton

20

Plaintiffs was insufficient. Doc. #109 at 4–5. Because the Court concludes that it lacks jurisdiction over the CWA claims, it need only address the notice under the RCRA.

### 1. McMillian/Hargett Plaintiffs

There is no dispute that the McMillian/Hargett Plaintiffs did not file a notice of suit under the RCRA. However, the plaintiffs, citing *Student Public Interest Research Group of New Jersey, Inc. v. AT&T Bell Laboratories*, 617 F. Supp. 1190 (D.N.J. 1985), argue that the Melton Plaintiffs' notices were sufficient to satisfy the notice requirement with respect to the McMillian/Hargett Plaintiffs. Doc. #129 at 16–17. While the plaintiffs are correct that some district courts have held that notice of suit to one plaintiff satisfies the notice requirement for all plaintiffs,[6] this approach is inconsistent with the only two circuits to have addressed the issue.

In *Washington Trout v. McCain Foods, Inc.*, the Ninth Circuit held that a CWA notice of suit sent by "the United Food and Commercial Workers, Local 1439, among perhaps others," did not satisfy the notice requirements of Local 1439's co-plaintiffs—Washington Trout and the Central Basin Audubon Society. 45 F.3d 1351, 1352–54 (9th Cir. 1995). In reaching this conclusion, the *Washington Trout* court held that a notice provision serves two purposes: (1) "to allow the parties time to resolve their conflicts in a nonadversarial time period" and (2) to alert "the appropriate state or federal agency, so administrative action may initially provide the relief the parties seek before a court must become involved." *Id.* at 1354. The court found that a notice which omits the names of the plaintiffs serves neither of these purposes. *Id.*

In a case decided one year later, the Tenth Circuit reached a similar conclusion based on *Washington Trout*'s analysis, and the Supreme Court's admonition that "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature

---

[6] *See Env't Def. Fund v. Tidwell*, 837 F. Supp. 1344, 1352–53 (E.D.N.C. 1992).

is the best guarantee of evenhanded administration of the law." *N.M. Citizens for Clean Air & Water v. Espanola Mercantile Co., Inc.*, 72 F.3d 830, 833 (10th Cir. 1996) (quoting *Hallstrom v. Tillamook Cnty.*, 492 U.S. 20, 31 (1981)).

The Court agrees with the analyses in *Espanola Mercantile* and *Washington Trout* and concludes that each plaintiff in a citizen suit under the RCRA (or the CWA) must provide individual notice of their claims.[7] Because the McMillian/Hargett Plaintiffs did not do so here, their RCRA claims must be dismissed.

## 2. RCRA 90-day notice period

The RCRA's notice provision requires that an action may not be commenced "prior to ninety days after the plaintiff has given notice of the endangerment." 42 U.S.C. § 6972(b)(2)(A). Illinois Central argues that the RCRA notice was not served until December 27, 2017, and that this action was filed exactly ninety days later. Doc. #109 at 20. The plaintiffs respond that according to the delivery receipt, "ICRR received its notice via its registered agent on December 26, 2017 — 91 days before the original complaint was filed." Doc. #129 at 17. Illinois Central replies that while notice was served on its registered agent on December 26, 2017, no notice was served on the corporate entity as required by the relevant regulations. Doc. #140 at 4.

While the RCRA requires that notice be given to a violator, it does not specify the form or contents of the notice. *See* 42 U.S.C. § 6972 (b). However, the statute's implementing regulation provides that when an individual is a corporation, notice must be provided to "the owner or site manager of the building, plant, installation, or facility alleged to be in violation" and "to the

---

[7] This is not to say that a notice need name *every* plaintiff to be joined in an action. *See Ebert v. Gen. Mills, Inc.*, 48 F. Supp. 3d 1222, 1235–36 (D. Minn. 2014) (letter on behalf of homeowner and "all others similarly situated" sufficient to provide notice on behalf of co-plaintiff where the impacted area was "finite, not extremely large, and [was] defined and known to [the defendant]").

registered agent, if any, of that corporation in the State in which such violation is alleged to have occurred." 40 C.F.R. § 254.2(a)(1).[8]

