**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**MELTON PROPERTIES, LLC., et al.**                                    **PLAINTIFFS**

**V.**                                                          **NO. 4:18-CV-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD
COMPANY, et al.**                                              **DEFENDANTS**

## OPINION AND ORDER

Following this Court's dismissal of the plaintiffs' Clean Water Act claim, the plaintiffs moved for reconsideration arguing that *Hamker v. Diamond Shamrock Chemical Co.*,[1] the Fifth Circuit authority on which this Court relied, has been implicitly overruled by the United States Supreme Court. In the alternative, the plaintiffs ask that the Court certify for interlocutory appeal the question of whether *Hamker* remains good law. Because the Supreme Court has not overruled *Hamker* and because certification will not materially advance the resolution of this case, the plaintiffs' motion will be denied.

### I
### Procedural History

On March 27, 2018, Melton Properties, LLC, Floyd M. Melton, Jr., Floyd M. Melton III, and Moss B. Melton ("Melton Plaintiffs"); and McMillan Acres, Danny Hargett, Jane Hart McMillan Hargett, and David Hargett ("McMillian/Hargett Plaintiffs") filed this action in the United States District Court for the Northern District of Mississippi against Illinois Central Railroad Company; Canadian National Railway; Union Tank Car Company, Inc.; and certain

---

[1] 756 F.2d 392 (5th Cir. 1985).

fictitious parties.  Doc. #1.  The complaint, as amended,[2] asserted state and federal claims arising from a toxic spill caused by the March 30, 2015, derailment of a railcar owned by Union Tank, which was being transported by "Illinois Central and/or Canadian National" on tracks "owned by Illinois Central and/or Canadian National."  Doc. #92 at ¶¶ 14–15, 36–114.  The plaintiffs, all property owners or farmers near the site of the spill in Leflore County, Mississippi (known as the Minter City site), also asserted claims related to the remediation of the spill.  *Id.* at ¶¶ 69–72.

On February 11, 2020, Illinois Central filed a "Motion to Dismiss Plaintiffs' Claims Related to Remediation."  Doc. #108.  Although not clearly delineated in its motion to dismiss, Illinois Central appeared to seek dismissal of the remediation related claims (1) as unripe under Federal Rule of Civil Procedure 12(b)(1), Doc. #109 at 12; (2) "under the primary jurisdiction and/or *Burford* abstention doctrines," *id.* at 16; and (3) as unexhausted, *id.*  As an alternative, Illinois Central sought a stay until the plaintiffs exhaust their administrative remedies.  *Id.* at 18. Illinois Central also moved to dismiss for lack of jurisdiction the plaintiffs' claims under the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA") as improperly noticed, and to dismiss the plaintiffs' CWA claim for failure to allege an ongoing violation.  *Id.* at 4–5.

On September 29, 2020, the Court granted in part and denied in part the motion to dismiss. Doc. #222 at 27.  Among other things, the September 29 order dismissed the CWA claim because the plaintiffs had not alleged an ongoing violation, as that term was defined in *Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392 (5th Cir. 1985).  *Id.* at 17–20.  On this point, the Court held that *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), did not implicitly overrule

---

[2] On November 6, 2019, the Court directed the plaintiffs to file an amended complaint to correct deficiencies in the jurisdictional allegations.  Doc. #91.  The plaintiffs filed a "First Amended Complaint" two days later.  Doc. #92.  But for the corrections to the jurisdictional allegations, the two pleadings are identical.

the holding in *Hamker*. *Id.* at 19. On October 9, 2020, the plaintiffs filed a motion seeking reconsideration of the dismissal of the CWA claim or, in the alternative, for certification of an interlocutory appeal on the dismissal. Doc. #225. The motion is fully briefed. Docs. #235, #238.

## II
## Reconsideration Standard

Pursuant to Federal Rule of Civil Procedure 54(b), any "order … that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." This rule, which by its terms applies to orders dismissing fewer than all the claims against a defendant,[3] grants a court discretion to "reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017).

## III
## Reconsideration

In seeking reconsideration, the plaintiffs argue that (1) *County of Maui*, as read in conjunction with two other Supreme Court opinions—*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*[4] and *Rapanos v. United States*[5]—has overturned *Hamker*; and (2) even if *Hamker* remains good law, it is distinguishable from the facts in the case. Doc. #226 at 2–10.

