**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**MELTON PROPERTIES, LLC., et al.**                 **PLAINTIFFS**

**V.**                              **NO. 4:18-CV-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD**
**COMPANY, et al.**                         **DEFENDANTS**

## ORDER

On September 29, 2020, this Court, on Illinois Central Railroad Company's motion, stayed the plaintiffs' remediation-related claims for ninety days under the doctrine of primary jurisdiction. Before the 90-day stay expired, Illinois Central, invoking primary jurisdiction, exhaustion of administrative remedies, and *Burford* abstention, filed a motion to extend the stay until October 2023. Due to an extended briefing period requested by the parties (including requests to supplement the record), the stay expired before briefing on the motion was completed. Now, having reviewed the briefing and the relevant supplements, the Court concludes that, due to administrative delays, the doctrine of exhaustion does not justify a stay. The Court further concludes that, because Illinois Central failed to adequately brief the propriety of *Burford* abstention, a stay under that doctrine is inappropriate. However, because the Court finds a stay would benefit these proceedings and would not irreparably harm the plaintiffs, a stay of 180 days is warranted under the doctrine of primary jurisdiction.

### I
### Procedural History

On March 27, 2018, Melton Properties, LLC; Floyd M. Melton, Jr.; Floyd M. Melton III; Moss B. Melton; McMillan Acres; Danny Hargett; Jane Hart McMillan Hargett; and David Hargett filed this action in the United States District Court for the Northern District of Mississippi against

Illinois Central Railroad Company; Canadian National Railway (Illinois Central's parent corporation); Union Tank Car Company, Inc.; and certain fictitious parties. Doc. #1. The complaint, as amended,[1] asserts state and federal claims arising from a toxic spill caused by a March 30, 2015, derailment of a railcar owned by Union Tank, which was being transported by "Illinois Central and/or Canadian National" on tracks "owned by Illinois Central and/or Canadian National." Doc. #92 at ¶¶ 14–15, 36–114. The plaintiffs, all property owners or farmers near the site of the spill in Leflore County, Mississippi (known as the Minter City site), also asserted claims related to the remediation of the spill. *Id.* at ¶¶ 69–72.[2]

On February 11, 2020, Illinois Central filed a motion to dismiss the plaintiffs' remediation-related claims or, in the alternative, to stay such claims. Doc. #108. The motion also sought dismissal of the plaintiffs' claims brought under the Clean Water Act and under the Resource Conservation and Recovery Act. *Id.* at 3. After receiving an extension to respond to the motion to dismiss,[3] the plaintiffs filed a motion for leave to file a second amended complaint "to reflect … additional facts [related to the remediation process] and to clarify allegations previously made." Doc. #119 at 1. On March 9, 2020, United States Magistrate Judge Jane M. Virden granted the plaintiffs' motion to amend. The second amended complaint was filed the same day. Doc. #127.

On September 29, 2020, the Court granted in part and denied in part Illinois Central's motion to dismiss. Doc. #222. Of relevance here, the order stayed the plaintiffs' remediation-related claims for injunctive relief for ninety days under the doctrine of primary jurisdiction. *Id.*

---

[1] On November 6, 2019, the Court directed the plaintiffs to file an amended complaint to correct deficiencies in the jurisdictional allegations. Doc. #91. The plaintiffs filed a "First Amended Complaint" two days later. Doc. #92. But for the corrections to the jurisdictional allegations, the two pleadings are identical.

[2] On August 23, 2018, Canadian National filed a motion to dismiss for lack of personal jurisdiction. Doc. #31. On November 14, 2019, the Court dismissed Canadian National for lack of personal jurisdiction. Doc. #93.

[3] *See* Doc. #114.

at 26–27.  Additionally, the Court stayed the remediation-related claims for damages to avoid piecemeal litigation.  *Id*.

On November 23, 2020, Illinois Central moved to extend the stay through the completion of MDEQ's remediation process, Doc. #252, which Illinois Central anticipates will be "no later than October 2023,"[4] Doc. #277 at 1.  Due to requests for extensions and a motion for leave to file a sur-rebuttal, briefing on the motion was not completed until January 20, 2021.  On April 26, 2021, Illinois Central was granted leave to supplement the record with additional exhibits.  *See* Doc. #330.

## II
## Factual Background

The relevant facts are largely undisputed.  On March 30, 2015, an Illinois Central train derailed, spilling contaminants—primarily Dicyclopentadine ("DCPD")—onto property owned and/or farmed by the plaintiffs.  Following the spill, Illinois Central made initial efforts to remediate the spill site.[5]

On September 28, 2015, MDEQ wrote Illinois Central requesting "a Corrective Action Plan addressing residual soils that exist above the EPA [Regional Screening Level] and the identification and removal both of surficial and buried debris and solid waste on or before October 30, 2015."  Doc. #117-1 at PageID 2123.[6]  Illinois Central submitted a Supplemental Site Assessment Work Plan, which MDEQ approved on December 23, 2015, subject to certain

---

[4] As alternative relief, Illinois Central seeks a stay "until after the Court rules on Plaintiffs' pending request for certification of an interlocutory appeal of the Court's dismissal of Plaintiffs' Clean Water Act ("CWA") citizen suit." Doc. #253 at 2.  Because this Court has denied certification of the interlocutory appeal, *see* Doc. #262 at 15–16, this alternative request is moot.

[5] The efficacy of the remediation efforts is disputed but largely immaterial to this motion.

