IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**MELTON PROPERTIES, LLC., et al.**                                                       **PLAINTIFFS**

**V.**                                                                                             **NO. 4:18-CV-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD**
**COMPANY, et al.**                                                                                    **DEFENDANTS**

**ORDER**

Before the Court is (1) Illinois Central Railroad's motion to further extend the stay of the plaintiffs' remediation related claims and (2) the plaintiffs' motion for leave to file a supplemental exhibit in support of their opposition to a further stay. For the reasons below, the motion to supplement will be granted and this case will be further stayed.

**I**
**Procedural History**

The procedural history of this case through April 26, 2021, is set forth in a prior order and need not be fully repeated here. *See* Doc. #351 at 1–3. In brief, the plaintiffs commenced this suit on March 27, 2018, asserting state and federal claims arising from a toxic spill caused by a March 30, 2015, derailment of a railcar owned by Union Tank, which was being transported by "Illinois Central and/or Canadian National" on tracks "owned by Illinois Central and/or Canadian National." Doc. #1. On September 29, 2020, this Court stayed for 90 days the plaintiffs' remediation-related claims for injunctive relief under the doctrine of primary jurisdiction and, to avoid piecemeal litigation, also stayed the remediation-related claims for damages. Doc. #222 at 26–27. On May 14, 2021, the Court extended the stay for 180 days under the primary jurisdiction doctrine and conditioned any additional stay on a showing of good cause and lack of irreparable harm to the plaintiffs. Doc. #351.

On August 27, 2021, Illinois Central filed an "urgent and necessitous" motion seeking to extend the stay another 180 days under the primary jurisdiction doctrine, arguing the remediation process overseen by the Mississippi Department of Environmental Quality ("MDEQ") remains on track for completion by October 2023.[1] Doc. #354. The Court denied the motion to the extent it sought an expedited ruling but deferred ruling on the request for a further stay pending the completion of briefing. Doc. #358. The plaintiffs, after receiving an extension,[2] filed a response opposing the motion to stay on September 24, 2021. Doc. #359.[3] Illinois Central replied October 1, 2021. Doc. #361.

In a November 12, 2021, order entered "for the purpose of extending the existing stay," United States Magistrate Judge Jane M. Virden extended by fourteen days the stay granted May 14, 2021. Doc. #365. On November 17, 2021, the plaintiffs filed a motion to supplement their opposition to extending the stay. Doc. #366.[4] Illinois Central responded on November 23, 2021.[5] Doc. #367. The plaintiffs did not reply.

## II
## Motion to Supplement

The plaintiffs seek to supplement their opposition to extending the stay with a two-page

---

[1] While the motion to stay was pending, the parties jointly moved to continue the trial date until after the stay is lifted. Doc. #356. Because the Court on its own continued trial until further notice, the motion to continue trial was denied as moot. Doc. #375.

[2] Doc. #358.

[3] In violation of Local Rule 7(b)(2), the plaintiffs failed to denominate their exhibits with "both an exhibit letter or number *and* a meaningful description."

[4] In violation of the Local Rules, the motion to supplement contains legal argument and does not state whether it is opposed. *See* L.U. Civ. R. 7(b)(2)(B) and (b)(10). However, for the reason stated in this order, rather than deny the motion as procedurally deficient, the motion will be addressed.

[5] In violation of the Local Rules, Illinois Central's response contains legal argument, is not accompanied by a separate memorandum of law, and includes an alternative motion for leave to file its own exhibits. *See* L.U. Civ. R. 7(b)(2)(B), (b)(3)(C), and (b)(4). However, for the reasons stated in this order, the response will be considered despite these procedural deficiencies.

November 12, 2021, e-mail chain[6] which they characterize as further evidence the October 2023 remediation deadline will not be met. Doc. #366 at 2–3. Illinois Central consents to the admission of the e-mail but objects to the plaintiffs' characterization of facts relating to the e-mail and argues the three exhibits[7] attached to its response would supply a more accurate picture of the surrounding events.[8] Doc. #367.