It is undisputed that the RCRA notice was served on Illinois Central's Mississippi agent on December 26, 2017. Doc. #1-1 at PageID #31. Notice on Luc Jobin was served one day later. *Id.* at PageID ## 32, 34. Thus, based on the record, it appears the plaintiffs failed to provide full notice, in compliance with the regulations, more than ninety days before the suit. However, partial notice under the regulations was provided within the required notice period. Under such circumstances, courts, noting that strict compliance with the regulations (as opposed to the statute) is not required, have overwhelmingly held that dismissal is unwarranted where notice was undisputed. *Hernandez v. Esso Standard Oil Co. (P.R.)*, 571 F. Supp. 2d 305, 313–14 (D.P.R. 2008) (collecting cases). Because Illinois Central undoubtedly received notice of the suit outside the 90-day period, dismissal will be denied. *See Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 426, 432 (M.D. Pa. 2000) ("CUSA did receive notice here, so we will not dismiss this suit because the notice did not conform to section 254.2(a). We acknowledge that compliance with section 254.2(a) is preferable and eliminates disputes over notice, but we cannot agree that it is necessary.").

### 3. Adequacy of CWA notice

Illinois Central also argues that the Melton Plaintiffs' CWA notice failed to provide adequate notice of their CWA claims. Specifically, Illinois Central argues that "[i]nstead of specifically explaining how [Illinois Central's] remedial work and any remaining contamination on the property violated the CWA, Plaintiff's pre-suit notice letter provided vague allegations of CWA violations." Doc. #109 at 21. Illinois Central further contends that the plaintiffs' complaint

---

[8] The CWA's regulations contain a similar requirement. 40 C.F.R. § 135.2(a)(1).

"contains specific allegations of CWA violations that were not included in the pre-suit notice letter." *Id.* at 22. Because the Court has concluded that the CWA claim must be dismissed, it need not address the adequacy of the notice.

## B. Primary Jurisdiction

"The doctrine of primary jurisdiction is a doctrine of judicial abstention whereby a court which has jurisdiction over a matter, nonetheless defers to an administrative agency for an initial decision on questions of fact or law within the peculiar competence of the agency." *Occidental Chem. Corp. v. La Pub. Serv. Comm'n*, 810 F.3d 299, 309 (5th Cir. 2016) (alterations omitted). "[A]t a general level, the primary jurisdiction doctrine requires the district court to balance the assistance potentially provided by an agency's specialized expertise against the litigants' certainty of delay." *Id.* at 310. "[P]rimary jurisdiction is most appropriate for fact-intensive questions within the agency's jurisdiction." *Id.* However, primary jurisdiction will ordinarily be unwarranted "if, under no conceivable set of facts, the agency could immunize what would be a clear violation of federal law; where the litigation deals with a single event which requires no continuing supervision by the regulatory agency; or where Congress has determined by statute that the courts should decide the issue in the first instance." *Id.* (cleaned up).

As an initial matter, while the plaintiffs previously sought and received a stay based on an invocation of primary jurisdiction, this procedural request was made before the various delays with the MDEQ proceedings. *See New Hampshire*, 532 U.S. at 755–56 (noting judicial estoppel may be inappropriate when change in positions is occasioned by a change in facts). Because the primary jurisdiction inquiry requires an analysis of the potential delay, it cannot be said that the litigants' current position that primary jurisdiction does not justify a stay *today* is inconsistent with

the position that a stay was warranted two years ago. Regardless, the Court concludes that a stay pursuant to the primary jurisdiction doctrine is proper.

First, this case presents none of the special circumstances which counsel against the invocation of primary jurisdiction. There is no clear violation of law which would render the agency's determination of factual issues moot. The litigation involves the continuing supervision of a regulatory agency. And there is no statute requiring that the plaintiffs' claims be addressed by this Court in the first instance.

As to the propriety of primary jurisdiction, the Court draws guidance from *Read v. Corning Inc.*, a case in which plaintiff property owners filed state and federal claims against a defendant polluter undertaking remediation of the property under the direction of the New York State Department of Environmental Conservation. 351 F. Supp. 3d 342, 347 (W.D.N.Y. 2018). The plaintiffs sought "response costs, compensatory and punitive damages, and injunctive relief requiring [the defendant] to undertake additional remediation efforts, beyond what was approved by the DEC." *Id.* at 349. The defendant moved to dismiss on numerous grounds, including primary jurisdiction. *Id.*

The *Read* court noted that "[a]t least one district court … has applied the primary-jurisdiction doctrine in the context of an environmental claim involving a state agency" and that "other federal courts have applied the primary-jurisdiction doctrine to defer to state agencies with particular expertise in the matters at issue." *Id.* at 352–53 (collecting cases). The court then concluded that a stay under the primary jurisdiction doctrine was warranted and that "the decision is not even a close one." *Id.* at 353.