---

[3] *See McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014) (Rule 54(b) applies to order granting partial summary judgment).

[4] 484 U.S. 49 (1987).

[5] 547 U.S. 715 (2006).

### A. The Viability of *Hamker*

In the absence of a conflicting en banc decision, published Fifth Circuit panel decisions like *Hamker* are binding unless there has been an intervening change in law. *Spong v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 787 F.3d 296, 306 (5th Cir. 2015); *see Thompson v. Beasley*, 309 F.R.D. 236, 247 (N.D. Miss. 2015) ("[I]t is well-settled law that a district court may recognize when a precedent has been explicitly or implicitly overruled by a subsequent Supreme Court decision.") (cleaned up). When a party argues that there has been an intervening change of law based on a Supreme Court decision, the relevant "decision must be more than merely illuminating with respect to the case." *In re Henry*, 944 F.3d 587, 591 (5th Cir. 2019) (quoting *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001)). Rather, the overruling of the decision must be "unequivocally directed by [the] Supreme Court precedent." *Id.* Accordingly, this Court must decide whether the three opinions identified by the plaintiffs— *County of Maui*, *Gwaltney*, and *Rapanos*—have "unequivocally directed" the overruling of *Hamker*.[6] To answer this question, a brief recap of the relevant authority is required.

### 1. The CWA and *Hamker*

The CWA citizen suit provision provides that "any citizen may commence a civil action on his own behalf … against any person … who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

The CWA "forbids the 'addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit from the Environmental Protection Agency." *Cnty. of Maui*, 140 S. Ct. at 1468. Of relevance here, the CWA defines the term "point source" as "any

---

[6] Given this limited inquiry, the out-of-circuit authority cited by the plaintiffs is irrelevant.

discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

In *Hamker*, property owners filed a CWA suit against owners of a pipeline seeking a remedial injunction based on a pipeline leak which had since been shut down by the defendant. 756 F.2d at 394. The *Hamker* panel held that the CWA "does not authorize citizen suits seeking either injunctive relief or the imposition of civil penalties where the defendant is not alleged to be in violation of an effluent standard, limitation or order." *Id.* at 396. The court then held:

> [E]ven if the complaint is construed to allege a continuing seepage into groundwater of the now-dispersed leaked oil, we cannot say this amounts to a continuing violation of section 1311 [prohibiting unlicensed discharges of pollutants] because that section prohibits only "discharges of any pollutant," which in turn are defined in section 1362(12) to be "any addition of any pollutant to navigable waters, *from* any *point source*." A "point source" is a "discernible, confined and discrete conveyance, including but not limited to any pipe…." 33 U.S.C. § 1362(14). No continuing addition to the ground water from a point source is alleged, nor could it be alleged under the facts set forth in this complaint. Rather, the complaint alleges, necessarily, only that there are continuing *effects* from the past discharge, and such an allegation is insufficient for the purposes of section 1365.
>
> …
>
> The complaint alleges facts constituting only one "discharge" of oil from the defendant's pipe; the complaint does not allege a continuing discharge from a point source. Mere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge.

*Id.* at 397.

Shortly after *Hamker*, the Fifth Circuit in *Sierra Club v. Shell Oil Co.* again addressed the scope of the citizen suit provision with respect to isolated discharges. 817 F.2d 1169 (5th Cir. 1987). In *Shell Oil*, the Sierra Club brought six CWA actions against multiple industrial

dischargers based on "past, sporadic or largely unconnected permit violations by each of the [defendants]." *Id.* at 1173. During the pendency of the suits, the Fifth Circuit issued the *Hamker* opinion. *Id.* at 1171. Consistent with *Hamker*, all six cases were dismissed for lack of an ongoing violation—five on a Rule 12(b)(1) motion, and one on a motion for summary judgment. *Id.* Sierra Club appealed these decisions, and the appeals were consolidated.

On appeal, the *Shell Oil* panel clarified that dismissal pursuant to Rule 12(b)(1) for lack of an ongoing violation is proper when the "court may determine it lacks jurisdiction based on pleadings alone" but that "when a plaintiff has alleged an ongoing violation for purposes of § 1365(a), but … fails to demonstrate a fact issue about whether a defendant is 'in violation,' the court should grant summary judgment for the defendant on the merits under Fed.R.Civ.P. 56, instead of dismissing for want of jurisdiction." *Id.* at 1172.