[6] In briefing this second motion to stay, both parties relied on exhibits filed in association with the first motion to stay. *See, e.g.*, Doc. #253 at 2–3.  This Court does so as well.

conditions, including that "should the data support a complete conceptual site model, then [Illinois Central] will develop a comprehensive Corrective Action Plan for the removal of contaminated soils and solid waste remaining on site from the property." Doc. #117-2 at PageID 2136.

On September 22, 2016, MDEQ rejected as inadequate Illinois Central's proposal of a "Site-Specific Cleanup Level." Doc. #117-4. Approximately six months later, on March 17, 2017, MDEQ conditionally approved a Groundwater Delineation Work Plan submitted by Illinois Central. Doc. #117-7. MDEQ approved with comments Illinois Central's June 23, 2017, Corrective Action Plan ("CAP") on July 24, 2017. Doc. #117-8. On December 28, 2017, the agency approved with comments an October 26, 2017, addendum to the CAP. Doc. #117-9.

On January 12, 2018, Melton Properties, LLC, Caroline McComb Scheppe, and the Caroline McComb Scheppe Trust Number One filed a petition with MDEQ requesting "an evidentiary hearing for the Commission to consider actions taken in connection with the assessment, delineation, remediation, and cleanup of soil and groundwater contamination caused by [the] train derailment." Doc. #117-11 at PageID 2192. Consistent with the petition, MDEQ set an evidentiary hearing for November 14, 2018. *Id.* at PageID 2192–93.

On February 20, 2018, after receiving Illinois Central's response to its comments, MDEQ approved the October 26, 2017, addendum to the CAP. Doc. #108-9 at PageID 1987. The approval "requests that the remediation and restoration activities proposed begin by March 23, 2018 and all actions be completed on or before June 29, 2018 with a final Corrective Action Report submitted to MDEQ on or before July 31, 2018." *Id.* It appears work began on the site on or about April 30, 2018. Doc. #117-10.

On August 2, 2018, MDEQ wrote Illinois Central regarding certain deficiencies in the CAP. Doc. #117-12 at PageID 2197. The letter noted that "considering that as of August 1, 2018,

4

the remediation and restoration activities are still ongoing, MDEQ will extend the completion due date to Friday, August 17, 2018, and the Corrective Action Report due date to Friday, September 7, 2018." *Id.* at PageID 2198. Due to this extension, MDEQ postponed the evidentiary hearing until further notice. *Id.* at PageID 2200.

On April 4, 2019, MDEQ approved with comments a March 1, 2019, Revised Monitoring Well Installation and Groundwater Sampling Work Plan submitted by Illinois Central. Doc. #117-13. The approval required that the "assessment activities be implemented within 45 days of receipt of this letter." *Id.* at PageID 2202.

On April 28, 2020, Illinois Central submitted to MDEQ a Fourth Quarterly Groundwater Sampling Report which, among other things, proposed "a pilot study work plan to evaluate the efficacy of various remedial strategies for miscible phase DCPD in groundwater." Doc. #180-1 at PageID 3127. On May 15, 2020, MDEQ approved the pilot study with the requirement that it be submitted to MDEQ for review by June 15, 2020. *Id.* at PageID 3443. Illinois Central submitted the proposed pilot study on June 15, 2020. *Id.* at PageID 3445. The schedule initially included a completion date of October 13, 2020. *Id.* at PageID 3452.

On June 22, 2020, counsel for the Meltons wrote MDEQ complaining of the pace of the remediation and MDEQ's actions. Doc. #180-1 at PageID 3453–58. On July 21, 2020, after its July 10 approval in part of the proposed pilot study plan with comments,[7] MDEQ responded to the Meltons' counsel by letter. Doc. #187-2. Acknowledging the Meltons' counsel's concerns, the letter states that "MDEQ has only one other experience with DCPD contamination" and that "DCPD is a unique chemical and there is little data available regarding cleanup options." *Id.* at PageID 3483. The letter concludes that "MDEQ does not dictate deadlines for final site

---

[7] Doc. #187-1.

remediation unless the responsible party has been unresponsive to its requests to initiate cleanup" and that "MDEQ expects [Illinois Central] to submit the CAP and provide a schedule of remedial implementation within six to eight weeks upon completion of the Work Plan (October 13, 2020)." *Id.* at PageID 3484.

On November 4, 2020, Illinois Central produced a soil sampling report which reflected no soil contamination on the plaintiffs' property but showed contamination on areas adjacent to the plaintiffs' property. Doc. #252-1 at PageID 4750.

On November 6, 2020, counsel for the plaintiffs wrote MDEQ to address concerns regarding an October 9, 2020, groundwater sampling report submitted by the defendants and to raise concerns about the status of MDEQ's enforcement action. Doc. #268-1. Approximately a month later, on December 8, 2020, MDEQ wrote the plaintiffs' counsel providing an update on the status of the remediation. Doc. #268-2. The correspondence noted that Illinois Central "must submit the Corrective Action Plan (CAP) within 60 days of completion of the pilot study" and that MDEQ "will work with all parties to expedite the CAP review period." *Id.* at PageID 5322. The letter also addressed other topics, including the nature of the chemicals in the pilot study, the possible migration of pollutants, the required removal of metal debris, and the possibility of future farming. *Id*. at PageID 5322–23. Ten days later, MDEQ wrote Canadian National requiring the submission of a remedial framework for site-wide remediation on or before January 15, 2021. Doc. #268-3.