Because Illinois Central does not oppose the plaintiffs' motion to supplement, the plaintiffs' motion to supplement is granted. Since the Court will consider the plaintiffs' supplemental exhibit, the Court, in the interest of efficiency and obtaining a complete record, will also consider the exhibits attached to Illinois Central's response to the motion to supplement. The Court deems as submitted the plaintiffs' "Proposed Exhibit F"[9] and Illinois Central's Exhibit 1 (Parts 1–3),[10] Exhibit 2,[11] and Exhibit 3.[12]

### III
### Factual Background

**A. Before May 14, 2021, Stay**

The pertinent facts before May 14, 2021, have been previously described by the Court. *See* Doc. #351. To summarize, on March 30, 2015, an Illinois Central train derailed, spilling contaminants—primarily Dicyclopentadine ("DCPD")—onto property owned and/or farmed by the plaintiffs. *Id.* at 3. Following the spill, Illinois Central made initial efforts to remediate the

---

[6] Doc. #366-1.

[7] Illinois Central's first exhibit, which spans three separate docket entries, is a revised remedial alternatives contingency plan. *See* Docs. #367-1, #367-2, #367-3. Its second and third exhibits contain e-mail chains from October 8, 14, and 15, 2021. Docs. #367-4, #367-5.

[8] Illinois Central requests the Court to "consider the … exhibits as further support for its pending motion to extend the stay and/or grant it leave to formally file the exhibits in support of its pending motion." Doc. #367 at 5.

[9] Doc. #366-1.

[10] Docs. #367-1, #367-2, #367-3.

[11] Doc. #367-4.

[12] Doc. #367-5.

spill site. *Id.* Since September 2015, MDEQ has overseen Illinois Central's remediation efforts. *Id.* In June 2017, MDEQ approved Illinois Central's Corrective Action Plan ("CAP") and subsequently approved addendums to the CAP. *Id.* at 4. Work began on the site on or about April 30, 2018. *Id.*

Following various reports and while studies were ongoing, Illinois Central provided MDEQ with a proposed schedule and "an October 2023 estimated completion for active remediation." *Id.* at 7. MDEQ approved the schedule but advised it "would require an approved Contingency Plan if it appeared remediation would not be completed on time." *Id.*

### B. Since May 14, 2021, Stay

On May 14, 2021, GHD Services, Inc., Illinois Central's remediation contractor,[13] submitted on Illinois Central's behalf its Comprehensive Site Characterization and Corrective Action Plan Addendum ("CAPA"). Docs. #354-1, #354-2. The CAPA included a "description of the nutrient amendment injections and air sparging system installation," a "description of the methodology used to collect and analyze the data to determine the efficacy of the remedial options," a summary of the data analysis and pilot study results, and Illinois Central's proposal recommending application to the full site. Doc. #354-1 at PageID 6009-15. The CAPA indicated a decrease in DCPD contaminants in groundwater was "not statistically significant." *Id.* at PageID 6012.

On May 27, 2021, the plaintiffs' counsel wrote a letter to MDEQ discussing the pilot study data included in the CAPA, arguing that based on analysis from their experts, including Dr. John Wilson, the pilot study was inconclusive at best regarding the efficacy of the bioremediation method and should be rejected. Doc. #354-3 at PageID 7236–39.

---

[13] Doc. #118 at 2.

4

On June 16, 2021, MDEQ sent a letter to Illinois Central discussing its review of the CAPA and the plaintiffs' May 27 letter, finding the "[CAPA] insufficient in detail and justification for the proposed expansion of the air sparging system and nutrient amendment pilot study." Doc. #354-4 at PageID 7250. The letter concluded by requiring Illinois Central to (1) submit a revised report by July 7, 2021 which includes both an analysis of the "groundwater characterization and modeling, lithology … and revised air sparge network and radius of influence justification" and a response to the concerns set forth in the plaintiffs' May 27 letter and exhibits; (2) submit a full contingency plan by July 31, 2021, including contingency actions, remedial alternatives, and criteria and objectives that would trigger its implementation; (3) complete the groundwater study as soon as possible and provide MDEQ with a letter updating it on the schedule and work plan for the study within seven days; and (4) notify MDEQ of the status of the air sparge system and the schedule for the pilot study report to be submitted. *Id.* at PageID 7254.