In electing to apply the primary jurisdiction doctrine to the claims for injunctive relief, the *Read* court held (1) the DEC "has considerably more expertise in the underlying factual matters;"

(2) "the underlying question at issue [in the case] – how best to remediate the contamination – has been committed to the DEC's discretion by the New York legislature;" (3) court-ordered injunctive relief would create a risk of inconsistent rulings; and (4) the DEC was well-into its administrative proceedings. *Id.* at 353–54. Having concluded that the primary jurisdiction doctrine justified a stay of the claims for injunctive relief, the court then stayed the plaintiffs' claims for damages for "response costs that will not be affected or reduced by any future remedial efforts" on the grounds that "to allow plaintiffs to pursue such claims now, while the remedial process moves forward, would accomplish little other than to dissect the case into piecemeal litigation, with consequent delay and multiplicitous appeals, and attendant attorney's fees." *Id.* at 360–61.

As in *Read*, there can be no doubt that the administrative agency here—MDEQ—has considerably more experience in the underlying factual matter of contaminant remediation or that responsibility for such matters has been delegated to MDEQ. 4 JEFFREY JACKSON ET AL., ENCYCLOPEDIA OF MISS. LAW § 31:5 (2d ed.). Similarly, to the extent Illinois Central's responsibilities with respect to the property have not been finally determined by MDEQ, any decision by the Court would create a risk of inconsistent rulings. Also, while there have certainly been delays, it seems that the remediation efforts of Illinois Central are nearing completion, so as to render any substantial delay unlikely. Furthermore, to guard against any prejudice from a substantial delay, the stay will be limited to ninety days.

Thus, the Court concludes that the benefits of MDEQ's decision outweigh the potential for delay so as to justify primary jurisdiction abstention. The Court further concludes that because "further judicial proceedings are contemplated, … jurisdiction should be retained by a stay of proceedings, not relinquished by dismissal." *Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 623 (C.D. Cal. 2020). Finally, the Court concludes that under these circumstances, a stay of the

damages claims related to Illinois Central's remediation efforts is justified by the judicial interest of avoiding dissecting the remediation related claims into piecemeal litigation. *See Vaughn ex rel. Vaughn v. Hosp. Serv. Dist. No. 1 Jefferson Parish*, No. Civ. A. 01-3456, 2002 WL 126649, at *2 (E.D. La. Jan. 30, 2002) (granting stay when "related" claims "overlap").[9]

## VIII
## Conclusion

For the reasons above, Illinois Central's motion to strike [177] and the plaintiffs' motion to supplement [180] are both **GRANTED**. The plaintiffs' supplemental exhibits [176-1] [176-2][176-3][176-4] are **STRICKEN**. The supplemental exhibits offered by the parties [180-1][187-1][187-2] are deemed a part of the record.

Illinois Central's motion to dismiss [108] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks dismissal of the plaintiffs' CWA claims for lack of jurisdiction, dismissal of the McMillian/Hargett Plaintiffs' RCRA claims, and a stay of the plaintiffs' remediation-related claims. The motion is DENIED in all other respects. The plaintiffs' remediation-related claims are **STAYED** for ninety days.

**SO ORDERED**, this 29th day of September, 2020.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[9] Having reached this conclusion, the Court declines to address Illinois Central's remaining arguments related to exhaustion of remedies and *Burford* abstention. However, given the possible statute of limitations issues and the posture of the case, any favorable resolution in Illinois Central's favor on these issues would have resulted in a stay, not dismissal. *See Gray v. Bush*, 628 F.3d 779, 785 (6th Cir. 2010) ("In some settings, *Burford* abstention thus may call for this exercise of judgment, weighing competing interests and maintaining an even balance, in deciding whether to withhold action until the state proceedings have concluded.") (cleaned up); *Schimsky v. U.S. Office of Pers. Mgmt.*, 403 F. App'x 150, 152 (9th Cir. 2010) (where statute of limitations would have run on claim, district court erred in dismissing rather than staying on grounds of lack of administrative exhaustion).