Turning to the merits, the panel noted that "[o]ne industrial facility may have numerous point sources of discharge" and that "when determining whether a permit-holder has violated an effluent limitation, one must look at each parameter within each point source independently." *Id.* at 1173. Because the undisputed evidence showed only isolated discharges at individual point sources and because Sierra Club did not attempt to show that "these isolated permit violations were the product of [a] systematic neglect of discharge limitations or of inadequate pollution control facilities" so as to render the violations ongoing, the panel held that the claims failed. *Id.*

In concluding that the claims failed, the *Shell Oil* panel rejected two challenges to *Hamker*—that *Hamker* did not apply to cases involving National Pollutant Discharge Elimination System permits and that the opinion was wrongly decided. *Id.* at 1174–75. As to the first argument, the court held that there was no reason for standards for a facility being "in violation" of the CWA to depend "on whether an NPDES permit is in force." *Id.* at 1174. As to the second,

the court held that it was "unpersuaded … that *Hamker* was wrongly decided" and that "[e]ven if *Hamker* were erroneously decided, [the] panel could not overrule a prior controlling decision in this Circuit." *Id.*

## 2. *Gwaltney*

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation Inc.*, considered the applicability of the citizen suit provision to past violations of an NPDES permit when the discharger had taken steps to prevent future discharges. 484 U.S. 49, 53–54 (1987). Justice Thurgood Marshall, writing for a five-justice majority, held that § 1365 "does not permit citizen suits for wholly past violations." *Id.* at 64. Specifically, Justice Marshall held that to invoke the citizen suit provision, a plaintiff must "make a good-faith allegation of [a] continuous or intermittent violation." *Id.* Ultimately, the majority opinion held that "[b]ecause the court below erroneously concluded that respondents could maintain an action based on wholly past violations of the Act," the case must be remanded for consideration of whether the "complaint contained a good-faith allegation of ongoing violation." *Id.* at 67. While the majority opinion did not purport to address what such allegations may look like, Justice Antonin Scalia, concurring in part with Justices John Paul Stevens and Sandra Day O'Connor, did.

Justice Scalia declined to join Part III of the majority opinion—the part which remanded the case for consideration of whether the plaintiffs had made a good faith *allegation* of an ongoing violation—which he believed improperly held "that the requirement for commencing a suit is the same as the requirement for maintaining it." *Id.* at 68 (Scalia, J., concurring). Justice Scalia argued that because "subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged," in

order to maintain a suit under the CWA, "allegations that are required to commence it must, if contested, be proved." *Id.* Accordingly, Justice Scalia concluded:

> [T]he issue to be resolved by the Court of Appeals on remand of this suit is not whether the allegation of a continuing violation on the day suit was brought was made in good faith after reasonable inquiry, but whether petitioner was in fact "in violation" on the date suit was brought. The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act—the opposite of a state of compliance. A good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated. When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation. It does not suffice to defeat subject-matter jurisdiction that the success of the attempted remedies becomes clear months or even weeks after the suit is filed.

*Id.* at 69.

Justice Scalia's concurrence was cited with approval by the Fifth Circuit in *Carr v. Alta Verde Industries, Inc.*, a case which considered a CWA citizen suit brought by two individuals against a cattle feed lot alleging that a series of heavy rains caused discharges into nearby navigable waters. 931 F.2d 1055, 1057–58 (5th Cir. 1991). The district court dismissed the claim for lack of standing because "[a]ny violations that had occurred … were wholly past." *Id.* at 1058. The plaintiffs appealed.

On appeal, the *Carr* panel held that "[i]n order to establish standing for a citizen suit, the plaintiff must 'make a good faith allegation of continuous or intermittent violation.'" 931 F.2d at 1061 (quoting *Gwaltney*, 484 U.S. at 64). The panel then adopted a two-part test under which an ongoing violation may be one "that continue[s] on or after the date the complaint is filed," or one for which there is a "continuing likelihood of recurrence in intermittent or sporadic violations." *Id.* at 1062. The panel found an ongoing violation existed under either test.