On December 23, 2020, Illinois Central wrote MDEQ to "confirm [its] remedial framework and schedule to address the remaining issues related to the Minter City derailment site." Doc. #276-1 at PageID 5370. The correspondence noted that the pilot study began on December 11, 2020, and was estimated for completion on March 15, 2021. *Id*. at PageID 5371. Based on this

end date, the letter estimated a CAP Amendment date of May 15, 2021, and approximately four to six weeks for a "CAP Amendment review/revision process." *Id*. It also estimated implementation of the miscible phase of the CAP addendum by September 2021 and an October 2023 estimated completion for active remediation. *Id*. at PageID 5371–72.

In a January 8, 2020, letter, MDEQ approved the proposed schedule but noted that it would "hold Canadian National accountable to this two-year expectation on remedial goals" and would require an approved Contingency Plan if it appeared remediation would not be completed on time. Doc. #276-2 at PageID 5379.

On March 25, 2021, MDEQ responded to a letter from the plaintiffs' counsel which raised concerns regarding the status of the remediation project. Doc. #318-1. In the letter, MDEQ cited three factors which contributed to the slow remediation process: (1) that "DCPD releases in Mississippi are extremely rare[,] and nationally there is very little research or remedial information for addressing impacts from DCPD spills;" (2) that the spill impacted farmland and an active railway; and (3) that MDEQ "has in effect been providing mediation efforts" between the parties. *Id*. at PageID 5578–79.

## III
## Analysis

Illinois Central's argues a stay is warranted under the doctrines of primary jurisdiction, *Burford* abstention, and exhaustion of administrative remedies. *See* Doc. #253 at 8–14.

### A. Administrative Exhaustion

"The jurisprudential exhaustion doctrine is a long settled rule of judicial administration which mandates that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 476 (5th Cir. 1997) (cleaned up). The doctrine "applies where a claim is cognizable in

the first instance by an administrative agency alone." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). The exhaustion requirement "applies in federal courts to both state and federal administrative remedies, and has been said to be of special force in federal-state cases." *Patsy v. Fla. Int'l Univ.*, 634 F.2d 900, 902–03 (5th Cir. 1981), *rev'd and remanded on other grounds sub nom.*, *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982).

For state law claims, exhaustion requirements are determined by reference to state law. *See Whitehead v. Zurich Am. Ins. Co.*, 348 F.3d 478, 481 (5th Cir. 2003) (considering Mississippi law of exhaustion for state law tort claims); *Lamar Co., L.L.C. v. Miss. Transp. Comm'n*, 786 F. App'x 457, 460 (5th Cir. 2019) ("As an initial matter, Mississippi law regarding the exhaustion of administrative remedies applies in this case."). Federal claims require analysis of federal law. *See Taylor*, 127 F.3d at 477.

There is no dispute that the plaintiffs' remaining federal claims, which are brought under the Resource Conservation and Recovery Act, are not subject to exhaustion requirements. *Cannata v. Forest Pres. Dist. of Du Page Cnty.*, No. 06 C 2196, 2006 WL 2927604, at *5 (N.D. Ill. Oct. 11, 2006) ("The RCRA does not require plaintiffs to exhaust state remedies prior to initiating federal proceedings."). Accordingly, the exhaustion doctrine is inapplicable to such claims.

As for the plaintiffs' state law claims, under Mississippi law, "[w]here an administrative agency regulates certain activity, an aggrieved party must first seek relief from the administrative agency before seeking relief from the trial courts." *Chevron U.S.A., Inc. v. Smith*, 844 So. 2d 1145, 1148 (Miss. 2002). However, "[t]he exhaustion doctrine is not without its exceptions." *Pub. Emps. Ret. Sys. of Miss. (PERS) v. Hawkins*, 781 So. 2d 899, 906 (Miss. 2001). To determine whether to apply the exhaustion doctrine, a court should consider six "factors": (1) if pursuing the

administrative remedy would "result in irreparable harm;" (2) if "the agency clearly lacks jurisdiction;" (3) if "the agency's position is clearly illegal;" (4) if "the dispositive question is one of law;" (5) whether "exhaustion would be futile;" and (6) "comparatively, [whether] the action can be disposed of with less expense and more efficiently in the judicial arena." *Id.*

The plaintiffs argue that, pursuant to Mississippi law, they are not required to exhaust claims which "do not specifically relate to an administrative remedy provided by the statutes and regulations of MDEQ." Doc. #129 at 13[8] (quoting *Georgia-Pacific Corp. v. Mooney*, 909 So. 2d 1081, 1090 (Miss. 2005)). They submit that because "MDEQ is not legally authorized to provide damages for ICRR's negligence, gross negligence, trespass, public nuisance *per se*, or any other claim for damages … those claims are not subject to the doctrine of exhaustion of administrative remedies." *Id.* at 14. They further argue that to the extent the exhaustion requirement applies, it should be excused due to administrative delay. *Id.* at 14–15.

### 1. Necessity of exhaustion

The Mississippi Supreme Court has provided three guidepost opinions regarding the necessity of administrative exhaustion for environmental claims—*Chevron* and *Mooney*, both cited above, and *Donald v. Amoco Production Co.*, 735 So. 2d 161 (Miss. 1999).