On July 7, 2021, GHD submitted to MDEQ on Illinois Central's behalf a revised CAPA[14] and responded to MDEQ's comments in the June 16 letter, including those related to groundwater hydrology, calculations regarding the air sparge system operation and maintenance, and issues regarding the DCPD contaminant analysis. Doc #354-7 at PageID 7299–304. Addressing MDEQ's deadline for submission of a contingency plan, GHD argued submission was premature "considering the Pilot study … is not yet complete" and stated a contingency plan will be submitted to MDEQ as part of a second addendum. *Id.* at PageID 7303. The same date, Illinois Central also submitted the expert report of James Reisinger dismissing the concerns in Wilson's report as "without any basis" or "without merit." Doc. #354-10 at PageID 8557–60.

---

[14] Docs. #354-8, #354-9.

Reisinger's report further addressed concerns raised by the plaintiffs' counsel's May 27, 2021, letter regarding a "mounding effect" issue relating to utilization of biosparging for remediation at the site, finding that the risk was outside the reasonable degree of scientific certainty. *Id.* at PageID 8560.

In a July 27, 2021, letter to MDEQ in response to Illinois Central's July 7 submissions, the plaintiffs' counsel requested that MDEQ "maintain its original requirement" for a contingency plan submission by July 31, 2021, arguing that "[i]mmediately beginning th[e approval] process for an alternative plan is essential to [Illinois Central's] ability to meet the October 2023 remediation deadline." Doc. #354-11 at PageID 8578.

On July 28, 2021, MDEQ responded to Illinois Central's July 7 revised CAPA and other correspondence of the same date, extending the contingency plan deadline to August 18, 2021, approving the scope of work for biosparge implementation, and reiterating that "[b]arring an Act of God, MDEQ will not be extending the October 2023 [remediation] goal." Doc. #354-12 at PageID 8580–81.

On August 17, 2021, GHD, on behalf of Illinois Central, submitted a remedial alternative contingency plan ("Contingency Plan") to MDEQ. Doc. #354-17. The Contingency Plan was devised to provide "potential remedial alternatives" in the event current remediation methods were unsuccessful in reducing DCPD concentrations in soil and groundwater to certain levels. *Id.* at PageID 8612.

On August 26, 2021, the plaintiffs provided comments to MDEQ on the Contingency Plan, rejecting it as insufficient, seeking an explanation why the methods proposed do not include more traditional remediation methods, and proposing use of more "conventional" remediation methods such as slurry walls, soil excavation, and pumping and treating of

6

groundwater, and less reliance on "experimental remedies." Doc. # 359-2 at 2–3.

On September 2, 2021, MDEQ, addressing the Contingency Plan and the plaintiffs' comments in their August 26 letter, requested additional clarification from Illinois Central regarding data used or omitted in the Contingency Plan, and required the Contingency Plan to be updated no later than October 29, 2021, once the findings of a hydraulic study and pilot test were complete. Doc. #359-3 at PageID 8751. MDEQ also discussed its own concerns with slurry walls, excavation, and pumping, including their remediation shortfalls and potential complications with implementation for the parties and the community. *Id.* Further, MDEQ acknowledged that "[i]f the biosparging, ISCO, and any necessary contingency alternatives fail to address site contamination by October 2023, excavation as a remedial alternative is still an option." *Id.*

On October 8, 2021, Thomas Wallace of MDEQ e-mailed GHD, Floyd Melton, III, Charles Brown of Illinois Central,[15] and their counsel, discussing the timeline for "initial air sparging," stating it would be "up and running before the end of the month" and "MDEQ does not intend to extend the October 2023 timeframe" as "previous correspondence has already addressed the matter of potential for equipment delays." Doc. #367-5. A week later, MDEQ sent a follow up e-mail discussing its approval of "sock" placement as an "interim measure" since "delivery of the secondary air sparge system may take some time." Doc. #367-4 at PageID 8915–16.