8

The *Carr* panel first noted that "concentrated animal feeding operations," defined as operations which "contain more than a specified number of animals and [which] discharge pollutants into navigable waters," are point sources within the meaning of the CWA, subject to the NPDES permit requirement. *Id.* at 1059. Then, citing Justice Scalia's concurrence from *Gwaltney*, the panel held that "[a] concentrated animal feeding operation that violates the Act by discharging without a permit … remains in a continuing state of violation until it either obtains a permit or no longer meets the definition of a point source"—that is, no longer contains the specified number of animals or discharges pollutants into navigable waters. *Id.* at 1062–63. Because the plaintiffs "adduced evidence from which a reasonable trier of fact could find a likelihood of a recurrence in intermittent or sporadic discharges" and because there was no indication the number of animals had decreased, the Fifth Circuit found that the defendant's "failure to obtain an NPDES permit was and is a violation of the Act." *Id.* at 1062. This same evidence satisfied the second prong of the test—that there be a likelihood of intermittent or sporadic violations. *Id.* at 1063.

### 3. *Rapanos* **and** *County of Maui*

*Rapanos* involved CWA civil and criminal enforcement proceedings against John Rapanos, a landowner in Michigan, who backfilled wetlands without applicable permits. 547 U.S. at 719–20. Rapanos challenged the enforcement actions on the grounds that the wetlands were not "waters of the United States" to implicate the CWA. *Id.* at 729. The lower courts held that the wetlands were waters of the United States, and Rapanos appealed. *Id.* The Supreme Court granted certiorari "to decide whether the[] wetlands constitute 'waters of the United States' under the [CWA]." *Id.* at 730. In a plurality opinion authored by Justice Scalia, the Supreme Court vacated the lower court opinions. *Id.* at 757.

The plurality opinion held that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are … covered by the Act." *Id.* at 742.  In advancing this approach, Justice Scalia considered the contention that under his definition of wetlands, "water polluters will be able to evade the permitting requirement … simply by discharging their pollutants into noncovered intermitted watercourses that lie upstream of covered waters." *Rapanos*, 547 U.S. at 742–43.  With respect to this argument, Justice Scalia wrote:

> Though we do not decide this issue, there is no reason to suppose that our construction today significantly affects the enforcement of § 1342, inasmuch as lower courts applying § 1342 have not characterized intermittent channels as "waters of the United States." The Act does not forbid the "addition of any pollutant directly to navigable waters from any point source," but rather the "addition of any pollutant to navigable waters." § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.

*Id.* at 743.

In *County of Maui*, certain environmental groups sued the County of Maui under the CWA's citizen suit provision.  140 S. Ct. at 1469.  According to the complaint, the County of Maui operated a wastewater reclamation facility which pumped treated water through four wells "hundreds of feet underground," and the discharge, which amounted to approximately four million gallons a day, traveled a "half mile or so, through groundwater, to the ocean," which is a navigable water under the CWA.  *Id.*  Based on the discharges, the plaintiffs argued that the County of Maui, without an appropriate permit, was discharging a pollutant into navigable waters.  *Id.* at 1469.  The district court granted summary judgment in the plaintiffs' favor, and the Ninth Circuit affirmed. *Id.*

On appeal, the Supreme Court considered the issue of how the CWA "applies to a pollutant that reaches navigable waters only after it leaves a 'point source' and then travels through groundwater before reaching navigable waters." *Id.* at 1469. In considering this question, Justice Stephen Breyer, writing for a six-justice majority, acknowledged the CWA's prohibition against "the discharge of any pollutant by any person without an appropriate permit." *Id.* at 1469 (internal quotation marks omitted). Because the CWA defined the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters … from any point source," Justice Breyer observed that "[t]he linguistic question … concerns the statutory word 'from.' Is pollution that reaches navigable waters only through groundwater pollution that is 'from' a point source, as the statute uses the word?" *Id.* at 1469–70.

Citing Justice Scalia's observation in *Rapanos* that the CWA "does not say 'directly' from or 'immediately' from," Justice Breyer rejected the position that the statute "refer[s] only to the pollutant's immediate origin." *Id.* at 1475. Rather, after considering "the statute's language, structure, and purposes," Justice Breyer held that the CWA "requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*" from the point source into navigable waters. *Id.* at 1476. According to the majority opinion, this inquiry depends on a multi-factor test in which the "transit time" and "distance traveled" by the pollutant "will be the most important factors in most cases." *Id.* at 1476–77.