In *Donald*, a property owner asserted, among other claims, a negligence per se claim against several oil companies based on allegations that the companies violated certain oil and gas regulations. 735 So. 2d at 176. In addressing the negligence per se claim, the Mississippi Supreme Court held that "[i]n general, a complainant must exhaust the administrative remedies available to him before resorting to the courts for resolution of his dispute. However, where no adequate

---

[8] Both parties purport to incorporate by reference their earlier briefing on *Buford* abstention and exhaustion of administrative remedies. Doc. #253 at 14; Doc. #269 at 15. While this Court ordinarily would not approve of this practice, it will excuse it in this instance.

administrative remedy is provided, the exhaustion doctrine is not applicable." *Id*. (internal citations omitted). The Court then held that because the State Oil and Gas Board had "jurisdiction and authority over all persons and property necessary to enforce its regulations" and the property owner had a right as an "interested person" to seek Board enforcement, the property owner was required to exhaust his remedies because the Board could have "required the[ oil companies] to pay the costs of clean-up, restoration, etc." *Id*. at 176–77. Since the property owner failed to exhaust his remedies, the *Donald* court held his claims were properly dismissed. *Id*. at 177.

*Chevron* involved an appeal from a $2,349,275 jury verdict against Chevron, U.S.A. for oil field contamination. 844 So. 2d at 1146. On appeal, Chevron argued, among other things, that the plaintiff property owners had failed to exhaust their administrative remedies before bringing their claims. *Id*. The Mississippi Supreme Court, as quoted above, held that "[w]here an administrative agency regulates certain activity, an aggrieved party must first seek relief from the administrative agency before seeking relief from the trial courts." *Id*. at 1148. It also held that pursuant to *Donald*, "plaintiffs must seek restoration from the Mississippi Oil and Gas Board before a court can properly assess the appropriate measure of damages." *Id*. Ultimately, the Court wrote:

> This Court cannot allow a private landowner to pursue restoration of his or her land in the courts of this State by sidestepping a very vital and useful agency that could help protect the average Mississippian from the dangers of NORM pollution. Since no court can order the plaintiffs in this case to expend the award on decontaminating the property, the outcome allowed by the trial court does nothing to protect the citizens of Mississippi from the dangers of NORM contamination. Nor will this Court allow a windfall to the plaintiffs who obviously have no intention of cleaning up their property since they have refused all such offers of cleanup. Not only will requiring the aggrieved property owner to pursue his claims with the Oil and Gas Board alert the Board to possible wide-reaching violations, it will benefit the courts of this state by helping reduce the amount of time necessary to try cases like this one (if the seven week trial in this instance was not enough). The citizens of this state are better served by having an expert regulatory agency enforce the environmental statutes rather than waiting for the private citizen to bring individual

actions for damages and restoration, which are no guarantee that the pollution will be eradicated. Therefore, due to the Smiths' failure to exhaust remedies available to them from the Mississippi Oil and Gas Board prior to bringing the present litigation, this Court must reverse and render.

*Id*. at 1148–49.

Three years after *Chevron*, the Mississippi Supreme Court in *Mooney* considered an interlocutory appeal in a case involving "multiple causes of action" arising from the alleged disposal of waste material. 909 So. 2d at 1082. While the interlocutory appeal concerned a transfer of the consolidated cases from state county court to chancery court, the Mississippi Supreme Court also addressed the necessity of exhaustion. *Id.* In that regard, the court held that "[t]he Mississippi Legislature has delegated authority to MDEQ in regard to solid waste management" and that MDEQ "has the authority to enforce compliance with the environmental laws and regulations of the State of Mississippi and may impose civil penalties, injunctive relief, remediation or clean-up." *Id*. at 1090. With respect to whether the plaintiffs in the consolidated cases were required to exhaust their remedies, the *Mooney* court observed:

> There is a distinction between *Chevron* and *Donald* in that *Chevron* is based upon an administrative ruling for contamination only whereas *Donald* and the case sub judice were initially based upon multiple claims in the complaints. *Donald* only provides administrative relief for the negligence per se claim because it was based upon alleged violations of oil and gas regulations.

909 So. 2d at 1090. The court further noted that "[i]n *Donald* the causes of action included negligence, nuisance, trespass to land, breach of contract, waste, strict liability and outrageous conduct. All claims against the oil companies, with the exception of only the negligence per se claim, were found to have been erroneously dismissed by the trial court." *Id*.

Turning to the claims at issue in the appeal, the *Mooney* court remarked that "[l]ike *Donald*, here the Plaintiffs' claims were for multiple claims such as negligence, gross negligence, strict liability, continuing toxic trespass, private nuisance, public nuisance and waste. The Plaintiffs'

11

claims are not solely based upon the clean-up of any contamination." *Id.* Accordingly, the *Mooney* court held, "[t]o the extent that the causes of action do not specifically relate to an administrative remedy provided by the statutes and regulations of MDEQ," such claims should not be dismissed for failure to exhaust. *Id.* Thus, on remand, the Mississippi Supreme Court directed the lower court to "determine what causes of action relate to potential clean-up, remediation or closure activities pursuant to the laws and regulations of MDEQ." *Id.* at 1091.

In the years since *Mooney*, it appears the Mississippi Supreme Court has not addressed the issue of what types of claims "relate to" an MDEQ remedy (such as remediation). However, in *Town of Bolton v. Chevron Oil Co.*, the Mississippi Court of Appeals rejected an argument that a claim for money damages is not barred by the exhaustion requirement when the relevant administrative agency (in that case, the Oil and Gas Board) lacks authority to provide monetary relief. 919 So. 2d 1101, 1111 (Miss. Ct. App. 2005) (citing *Von Hoffburg v. Alexander*, 615 F.2d 633 (5th Cir. 1980)). This is because the exhaustion requirement is not dependent on whether the specific remedy requested for a given claim is available from the agency. "Rather, the question is whether the Board's authority embraces the types of harm suffered by the" plaintiff to such an extent as to require exhaustion. *Id.* at 1108. And, consistent with *Mooney*, a claim is embraced by the authority of an agency when it "specifically relates" to a remedy available in the agency. 909 So. 2d at 1090.