On October 29, 2021, GHD, on Illinois Central's behalf, submitted its revised remedial alternative contingency plan ("Revised Contingency Plan")[16] to "outline potential remedial alternatives for the source soil and miscible phase DCPD contaminants ... as requested by

---

[15] Charles Brown is a regional environmental manager for Illinois Central. Doc. #64-2 at 8.
[16] Docs. #367-1, #367-2, #367-3.

7

MDEQ in their June 16, 2021, letter." Doc. #367-1 at PageID 8810. GHD reiterated it "remain[s] confident that enhanced biodegradation/biosparging and ISCO, remain the mostly [sic] likely options to achieve Site remedial goals" but devised the Revised Contingency Plan to "review[] various alternate remedial methods, in terms of applicability as a potential remedial option for the Site." *Id.*

On November 12, 2021, Nathan Judice of GHD e-mailed MDEQ, Floyd Melton, III, Charles Brown, and counsel for each party, acknowledging that the biosparging equipment onsite was not fully functional but he "anticipate[d] that the unit will be running by the end of the week." Doc. #366-1 at PageID 8798.

## IV
## Analysis

As mentioned above, Illinois Central seeks to extend the stay for an additional 180 days under the doctrine of primary jurisdiction.[17] Doc. #354. In granting the most recent stay, this Court "balance[d] the assistance potentially provided by an agency's specialized expertise against the litigants' certainty of delay." Doc. #351 at 16 (quoting *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 810 F.3d 299, 310 (5th Cir. 2016)). When considering MDEQ's expertise as the overseeing agency, this Court looked to the factors set forth in *Read v. Corning Inc.*,[18] finding the first three *Read* factors—the Court's lack of expertise in the subject area

---

[17] When considering whether to extend a primary jurisdiction stay, courts have looked at their prior rationale for implementing the stay, the progress made by the agency since the stay was implemented in comparison to the amount of time the case has been delayed, and the potential harm caused to the nonmoving party by the stay. *See, e.g., In re Kind LLC "Healthy & All Natural" Litig.*, 287 F. Supp. 3d 457, 467–70 (S.D.N.Y. 2018) (denying motion to lift primary jurisdiction stay after considering prior rationale for implementing the stay, the pace in which the agency acted, and any new facts which occurred since the prior stay was granted); *Great Lakes Commc'n Corp. v. AT&T Corp.*, No. C 13-4117, 2018 WL 6072004, at *3 (N.D. Iowa Nov. 20, 2018) (denying motion to lift stay where delays in the administrative proceedings related to all parties' actions and the basis for the initial stay still existed); *Driving Force, Inc. v. Manpower, Inc.*, 538 F. Supp. 57, 59–60 (E.D. Pa. 1982) (lifting a primary jurisdiction stay despite pending appeal of agency determination because the issues before the court were broader than the matters before the agency's appellate body).

[18] 351 F. Supp. 3d 342, 353–54 (W.D.N.Y. 2018).

relative to MDEQ's, authority over the remediation process which was already delegated to MDEQ, and the risk of inconsistent rulings relating to the plaintiffs' injunctive relief claim—favored the stay.[19] Doc. #351 at 19–22. When addressing the Fifth Circuit's certainty of delay factors,[20] this Court found they too favored staying the case because the issue of what remediation methods are proper was already before MDEQ; an October 2023 remediation deadline was appropriate[21] based on MDEQ's oversight of the remediation process, attentiveness to responding to related issues, and "intention to hold Illinois Central to the promised timeline;" and a delay in receiving compensation from farming losses due to the plaintiffs' continued inability to farm was on its own not irreparable harm. *Id.* at 22–25.