### 4. *Hamker* Today

As explained above, this Court may deem *Hamker* overruled only if its holding has been "unequivocally" overturned by a Supreme Court decision. *Hamker*'s holding that an isolated spill cannot support a CWA citizen suit was based on two primary holdings: (1) that the citizen suit

provision does not apply to wholly past violations; and (2) spills cannot be ongoing violations because there is no continuous or intermittent addition of a pollutant to navigable waters from a point source. *See* 756 F.2d at 397 ("No continuing addition to the ground water from a point source is alleged, nor could it be alleged under the facts set forth in this complaint. Rather, the complaint alleges, necessarily, only that there are continuing *effects* from the past discharge, and such an allegation is insufficient for the purposes of section 1365."). Neither of these holdings has been called into question, much less unequivocally overruled, by the Supreme Court.

First, the holding that the citizen suit provision requires an ongoing violation was *confirmed* by the Supreme Court in *Gwaltney*, which required a continuous or intermittent violation. 484 U.S. at 64.

Second, while the plaintiffs argue that based on Justice Scalia's concurrence in *Gwaltney*, "*Hamker*'s formulation that the removal of the point source inherently meant the plaintiffs alleged only a single past discharge was … called into question," Doc. #226 at 3, concurrences are not controlling. *See Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) ("The reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent.") (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987)). More fundamentally, it is not at all clear that Justice Scalia's concurrence called *Hamker* into question.

Justice Scalia's concurrence stated that a defendant remains in violation of a standard limitation "so long as it has not put in place remedial measures that clearly eliminate *the cause of the violation*." 484 U.S. at 69 (Scalia, J., concurring) (emphasis added). This language "strongly indicates that the causes of the violation, not the lingering effects, should be used to determine whether there is an ongoing violation." *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1239 (N.D. Ala. 2018); *but see Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267,

1277 & n.1 (concurrence supported proposition that a violation is continuing when material "has been placed in a wetland" and not removed). Consistent with this analysis, the opinion in *Carr*, which quoted Justice Scalia's concurrence, was unconcerned with the presence (or absence) of lingering pollution. Rather, the *Carr* panel focused on whether there was a likelihood of future discharges and, having found such a likelihood, considered whether the defendants had remedied the *cause of the violation* (the absence of a permit). This analytical framework, which addressed a point source for which there was a likelihood of future discharges, is wholly inapplicable to the reasoning of *Hamker*, which involved no such likelihood.

Similarly, neither the dicta portion of the *Rapanos* non-precedential plurality opinion relied on by the plaintiffs nor the opinion in *County of Maui* purported to address the ongoing violation requirement. To the contrary, both opinions addressed the very limited question of what it means for a pollutant to be added to navigable waters *from* a point source. Put differently, as applied to this case, the opinions did not address whether the remnants of the spill amounted to an ongoing violation; instead, they addressed whether, within the meaning of the CWA, the migration of the remnants to a navigable water could be deemed *from* the relevant point source (the railcar). They would thus support the conclusion that if there was an ongoing leak from the railcar, there would likely be a violation even if the leak was not directly into a navigable water.

For all these reasons, this Court concludes that *Hamker* has not been unequivocally overruled by Supreme Court precedent and thus remains good law.

### B. *Hamker* Applied

The plaintiffs next argue that even if *Hamker* is still good law, "[t]he fact that pollutants remain present in the ground beneath Plaintiffs' property, which continues to discharge into such hydrologically connected groundwater, is an important distinction from the *Hamker* plaintiffs'

misplaced reliance on pollution of groundwater and grasslands alone, and not of jurisdictional waters subject to the Clean Water Act." Doc. #226 at 11. The plaintiffs' argument rests primarily on the Fourth Circuit's decision in *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, a case in which a Fourth Circuit panel distinguished *Hamker* on the grounds that the complaint in *Hamker* "alleged only that the discharged oil was 'leaking into ground water' and 'grasslands,' not into navigable waters." 887 F.3d 637, 649 (4th Cir. 2018). The Court finds the plaintiffs' argument unpersuasive.