Here, by the plaintiffs' own admission, their claims at issue in this motion "relat[e]" to Illinois Central's "faulty remediation of Plaintiff's property," a remedy which falls squarely within MDEQ's authority. Doc. #129 at 13. It follows, therefore, that such claims are subject to Mississippi's administrative exhaustion requirement.

## 2. Exceptions to exhaustion requirement

The plaintiffs argue that even if the exhaustion requirement applies, it should be excused as to their claims because pursuing the remedies (1) would be futile because MDEQ cannot award the damages they seek and (2) would result in undue administrative delay. Doc. #129 at 14–16. As explained above, Mississippi courts have rejected the argument that an unavailability of remedies can excuse the exhaustion requirement. So this Court need only address the delay argument.

Under Mississippi law, an "exception to the requirement to first exhaust administrative remedies provides relief for a party when there is a delay of action or failure to act on the part of an administrative agency." *Mooney*, 909 So. 2d at 1089. To this end, the Mississippi Supreme Court appears to have adopted a bright-line rule for determining whether an administrative delay will excuse an exhaustion requirement.

In *Public Employees Retirement System of Mississippi (PERS) v. Hawkins*, a panel of special justices sitting on the Mississippi Supreme Court considered whether Armis E. Hawkins, a former Mississippi Supreme Court Justice, was required to exhaust his remedies through the Public Employees Retirement System of Mississippi before pursing declaratory relief claims related to his entitlement to certain pension benefits. 781 So. 2d at 900–02. In determining there was no requirement to exhaust, the panel wrote:

> This Court has held that administrative remedies which provide plain, speedy adequate and complete relief must be exhausted. *Hood v. Mississippi Dep't of Wildlife Conservation*, 571 So.2d 263, 268 (Miss.1990). However, this Court has previously decided that a claimant was not afforded a plain, speedy, adequate and complete remedy where the matter had been pending for three years or more. *Weems*, 653 So.2d at 276. In today's case, the matter has been pending since 1993. At least four years passed before this action was filed in the circuit court in 1997. Under the Court's holding in *Weems*, Hawkins did not have an adequate and complete administrative remedy because he could not get a "final administrative decision," which is a condition precedent to the right to appeal to the Board of

13

> Trustees under Regulation 42. Without a "final administrative decision," Hawkins had no right to appeal under Regulation 42, and had no other administrative remedy available to him. Accordingly, no further exhaustion of remedies was required in this action.

*Id.* at 907.

In *Mooney*, the plaintiffs, citing *Hawkins*, argued the delay in the underlying administrative proceedings justified excusing the exhaustion requirement. 909 So. 2d at 1089. The Mississippi Supreme Court rejected this argument because:

> the Plaintiffs have not shown that they requested a hearing before MDEQ to order closure on the site. Indeed, the correspondence from MDEQ never decisively stated that the site was an illegal dump. The MDEQ did view the site on November 27, 1990. On July 15, 1991, a MDEQ letter indicated that the site did not need a permit at that time. In 1999, the MDEQ indicated that the site needed closure and requested, among other things, proposed closure plans and a closure schedule. In 2002, the MDEQ sent correspondence indicating that it had waited for resolution of the litigation, however, there was no resolution and therefore it would consider seeking administrative actions to require closure of the site. While it is true that Georgia–Pacific urged the MDEQ to wait for the final result of the ongoing litigation, there is no indication that the Plaintiffs requested any hearing by the MDEQ.

*Id*. at 1091.

Taken together, these two opinions hold that under Mississippi law, a plaintiff is not required to exhaust his administrative remedies when he will not receive a final decision within three years of his request for hearing. While the Court questions the wisdom of such a rule (and indeed questions *Hawkins*' interpretation of *Weems*), it is not in a position to overrule binding state authority. Because it has been more than three years since the plaintiffs here sought a hearing before MDEQ (and appears to be at least two years more before any final agency action may be forthcoming), the Court concludes the plaintiffs were not required to exhaust their administrative remedies.

14

### B. *Burford* Abstention

"*Burford* abstention allows federal courts to avoid entanglement with state efforts to implement important policy programs." *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021). Under this doctrine:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989)).

To determine whether abstention is warranted under *Burford*, a court should consider five factors: (1) "whether the cause of action arises under federal or state law;" (2) "whether the case requires inquiry into unsettled issues of state law or into local facts;" (3) "the importance of the state interest involved;" (4) "the state's need for a coherent policy in that area;" and (5) "the presence of a special state forum for judicial review." *Id.* The burden of establishing the propriety of *Burford* abstention rests with the party invoking the doctrine. *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 497 (7th Cir. 2011); *Neary v. Miltronics Mfg. Servs., Inc.*, 534 F. Supp. 2d 227, 229 (D.N.H. 2008).

While the *Burford* elements differ somewhat from the primary jurisdiction analysis, when a party asserts that a federal court should abstain in light of a state administrative agency, the *Burford* abstention and primary jurisdiction doctrines are "different labels for the same thing." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998); *see Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1266 (11th Cir. 2000) (quoting *PMC, Inc.*).

In invoking *Burford* abstention, Illinois Central purports to incorporate "all arguments and authorities" related to the doctrine in its motion to dismiss and supporting memorandums. Doc. #253 at 14. In its earlier briefing, Illinois Central made no effort to apply the relevant *Burford* factors to this case. Doc. #109 at 14–15. Rather, it argued that the primary jurisdiction factors should control the analysis. *Id.* Given this, the Court sees no reason to conduct an independent *Burford* analysis.