After balancing the agency assistance factors against the undue delay factors, this Court found "all relevant factors weigh in favor of staying the plaintiffs' remediation-related claims for injunctive relief[ and that a]ll factors but the inconsistent ruling factor favors a stay of the remediation-related claims for damages." *Id.* at 25. Accordingly, the case was stayed under the primary jurisdiction doctrine for 180 days on May 14, 2021, allowing for extension upon "a showing of good cause and lack of irreparable harm." *Id.*

In support of extending the stay, Illinois Central submits that "[a]ll of the underlying justifications" of the prior stays "remain in place," "significant progress" has been made on the remediation plan, the October 2023 remediation deadline is unchanged, and the plaintiffs will not

---

[19] Because the *Read* "stage of the administrative proceeding" factor "necessarily incorporates the extent of the delay associated with any stay," the Court applied the Fifth Circuit's certainty of delay factors. Doc. #351 at 19, 22.

[20] The certainty of delay factors are "(1) whether the relevant issues before the Court are already or are likely to be before the agency; (2) the expected length of time for the [agency's] decision; and (3) whether the delay would cause the plaintiffs irreparable harm." Doc. #351 at 22 (internal citation omitted) (citing *Miss. Power & Light Co. v. United Gas Pipeline, Co.*, 532 F.2d 412, 420 (5th Cir. 1976) and *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 801 F.3d 299, 313 (5th Cir. 2016)).

[21] When considering the delay factors, this Court's decision to stay the case, despite the proposed deadline of October 2023 being over two years away, was in large part based on representations that remediation could be completed by that date. Doc. #351 at 24.

suffer any irreparable harm by the stay's continuation. Doc. #355 at 1–2, 6; Doc. # 361 at 1. The plaintiffs renew their prior argument that factors set out in *Golden Rule Fasteners, Inc. v. Neverleak Company, LP*[22] "favor denying a stay in this case" and claim the second and third factors relating to certainty of delay—the expected length of time for the agency's decision and whether the delay would cause the plaintiff irreparable harm—now favor lifting the stay because (1) the current remediation plans have been subject to continual and ongoing delays rendering the October 2023 deadline unattainable, and (2) the methodology being utilized is inadequate to satisfactorily complete remediation by the deadline.[23] Doc. #360 at 8, 10–11.

### A. Current Delays Impacting October 2023 Remediation Deadline

As support for their position that they now will be irreversibly harmed by extension of the stay because remediation is unlikely to be completed by the current deadline, the plaintiffs point to the previous order's finding that no irreparable harm would come to them so long as remediation was completed by October 2023. *Id.* at 11–13 (citing Doc. #351 at 224). As evidence of the inability to complete remediation by October 2023, the plaintiffs cite two items of correspondence relating to the current biosparging remediation process.[24]

The first is correspondence from MDEQ in September 2021 stating that "[i]f the

---

[22] No. 3:17-cv-249, 2019 WL 257983, at *2 (N.D. Miss. Jan. 17, 2019). The *Golden Rule* factors include "1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party; 2) whether stay will simplify the issues in question and the trial of the case; and 3) whether discovery is complete, and a trial date has been set." *Id.*

[23] Specifically, the plaintiffs contend that:

> in the ensuing four months [since the May 14, 2021, stay], MDEQ has allowed [Illinois Central] to proceed with a CAP that relies on unproven methods. MDEQ has also countenanced a Contingency Plan that proposes, in the event these unproven methods are not up to the task of remediating Plaintiffs' property, that the solution should be *more* of the unproven methods. Most important, [Illinois Central] has acknowledged it is not beginning the remediation process in time to meet the October 2023 deadline.

Doc. #360 at 11.

[24] The plaintiffs' opposition also references five other documents concerning potential delays, however, those documents relate to the proposed remediation and contingency plan methodology as evidence of potential future, as opposed to current delays, and will be addressed later in this order. *See* Doc. #360 at 4–6.

biosparging, ISCO, and any necessary contingency alternatives fail to address the site contamination by October 2023, excavation as a remedial alternative is still an option." Doc. #359-3 at PageID 8751. The plaintiffs contend this is an explicit acknowledgment by MDEQ that completion of remediation will likely extend beyond October 2023. *Id.* at 6–7. The second is Judice's November 2021 e-mail discussing issues with biosparging equipment. Doc. #366-1. The plaintiffs contend the e-mail is an admission by Illinois Central that the biosparging system is not operating as intended, was and will continue to be problematic, and that more delays with the current remediation process are forthcoming.[25] Doc. #366 at 2.