As an initial matter, the *Upstate Forever* opinion was vacated by the Supreme Court in the wake of *County of Maui*. *Kinder Morgan Energy Partners, L.P. v. Upstate Forever*, 140 S. Ct. 2736 (2020). Furthermore, the *Hamker* opinion was not based on the absence of a discharge into navigable waters. Rather, it was based on the broader holding that an allegation "that there are continuing effects from [a] past discharge" is insufficient to allege an ongoing CWA violation. 756 F.2d at 397. The dissent to the Fourth Circuit's opinion in *Upstate Forever* recognized as much, noting that "the court's analysis in *Hamker* did not turn on the issue of navigable waters; rather, it turned on the fact that the continuing addition of pollutants did not come from any point source." 887 F.3d at 661–62 (Floyd, J., dissenting). Indeed, in *Upstate Forever*, the Fourth Circuit did not attempt to distinguish this aspect of *Hamker*. It merely held that "to the extent *Hamker's* reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant, *Hamker* contravenes our decision in *Goldfarb* [*v. Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. 2015)]." *Id.* at 649 n.9. Thus, the plaintiffs' allegations here regarding discharges into navigable waters do not distinguish this case from *Hamker*.

## C.  Summary

Because *Hamker*'s holding that an allegation "that there are continuing effects from [a] past discharge" is insufficient to allege an ongoing CWA violation remains good law, the plaintiffs' motion for reconsideration is denied.

## IV
## <u>Certification of Interlocutory Appeal</u>

Generally, an order is not appealable if it "disposes of one or more but fewer than all of the claims for relief asserted." *Sch. Bd. of Avoyelles Par. v. U.S. Dep't of Interior*, 647 F.3d 570, 577 (5th Cir. 2011) (quoting *Tower v. Moss*, 625 F.2d 1161, 1164 (5th Cir. 1980)).  Unless certified as a final judgment pursuant to Federal Rule of Civil Procedure 54(b), such orders are appealable only if they "have been properly certified for appeal by the district court [pursuant to] 28 U.S.C. § 1292(b)." *Gibson v. Davis*, 790 F. App'x 11, 12 (5th Cir. 2020) (quoting *Askanase v. Livingwell, Inc.*, 981 F.2d 807, 809–10 (5th Cir. 1993)).

Section 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [s]he shall so state in writing in such order.

Under the plain terms of the statute, § 1292(b) certification is appropriate where "(1) a controlling question of law is involved, (2) there is substantial ground for difference of opinion about the question of law, and (3) immediate appeal will materially advance the ultimate termination of the litigation." *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007).

The plaintiffs argue that § 1292(b) certification is warranted because the viability of *Hamker* satisfies the three requirements of the statute.  Doc. #226 at 11.  Illinois Central does not object to the request for certification.  Doc. #235 at 11.

Under section 1292(b), "a question is controlling if its incorrect disposition would require reversal of a final judgment, either for further proceedings or for dismissal that might have been ordered without the ensuing district court proceedings." *Hood v. JPMorgan Chase & Co., & Chase Bank USA, N.A.*, No. 3:12-cv-565, 2013 WL 12092108, at *2 (S.D. Miss. Sept. 12, 2013). Ordinarily," a substantial ground for difference of opinion exists where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (quotation marks omitted). As to the third requirement, "[a]lthough the availability of review is not limited to those situations in which decision on an issue would result in a complete dismissal, the Fifth Circuit has held that certification is particularly inappropriate when a party has claims remaining for adjudication by the finder of fact." *McCollum v. Livingston*, No. 4:14-cv-3253, 2017 WL 2215627, at *5 (S.D. Tex. May 19, 2017) (collecting cases).

Here, even if the two requirements for § 1292(b) certification were satisfied, the third requirement is wholly absent. The issue to be certified on appeal—the viability of *Hamker*—could conceivably dispose of only the plaintiffs' CWA claims. Such a disposition would leave an array of state and federal claims to be resolved by this Court. Under these circumstances, certification would not materially advance the ultimate termination of the litigation. *See Jay Bearden Constr., Inc. v. Unlimited Constr., Inc.*, No. 1:10-cv-480, 2011 WL 4737572, at *3 (S.D. Miss. Oct. 5, 2011) ("This order does not involve a controlling question of law that could materially advance the ultimate termination of the litigation; if the twelve month limitation period in § 85–7–141 applies, only the stop payment claims against Three Rivers would be potentially time-barred.

Breach of contract and unjust enrichment claims remain."). Therefore, the plaintiffs request for § 1292(b) certification is denied.

**V**

**<u>Conclusion</u>**

The plaintiffs' motion for reconsideration or, in the alternative, for certification of an interlocutory appeal [225], is **DENIED**.

**SO ORDERED**, this 14th day of December, 2020.

<u>/s/Debra M. Brown</u>
**UNITED STATES DISTRICT JUDGE**