## C. Primary Jurisdiction

"The doctrine of primary jurisdiction is a doctrine of judicial abstention whereby a court which has jurisdiction over a matter, nonetheless defers to an administrative agency for an initial decision on questions of fact or law within the peculiar competence of the agency." *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 810 F.3d 299, 309 (5th Cir. 2016) (alterations omitted). Application of the doctrine "is favored when (a) it will promote even-handed treatment and uniformity in a highly regulated area, or when sporadic action by federal courts would disrupt an agency's delicate regulatory scheme; or (b) the agency possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 811 (5th Cir. 2011). "[A]t a general level, the primary jurisdiction doctrine requires the district court to balance the assistance potentially provided by an agency's specialized expertise against the litigants' certainty of delay." *Occidental*, 810 F.3d at 310. However, primary jurisdiction is inapplicable

> if, under no conceivable set of facts, the agency could immunize what would be a clear violation of federal law; where the litigation deals with a single event which requires no continuing supervision by the regulatory agency; or where Congress has determined by statute that the courts should decide the issue in the first instance.

*Occidental*, 810 F.3d at 309 (cleaned up).

In granting the initial ninety-day stay of the injunction claims related to remediation, this Court drew substantial guidance from *Read v. Corning Inc.*,[9] a case form the Southern District of New York with very similar facts. Doc. #222 at 25. In *Read*, a district court invoked the primary jurisdiction doctrine to stay injunctive claims against a defendant polluter undertaking remediation of the property under the direction of the New York State Department of Environmental Conservation and then stayed remediation-related damages claims in the interests of judicial efficiency. *Id.* at 25. This Court noted that *Read*'s invocation of primary jurisdiction turned on four factors:

> (1) the [state agency] ha[d] considerably more expertise in the underlying factual matters; (2) the underlying question at issue in the case – how best to remediate the contamination – ha[d] been committed to the [state agency's] discretion by the New York legislature; (3) court-ordered injunctive relief would create a risk of inconsistent rulings; and (4) the [state-agency] was well-into its administrative proceedings.

*Id.* (cleaned up). This Court then concluded that primary jurisdiction justified a stay because the case presented none of the special circumstances which counsel against the invocation of primary jurisdiction and because:

> As in *Read*, there can be no doubt that the administrative agency here—MDEQ— has considerably more experience in the underlying factual matter of contaminant remediation or that responsibility for such matters has been delegated to MDEQ. 4 JEFFREY JACKSON ET AL., ENCYCLOPEDIA OF MISS. LAW § 31:5 (2d ed.). Similarly, to the extent Illinois Central's responsibilities with respect to the property have not been finally determined by MDEQ, any decision by the Court would create a risk of inconsistent rulings. Also, while there have certainly been delays, it seems that the remediation efforts of Illinois Central are nearing completion, so as to render any substantial delay unlikely. Furthermore, to guard against any prejudice from a substantial delay, the stay will be limited to ninety days.

Doc. #222 at 26.

In its motion to stay, Illinois Central "requests that this Court continue to follow the

---

[9] 351 F. Supp. 3d 342, 347 (W.D.N.Y. 2018).

rationale in *Read* and stay Plaintiffs' claims until MDEQ deems the remediation complete." Doc. #253 at 10. The plaintiffs respond that *Read* "is in direct conflict with controlling Fifth Circuit authority" and, even if it was not, it does not justify a stay in this instance. Doc. #269 at 13–15.

### 1. *Read*'s applicability

The plaintiffs first argue that *Read* is inapplicable because the decision was based on a four-factor test articulated by the Second Circuit whereas "in the Fifth Circuit '[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case, the question is whether the reasons for the existence of the doctrine are present and whether the purpose it serves will be aided by its application in the particular litigation." Doc. #269 at 11–12 (quoting *Occidental*, 810 F.3d at 309)). The plaintiffs' argument is misplaced.

The command that courts avoid "fixed formulas" in evaluating the applicability of the primary jurisdiction doctrine is not a distinctly Fifth Circuit position. To the contrary, the rule, which was set forth in 1956 by the United States Supreme Court in *United States v. Western Pacific Railroad Co.*, cited above, necessarily applies in *all* federal courts, including the Second Circuit. Indeed, the Second Circuit has cited the no fixed-formula rule in setting forth its four-factor test. *See Ellis v. Tribune Television Co.*, 443 F.3d 71, 82–83 (2d Cir. 2006). The consideration of general factors is not a "fixed formula." If it were, the Fifth Circuit's own rules would necessarily be inconsistent with Supreme Court precedent. Moreover, the factors considered in *Read* are wholly consistent with Fifth Circuit precent.

The first *Read* factor—the comparison of agency expertise with the experience of the Court—mirrors the Fifth Circuit's recognition that primary jurisdiction will be warranted when "the agency possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Elam*, 635 F.3d at 811. The second factor—whether the agency has been delegated

18

authority to act in the area—incorporates the consideration that the doctrine is favored when the court's action "would disrupt an agency's delicate regulatory scheme." *Id.*[10] The third factor—the risk of inconsistent rulings—mirrors the Fifth Circuit's consideration of whether the doctrine would promote "even-handed treatment and uniformity in a highly regulated area." *Id.*; *cf. Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 801 (5th Cir. 2000) (in full faith and credit case, citing primary jurisdiction goal of promoting uniformity and consistency as authority for avoiding inconsistent results). Finally, the fourth factor—the stage of the administrative proceeding—necessarily incorporates the extent of the delay associated with any stay. *See Occidental*, 810 F.3d at 312.