While there clearly have been delays in the remediation process, the September 2021 letter and the November 2021 e-mail do little to support the plaintiffs' position that Illinois Central absolutely cannot meet the October 2023 deadline. The letter's mention of excavation as an option if remediation is not complete by October 2023 was made in the context of *contingency planning*—options for what could be done *if* the current remediation methods were unsuccessful—not as an admission that remediation will not be completed by October 2023. While the e-mail does discuss ongoing delays with the remediation equipment, when viewed alongside other correspondence from the same time period,[26] it is clear MDEQ continues to move forward with remediation by timely responding to the concerns of the parties relative to remediation technology and contingency planning,[27] utilizing alternative technologies to

---

[25] The plaintiffs also attach the affidavit of Floyd M. Melton, III, detailing a discussion with Judice about ongoing delays related to remediation equipment in September 2021. Doc. #359-4.

[26] During the delays relating to the air sparge compressors, acknowledged by both Illinois Central and MDEQ, Illinois Central installed "ORC Socks" to supply oxygen as set forth in the approved Revised Contingency Plan to keep the project moving forward. *See* Doc. #367-1 at PageID8822, Doc. #367-4, Doc. #367-5.

[27] *See* Doc. #354-4 (addressing the plaintiffs' concerns regarding insufficiencies in the CAPA); Doc. #354-12 (addressing Illinois Central's letter regarding its Revised CAPA); Doc. #359-3 (addressing Illinois Central's Contingency Plan and the plaintiffs' comments on the plan).

11

continue the remediation process when delays are experienced,[28] addressing issues with the current remediation technology and related delays in a timely manner, and maintaining a commitment to the October 2023 deadline.[29]

The Court does not find the evidence presented by the plaintiffs establishes with any certainty that the October 2023 deadline cannot still be met such that an extension of the stay is unwarranted. Nine months have passed since the last stay was entered, and while delays have occurred, MDEQ's continuing involvement with the remediation process and its commitment to maintaining the October 2023 deadline appears to remain unchanged.

### B. Remediation Methodology Impacting October 2023 Deadline

The plaintiffs' next argument concerns the potential for future delays. They argue the remediation methodology currently used by MDEQ "is *unlikely* to result in substantial remediation," which in turn is likely to result in the need for additional work beyond the October 2023 remediation deadline. Doc. #360 at 2. Disagreeing, Illinois Central argues that the plaintiffs are misconstruing various studies and correspondence relating to the approved remediation and contingency remediation techniques to obtain a second chance at obtaining their own preferred remediation methods although MDEQ already "fully considered Plaintiffs' input … and rejected the remedial alternatives suggested by [them]." Doc. #361 at 4.

Primary jurisdiction has been described as a "doctrine of primary expertise," *Vision Imp. Grp., LLC v. Fresh Grp., Ltd.*, No. 7:21-CV-295, 2021 WL 4295369, at *8 (S.D. Tex. Sept. 21, 2021), designed to "coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges

---

[28] *See* Doc. #367-4 (discussing use of "sock" placement as an interim measure while issues with biosparging equipment are resolved).

[29] Doc. #354-12 at PageID 8581 (stating that "[b]arring an Act of God, MDEQ will not be extending the October 2023 remedial goal"); Doc. #367-5 (stating MDEQ does not intend to extend the October 2023 timeframe).

12

or cases which require the exercise of administrative discretion." *Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 891–92 (S.D. W. Va. 2011) (quoting *Env't Tech. Council v. Sierra Club,* 98 F.3d 774, 789 (4th Cir. 1996)). A reviewing court should not "lightly second guess a deliberate and informed determination by the [administrative] agency,"[30] especially where doing so would require the court to obtain outside assistance addressing issues of specialized knowledge and repeating work already done by the agency. *See B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 803–04 (N.D. Okla. 2007) (primary jurisdiction stay was warranted to avoid duplication of administrative agency's investigation and abatement process because court would need to obtain assistance from outside sources to craft an appropriate resolution and agency had already begun remediation).