Put differently, consistent with the general balancing test set forth in *Occidental*, the first three *Read* factors consider the assistance provided by the agency decision (the positive side of the inquiry) while the fourth considers the possibility of delay (the negative side). *Id.* at 312. Thus, the Court rejects the plaintiffs' argument that the Second Circuit framework, as applied in *Read*, is contrary to Fifth Circuit authority.

### 2. Propriety of primary jurisdiction

Having concluded that under Fifth Circuit precedent, *Read* provides relevant guidance for considering the applicability of primary jurisdiction to state cleanup proceedings, the question is whether the balancing of the positive and negative aspects of a stay would justify primary jurisdiction here.

#### a. The Positive Inquiry

As mentioned above, the benefits of an administrative stay generally depend on three

---

[10] Delegation may also be relevant to the extent of the agency's expertise. *See Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir. 1988).

factors—the court's expertise in the subject area relative to the administrative agency; whether the agency was delegated authority over the subject matter; and whether refusing to stay could result in inconsistent rulings.

The plaintiffs do not dispute that MDEQ has significant expertise in determining the proper remediation response to contaminant spills such as the one at issue here. While this Court acknowledges that federal courts "routinely hear complicated environmental tort cases, which blend discreet facts with federal law, state law, and administrative regulations," *People of Ca. v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1084 (S.D. Cal. 2008), in comparison to MDEQ's expertise, this Court is "relatively unfamiliar" with such issues. *See Read*, 351 F. Supp. 3d at 353 (technical remediation questions "not within the conventional experience of judges"). Accordingly, the first factor weighs in favor of primary jurisdiction.

This Court previously concluded that the responsibility for remediation has been delegated to MDEQ. Doc. #222 at 26. The plaintiffs do not dispute this conclusion. Accordingly, the existence of this regulatory authority weighs in favor of primary jurisdiction. *See Elam*, 635 F.3d at 811.

Now, the plaintiffs argue that because MDEQ lacks the authority to award damages, any award of damages could not be inconsistent. Doc. #269 at 14. Additionally, the plaintiffs, without citing authority, also argue there is only a "minimal" risk of inconsistent rulings with respect to injunctive relief because "this Court requiring ICCR to restore Plaintiffs' property … is the goal of MDEQ-supervised remediation as well." *Id.* Illinois Central argues that continuation of this action could expose it to inconsistent rulings because this Court would be placed in a position

> to address very complex remedial issues, such as the sufficiency of MDEQ's and EPA's target remediation goals, the most appropriate method of bioremediation for degradation of contamination based on ICRR's pilot and respirometry studies, the potential for migration of groundwater contamination, whether a hydrological

20

> connection exists between the groundwater aquifer and the Tallahatchie River, and the potential for soil remediation present on adjacent properties to leach into the groundwater and travel to Plaintiffs' property.

Doc. #277 at 9.

As an initial matter, the plaintiffs are correct that claims seeking damages "for past and completed conduct would not interfere" with any action of an agency. *Litton Sys., Inc. v. Sw. Bell Tel. Co.*, 539 F.2d 418, 423 n.13 (5th Cir. 1976).[11] To the extent the plaintiffs seek damages for Illinois Central's past conduct in failing to remediate the property, this factor weighs against invocation of primary jurisdiction.

With respect to claims for injunctive relief, it is true that restoration of the plaintiffs' property is the goal of both this proceeding and MDEQ's administrative action. It is also true that "a more stringent remediation standard" is not the type of inconsistent ruling which would ordinarily justify primary jurisdiction. *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 692 (3d Cir. 2011); *see Concerns Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 601 (E.D. Mich. 2016) ("The danger of creating inconsistent obligations for the defendants is relatively low in this case, because the EPA and the plaintiffs are seeking the same result: safe drinking water for the residents of Flint."). However, the risk of an inconsistent ruling does not rest solely in the possibility that a court may require (or deny) relief while the state agency may not. Rather, there is also a risk in inconsistent rulings with respect to what *form* the required relief may take. Thus, there is a risk of inconsistent rulings when "[t]here is room for significant disagreement as to the

---

[11] *But see Miss. Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 419 (5th Cir. 1976) ("The nature of relief sought, moreover, is also a relevant consideration in deciding whether to refer to the agency. The court in instituting injunctive relief may be able to provide adequate flexibility to coordinate its decision with subsequent regulatory action.").

necessity or wisdom of any particular" course of action. *Palmer v. Amazon.com, Inc.*, __ F. Supp. 3d __, No. 20-cv-2468, 2020 WL 6388599, at *6 (E.D.N.Y. Nov. 2, 2020).

For example, in *Read*, the potential inconsistency was that the state agency had approved a "two-foot excavation remedy," which the plaintiffs argued was "not good enough." 351 F. Supp. 3d at 354. The court noted that "[i]f this case were to go forward, and the Court were ultimately to order, for example, a fifteen-foot excavation remedy, one can only imagine the delay and uncertainty that would ensue, as Corning found itself whipsawed between two different remedies ordered by two different entities, each with jurisdiction over the matter." *Id*.

This Court agrees with Illinois Central that granting injunctive relief in this case carries a risk of subjecting it to inconsistent rulings. While Illinois Central is required to remediate the plaintiffs' properties, it is beyond dispute that there is room for significant disagreement *as to the form* such remediation should take. *See Davies v. Nat'l Cooperative Refinery Ass'n*, 963 F. Supp. 990, 998 (D. Kan. 1997) ("A potential for conflicting orders would exist if this court were to determine an investigatory and remediation plan independently of the KDHE."). Indeed, the form of the required remediation has, as explained above, been the subject of study for years. Given the uncertainty surrounding Illinois Central's remediation requirements, the Court concludes that there is a risk of inconsistent rulings as to the claims for injunctive relief.