The plaintiffs ask this Court to accept their interpretation of documents addressing very specific and technical methodologies as evidence that MDEQ is proceeding with less effective methods—or possibly ineffective methods[31]—and that allowing MDEQ to continue selecting the method of remediation will only add to the harm suffered by them resulting from further hypothetical remediation delays.[32] The plaintiffs also contend the October 2023 deadline "can no longer be considered credible" because of MDEQ's approval of "unproven" remediation methods. Doc. #360 at 11.

---

[30] *Pugh v. Pearson*, No. 5:11-cv-74, 2012 WL 4468469, at *3 (S.D. Miss. Aug. 8, 2012), *report and recommendation adopted*, 2012 WL 4468462 (S.D. Miss. Sept. 25, 2012); *see Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 375 (5th Cir. 1976) (deferring to agency where the subject matter is within the agency's specialized field).

[31] The plaintiffs argue the remediation methods and contingency methods approved by MDEQ are "unproven," inconclusive, and contain "no statistically significant evidence" that they reduce groundwater contamination, while the "obvious solution of soil excavation" is being ignored. Doc. #360 at 3, 5, 7, 11.

[32] *Id.* at 4 (arguing Illinois Central's contractor "acknowledge[s in the CAPA] that, during the pilot study, any trend indicating a decrease in contaminants in groundwater was 'not statistically significant,' yet went on to recommend the use of biosparging throughout the site."); *id.* (citing plaintiffs' expert Wilson's analysis, at Doc. #354-3, stating "the [CAPA] provides no information that shows with an acceptable level of statistical confidence that operation of the pilot study was associated with a reduction in concentrations of DCPD in groundwater in the pilot study areas."); *id.* at 5–6 (arguing the "contingency plan" proposed by Illinois Central utilizes the same processes as the current remediation plan, and that neither will resolve the contamination to their satisfaction).

Not much has changed regarding the methodology being used since this Court's last review. MDEQ has already selected what it deems is appropriate remediation methodology after considering the parties' positions.[33] And the submissions on the motion for stay alone establish the exceedingly technical nature of the ongoing remediation[34] and illustrates why oversight by MDEQ is critical and more beneficial than litigation at this time. In addition, when discussing the risk of further delay, the plaintiffs fail to address why the Court would be a better option than MDEQ to determine the appropriate remediation process, as the Court would need to review all work previously performed, understand the methodologies used and proposed, and decide how to proceed, all of which would take substantial time.

The Court again declines the plaintiffs' invitation to make determinations or otherwise second guess whether the methodology approved by MDEQ will effectively remediate the plaintiffs' property by October 2023, since MDEQ has substantially more expertise and specialized technical knowledge,[35] especially based on an incomplete record. This Court finds the plaintiffs' argument regarding potential future delays relating to remediation methodology too speculative to support a finding of harm which would justify proceeding with litigation at this time.

V
**Conclusion**

The plaintiffs' motion to supplement [366] is **GRANTED**. Illinois Central's motion to

---

[33] As an example, MDEQ was provided with comments from the plaintiffs' expert who disagreed about what methodology should be utilized. Doc. #354-3 at PageID 7236, 7249. Those comments were incorporated in MDEQ's requirements for Illinois Central. *See* Doc. #354-4 at PageID 7250.

[34] Even the parties' own experts disagree about the methodology being used as indicated by their respective reports, which both contain detailed scientific and technical information outside the scope of this Court's general knowledge. *Compare* Doc. #354-10 (Reisinger report) with Doc #354-3 at PageID 7240–49 (Wilson report).

[35] *See* Doc. #222 at 26 ("[T]here can be no doubt that the administrative agency here—MDEQ—has considerably more experience in the underlying factual matter of contaminant remediation or that responsibility for such matters has been delegated to MDEQ.").

stay [354] is **GRANTED**. This case is stayed under the primary jurisdiction doctrine for one hundred and eighty (180) days from the date of this order.

    **SO ORDERED**, this 3rd day of March, 2022.

                                              **/s/Debra M. Brown**
                                              **UNITED STATES DISTRICT JUDGE**