*b.    The Negative Inquiry*

In considering the certainty of delay, the Fifth Circuit considers three factors: (1) whether the relevant issues are already before the agency or are likely to be before the agency, *see Miss. Power*, 532 F.2d at 420 ("The advisability of invoking primary jurisdiction is greatest when the issue is already before the agency."); (2) the expected length of time for the decision; and (3) whether the delay would cause the plaintiffs irreparable harm. *Occidental*, 810 F.3d at 313. In

considering these factors, an agency's "possible inaction" is a relevant consideration but will not preclude the primary jurisdiction doctrine when "recent developments indicate[] [the agency] might be … willing to act on such claims." *Id.* at 312–13.

Here, there is no dispute that the relevant issues (the proper method for remediation) are already before MDEQ. With respect to the potential length of delay, Illinois Central argues it likely will complete active remediation by October 2023, which will eliminate the risk of inconsistent rulings. Doc. #277 at 8. The plaintiffs respond that Illinois Central, with the acquiescence of MDEQ, has engaged in a pattern of delay which calls into question its proposed timeframe. Doc. #287 at 2–4. The plaintiffs further argue that even if the Court credited the October 2023 completion date, "such a long stay … is clearly disfavored in the Fifth Circuit." Doc. #269 at 13.

To be sure, the remediation process in this case has stretched over years. However, as noted above, MDEQ claims the lengthy period has been caused by the agency's inexperience with DCPD, the dual nature of the farmland and the active railroad track, and the agency's attempts to mediate issues between Illinois Central and the plaintiffs. Doc. #318-1. In response to these claims, the plaintiffs argue that the March 25 letter is self-serving and that MDEQ's inexperience with DCPD and the use of the land as farmland should have increased the urgency of the response. Doc. #328 at 2–3. The plaintiffs do not appear to address MDEQ's statement that the delay was attributable, in part, to its efforts to mediate between Illinois Central and the plaintiffs.

In considering the reasons for the delay, the Court agrees with the plaintiffs' assertion that given the toxicity of the chemicals and the nature of the farmland, there is certainly a *reason* to complete the remediation process as quickly as possible. However, a need to move quickly does not define what quickly means. To this end, the Court sees no reason to doubt MDEQ's

representations regarding the reasons for the drawn-out timeframe. In other words, while the Court accepts the plaintiffs' argument that there is a reason for MDEQ to move as quickly as possible, it does not follow that MDEQ is not moving as quickly as possible.

MDEQ's diligence can be seen in its quick responses to Illinois Central's proposals and recent correspondence in which MDEQ expressly notified Illinois Central that it would be held to the proposed timeline. Indeed, in their response brief, the plaintiffs represent that "[a]s recently as a week and a half before this filing, ICRR attempted to delay normal sampling of new groundwater wells until February of next year – changing course to sample the new wells this year only after Plaintiffs demanded they do so and MDEQ concurred." Doc. #269 at 6. Thus, it appears MDEQ has followed through on its intention to hold Illinois Central to the promised timeline. All this is to say that under the circumstances, the Court credits Illinois Central's representation that the active remediation will be completed by October 2023, more than two years from now. *See Jones v. Halliburton Energy Servs., Inc.*, No. CIV-11-1322, 2016 WL 1212133, at *2 (W.D. Okla. Mar. 25, 2016) (finding "nothing that would indicate that the [agency] has been anything but diligent" when agency responded quickly to remediation proposals).

With respect to the length of the delay, the plaintiffs are correct that lengthy delays, such as the more than two-year delay sought here, are disfavored by the Fifth Circuit. However, in the absence of a showing of irreparable harm, such stays are not prohibited. *Occidental*, 810 F.3d at 312–13. Rather, when "it could take years" to resolve the administrative action, a court may guard against irreparable harm by limiting a stay to 180 days and then conditioning an additional stay on a showing of good cause and lack of irreparable harm. *Id.* at 313. Of relevance here, a mere delay in receiving damages is not irreparable harm. *Id.*

The plaintiffs argue the delay will cause irreparable harm because they are unable to farm and because the delay would adversely impact MDEQ's ability to supervise the remediation. However, the plaintiffs offer no evidence or authority which would support the proposition that the stay in this case would impact the administrative remediation process. Nor have they offered any authority which would show that a delay in receiving compensation from their farming losses would cause them irreparable harm. *See Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 620 (W.D. La. 2010) ("Simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm.") (preliminary injunction case). Thus, the Court finds no danger of irreparable harm at this time. Additionally, consistent with *Occidental*, the Court finds that any danger of future irreparable harm may be prevented by limiting the stay to 180 days and conditioning an additional stay on a showing of good cause and lack of irreparable harm.

### c. *Balancing*

For these reasons, the Court concludes that all relevant factors weigh in favor of staying the plaintiffs' remediation-related claims for injunctive relief. All factors but the inconsistent ruling factor favor a stay of the remediation-related claims for damages. Under these circumstances, a stay of all such claims is warranted.

### IV
### Conclusion

Illinois Central's motion to stay [252] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent this case is stayed under the primary jurisdiction doctrine for one hundred and eighty (180) days from the date of this order. The motion is DENIED in all other respects.

**SO ORDERED**, this 14th day of May, 2021.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**