**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**MELTON PROPERTIES, LLC, ET AL.**                                    **PLAINTIFFS**

**v.**                                    **CIVIL ACTION NO. 4:18-cv-79-DMB-JMV**

**ILLINOIS CENTRAL RAILROAD COMPANY, ET AL.**                      **DEFENDANTS**

## ORDER

This matter is before the court on Motion [Doc. No. 519] of Defendant, Illinois Central Railroad Company, to Strike Supplement to Report of Plaintiffs' Expert, Harvey H. Stone. The motion is opposed and as of July 30, 2024, is fully briefed. For the reasons that follow, the motion is granted.

### I.     Procedural History

This lawsuit was initially filed by Plaintiffs on March 27, 2018, alleging damages arising out of a train derailment on March 30, 2015, in which a rail car spilled a chemical known as Resin Oil Heavies onto fields owned and farmed by Plaintiffs. For various reasons, the case was intermittently stayed, which resulted in an initial case management order not being entered until January 8, 2020. [Doc. No. 99]. That order set Plaintiffs' designation of experts deadline as June 8, 2020; Defendants' designation of experts was July 7, 2020; discovery was to be concluded by September 7, 2020; and an original trial setting of March 8, 2021, was set. Shortly after entry of the CMO, remediation-related discovery in the case was stayed effective March 3, 2020. [Doc. No. 122]. On April 15, 2020, the trial date was continued to October 18, 2021. [Doc. No. 154]. On May 12, 2020, the stay of remediation discovery was continued to June 24, 2020.

After approximately 5 months of discovery, a renewed motion to stay was made by Defendant on November 23, 2020, and ultimately, on May 14, 2021, it was granted for 180 days.

[Doc. No. 351]. Prior to the entry of this stay, trial was continued to January 31, 2022, and on

January 5, 2021, the CMO was amended making discovery due by July 1, 2021; Plaintiffs'

designation of experts due by April 5, 2021; and Defendants' designation of experts due by May

5, 2021. *See* [Docs. No. 264; 275]. On February 10, 2021, the parties' expert designation

deadlines were extended again as follows: Plaintiffs' designation of experts due by May 5, 2021;

Defendants' designation of experts due by June 4, 2021. [Doc. No. 300]. Plaintiffs moved on

May 5, 2021, for a brief extension of their designation deadline to May 19, 2021, and the motion

was granted. [Doc. No. 343]. Despite the extension of the deadline being granted until May 19,

2021, Plaintiffs filed a notice of designation of expert witness on May 5, 2021, and filed a brief

supplement to it two days later on May 7, 2021. *See* [Docs. No. 339; 342]. Of relevance to the

instant motion, Plaintiffs' designation identified Harvey H. Stone ("Stone") as an expert in the

field of train and train track design, operation, maintenance, and equipment, and included his

Fed. R. Civ. P. 26(a)(2)(B) Expert Report.

### A. The May 5, 2021, Initial Stone Report

Relevant to the instant motion, Stone opined in his 2021 report as follows:[1]

The track inspector, Mr. Ramage, noted a cross level deviation in his inspection report of
March 15, 2015 of 6.313 inches, more than twice the allowable cross level for a class 1
track. The deviation in cross level after the track was tamped on March 30th was 4" and
after the third train ran over that track it had increased to 8". That is almost 3 times the
allowable deviation for class 1 track and after the derailment the deviation was measured
as 8 inches. This amount of cross level is greater than that allowed by §213.63 Track
Surface for Class 1 track. Class 1 track is permitted a 3 inch deviation from cross level.
Based upon this, it appears that the track inspector should have set the track speed at
Class 1, 10 MPH for freight and 15 MPH for passenger instead of 30 MPH for each. The
foreman who measured the deviation after the tamping that day, should have set the track

---

[1] In addition to failing to decrease the speed of the train to a max of 10 mph, Stone identifies two other ways in
which he says the defendant was negligent or grossly negligent. In a nutshell they are: (1) the allowable cross level
for Class 1 track may not be more than 3 inches. After remediation, the relevant section of track was left at 4 inches,
1 inch greater (33% more) than is allowable for Class 1. Had this action taken by the foreman not occurred, it is
possible that the derailment could have been avoided; and (2) they could have avoided this derailment had they just
scheduled the area for remediation at an earlier date.

speed at Class 1 or, at the very least, contacted Mr. Ramage so that he could reduce the allowable speed. Instead, they allowed train traffic to move at the higher speed of 30 MPH.

§213.9 (b) However, if the segment of track does not at least meet the requirements for Class 1 track, operations may continue at Class 1 speeds for a period of not more than 30 days without bringing the track into compliance.

It is my opinion to a reasonable degree of engineering certainty that this derailment occurred due to the gross negligence of the ICR, had the speed restriction been reduced to 10 MPH in accordance with §213.9 (b), train M334 most probably would not have derailed, and if it did derail, the reduced speed at derailment would probably have avoided damage to car UTLX640074 that was carrying Dicyclopentadiene (resin oil heavies), a hazardous material, which discharged a significant amount of material at that site.

When the 180-day stay of May 14, 2021, expired, Chief District Judge Debra Brown granted another motion to stay as follows: "this case is stayed under the primary jurisdiction doctrine for one hundred and eighty (180) days from the date of this order [filed 11/23/20]." [Doc. No. 351]. Ultimately, the stay of the case was extended through November 20, 2023, and trial was reset to October 7, 2024, and then February 3, 2025. *See* [Docs. No. 410; 412; 418].

On December 6, 2023, the CMO was amended as follows: Discovery due by 7/1/2024. Daubert Motions due by 8/1/2024. Motions due by 9/2/2024. Plaintiffs Designation of Experts due by 3/1/2024. Defendants Designation of Experts due by 5/1/2024. [Doc. No. 423]. On March 1, 2024, Plaintiffs apparently re-designated the May 2021 report of Stone. Upon review, there does not appear to be any difference in the May 2021 version and the one filed in March 2024.

**B. The Stone Deposition**

On or about April 19, 2024, Defendant took the deposition of Plaintiffs' expert Stone. Of relevance here, the testimony was:

Q. With your engineering degree do you have the ability to do that type of calculation to determine if an issue with cross level detected on March 30th caused the derailment?

A. No. I don't believe there is a calculation you can do that determines that that is where a derailment would occur. What we have to do is go by the federal regulations. The federal

regulations have been put in place based on experience over the years, and they have determined that the difference in cross level for Class 1 track should not exceed three inches. The difference in cross level on this track at the time it was repaired was four inches. That means that based on that repair and that information, if not before, then at that point that track should have been reduced to ten miles per hour. It was just about criminal for the railroad to allow trains to pass through that area at those speeds, at thirty miles per hour, especially passenger trains.

Q. Let's talk about speed. Have you done any mathematical calculation to indicate whether or not a derailment would have occured (sic) if the train speed was reduced to ten miles an hour?

A. Again, you cannot do a mathematical calculation to determine if a car is going to derail. There are a lot of factors that come into a derailment. What we do know is that with that cross level, they should not have been going at that speed.

Q. It is your testimony here today that there is no modeling that can be done to determine if a cross-level issue or even a difference in speed will cause a derailment? That's your testimony?

A. That's my understanding. I have never seen anybody be able to do a calculation to say that at this speed there is going to be a derailment. The derailment is affected by the condition of the wheels, the weight of the tracks, the condition of cars, the layout of the train. There are a lot of factors that enter into that. The federal regulations have determined that if it is in excess of three inches, it should be class 1 track. That is what I went by.

Q. Did you perform any mathematical calculations to determine the stress on the rail at the area where there was a cross-level issue on March 30th, 2015?

A. There is no -- there is no reason to believe that the stress on a rail has anything to do with the derailment.

Q. Did you do anything in this case other than identify here is a point where there was an issue with cross level and later there was a derailment? I want to understand, sir, from a point of science what you did beyond that.

A. My point of science is I read the locomotive report, the data-recorder report. I determined what the miles per hour were of the locomotive at the time the first derailment occured (sic). I saw how long it took for the train to stop. And I then determined that based on the cross level that was in existence at that point, that the speed limit should have been ten miles an hour and the track was in violation ever (sic) the federal regulations. It doesn't require a calculation for that to be determined. It just requires somebody to determine what the speed was and what the speed should have been.

Q. So tell me -- you are telling me the opinion that the speed should have been reduced to ten miles an hour, correct?

A. That's the regulation. That's not my opinion.

Q. Okay. If the speed had been reduced to ten miles per hour, have you done a calculation that would indicate the derailment would not have occured (sic) if the speed was reduced to ten miles per hour in compliance with the federal regulation as you state?

A. No, I have not done a calculation to determine if there would have been or not have been a derailment at ten miles per hour. I'm just saying that I read the event-recorder, the speed of the train was twenty-three miles per hour, there was a minimum of four-inch differential in elevation, and based on the four-inch differential in elevation, that speed should have been no more than ten miles per hour. I don't know if there would have been a derailment at ten miles per hour. It was more likely that there would not have been a derailment at a slower speed. But that is not an issue in this case. The issue is should the speed have been twenty-three or twenty-five or thirty miles per hour.

Q. But as we sit here today, sir, you have no calculation to say with any certainty that at a speed of ten miles per hour, the derailment would not have occured (sic), correct?

A. That is correct.

Q. What role did the stopping distance of the train play in your formulation of your opinions in this case?

A. It didn't play any role in my opinion….

EXAMINATION BY MR. SPENCER, SR.:

Q. Mr. Stone --

A. Yes, sir.

Q. -- what is the purpose for having speeding restrictions on tracks?

A. It is a safety issue.

Q. It is a safety issue?

A. Yes.

Q. So if you have a Class 1 track and you have a sixty-mile-an-hour speed limit, if you reduce the speed limit to thirty miles an hour, does that reduce the probability of accidents?

A. First of all, the question --

MS. REIFERS: Objection. Objection, calls for speculation.

Q. (BY MR. SPENCER, SR.) That's all right. You can answer.

A. The Class 4 track would be sixty miles an hour.

Q. Yes. That's right.

A. If you have a Class 1 -- if the track is reduced to Class 1, then the answer is yes, it is dangerous.

Q. So if -- when you have the slow orders issued on the track which reduce the speed on this track from sixty to thirty, did it not, on freight trains –

A. Yes.

Q. -- did that decrease the probability of accidents --

MS. REIFERS: Objection.

Q. (BY MR. SPENCER, SR.) -- to reduce the speed?

MS. REIFERS: Objection, undisclosed opinion, as well as calls for speculation.

Q. (BY MR. SPENCER, SR.) That's fine. You can answer the question.

A. Yes. The answer is yes.

Q. All right.

A. Any time you reduce the speed, you are reducing the chance of accidents.

Q. Would that be why the regulations, the federal regulations, require reduction of speed under certain conditions --

MS. REIFERS: Objection. Calls for --

Q. (BY MR. SPENCER, SR.) -- if there a misalignment?

A. Yes.

MS. REIFERS: Objection, calls for speculation.

Q. (BY MR. SPENCER, SR.) That's correct, is it not?

A. That's correct.

Q. And so if the -- if the IC Railroad had followed the federal regulations and reduced the speed to no more than ten miles an hour on this track at the time of the accident, would that not have reduced the probability of accidents?

MS. REIFERS: Objection. Calls for speculation. Undisclosed expert opinion.

A. Yes.

Q. (BY MR. SPENCER, SR.) So would I be correct that during January through March of 2015 there were numerous slow orders put on this track, correct?

A. Yes.

Q. That was because of a condition they found that involved the surface of the track. Is that correct?

A. That's correct.

Q. I believe you said that could have been misalignment or that could have been -- you gave three things. Is that correct?

A. The misalignment, it could be cross level, or it could be a dip in the track.

Q. Okay. Now, at that point in time IC had certain choices they could make as to what they would do in regard to that track, did they not?

A. Yes.

Q. All right. Number one, they could close down the track and repair it, complete any repairs that they needed to make to make it a safe track again. Is that one?

A. That's one.

Q. All right. Two would be reduce the speed, and in this instance when you had over a three-inch differential, reduce it to a Class 1 track of no more than ten miles an hour?

A. Yes.

Q. Number three, they could have kept employees out there and watching the tracks themselves to determine any problems that were occurring on those tracks, could they not?

A. Yes.

Q. All right. Now, they did none of those, did they?

A. Well, they reduced the speed, but they didn't reduce it to the proper level I believe.

Q. They did reduce it to the speed that the federal government has said would be a safe speed?

A. That's correct.

MS. REIFERS: Objection, assumes facts not in evidence.

Q. (BY MR. SPENCER, SR.) So would it be safe to say that the railroad knew they had a risk with that area of track?

MS. REIFERS: Objection, undisclosed expert opinion, calls for speculation.

MR. SPENCER, SR.: Thank you.

Q. (BY MR. SPENCER, SR.) Go ahead and answer.

A. Yes.

Q. And they elected to run that risk as opposed to taking either one of the three steps that you just discussed with us?

MS. REIFERS: Objection, undisclosed expert opinion, calls for speculation.

Q. (BY MR. SPENCER, SR.) You can answer.

A. Yes.

MR. SPENCER, SR.: Give us one minute. I think we'll probably be through.

MS. REIFERS: Okay.

MR. SPENCER, SR.: No further questions.

MS. REIFERS: I have some follow-up questions.

EXAMINATION BY MS. REIFERS:

Q. So, sir, where in your expert report is this listing of three options that you claim the railroad had after determining an issue with cross level on March 30th, 2015?

A. I didn't put that in the report.

Q. Oh, okay. Thank you. All right. I thought so. Now let's talk about reducing the speed of train track in the area where the derailment occured (sic). As I understood it, you have testified here today on multiple occasions that you have performed no calculation or analysis to determine if a derailment would have occured (sic) at a speed of ten miles per hour, correct?

A. Correct.

Q. Is it correct that you have done no analysis to determine what the probabilities were of a derailment at ten miles per hour, correct?

A. Correct.

Q. You have done no analysis or calculation to determine what the probability of a derailment would be at thirty miles per hour, correct?

A. Correct.

Q. You have done no analysis or calculation to determine the probability of a derailment with a four-inch cross-level issue, correct?

A. Correct.

Q. You have done no calculations or analysis to determine what is the probability of a derailment with a cross-level issue greater than four inches, correct?

A. Correct.

On May 1, 2024, its deadline for doing so, Defendant designated its experts. [Doc. No.

444].

## C. **The Stone Supplemental Report**

On June 26, 2024, Stone "supplemented" his opinions to include, of relevance here, his

statement of why he was "supplementing" his report. He explained:

During my deposition, I responded to the question about whether I had done any
calculation to indicate whether or not a derailment would have occurred if the train speed

was reduced to ten miles per hour by saying no, there was no way to calculate if a car was going to derail. I still stand by that statement. However, I decided to look for a way to calculate if the derailment was more likely than not to occur at faster speeds than at slower speeds.

Next, he asserts that in doing so, he learned that after 1971 academia began studying railroad accidents and especially derailments, to try to determine the root cause of derailments and determine if an algorithm could be produced to predict the occurrence of derailments based upon known factors in track condition, speed and equipment.

The earliest study he was able to find was published in 1983, but he goes on seemingly to explain that it would not have application to the facts of this case. Then he cites a more recent report for the proposition that as train speeds increase derailments decrease, a thing he said was attributed to the tracks in question being of higher quality. Specifically, he said the report found that trains on a higher or better-quality track derailed at a lesser rate; tracks with signals had better derailment stats than those without, and tracks with more traffic density have a lower derailment rate attributable to those being higher quality tracks.

Next, Stone examines how the report also looked at the severity of the derailments and found that while the greater the density of traffic, the fewer derailments, more cars are derailed per train derailment when there is high traffic density due, according to Stone, the expected effect of kinetic energy.

He elaborates: "The simple equation for kinetic energy associated with uniform linear motion of a rigid body with constant mass is $Et = mv$ where $Et$ is kinetic energy in foot pounds, m is the mass in pounds and v is the velocity in feet per second." Stone concludes "In a moving train or a moving car, the mass is constant so that if the velocity goes from 10 mph to 23mph, the energy increases by a factor of 5, indicating that a derailment at 10 mph is 5 times less likely to

cause significant damage as it is at 23 mph. Stated differently but to the apparent same effect, he opined that had the train been going at 10 miles per hour instead of 23 miles per hour, it is more likely than not, the reduction in kinetic energy would have led to there not being a derailment or if there was a derailment, to less damage from the derailment because the cars would have been going at a slower speed and therefore would have had less kinetic energy when they derailed and collided.

Next, Stone, who testified at his deposition that the stopping distance of the train played no role in the formulation of his opinions in this case, then added in the latest supplement that "the distance it takes to stop a train is dependent on the response time, initial speed, final speed (0 mph) and the equivalent deceleration." He further stated if the response time, final speed and the equivalent deceleration are the same for the train in question, then the variable is the initial speed for determining the stopping distance. He offers the following formula expressing the same:

$$s = v_0 \cdot t_e + \frac{v_0^2 - v_{fin}^2}{2 \cdot a_e}$$

And, he asserts that if the only number that varies is the initial speed (Vo), the same result occurs as for the energy calculation, and (s) the stopping distance is dependent upon the velocity squared. Thus, he concludes, "the stopping distance at 23 miles per hour is 5 times that of the stopping distance at 10 miles per hour." Based thereon he then opines "had the train been going at

10 miles per hour instead of 23 miles per hour, the train would have stopped in a much shorter distance when the derailment was noted by the braking system and it is more likely than not there would have been less damage to the cars that derailed as they would have been pulled a shorter distance after derailment."

**D. Defendant's Motion to Strike Supplement to Report of Plaintiffs' Expert, Stone [519]**

Five days after Stone's June 26, 2024, report was made, discovery ran. Approximately one week later, on July 9, 2024, the instant motion to strike the June 26, 2024, supplement to the Stone opinion was filed. In the motion, Defendant asserts the court should strike the June 26, 2024, supplement for failure to follow the applicable Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1); L.U. Civ. R. 26(a)(2); and the Court's Order Amending Scheduling Order. Defendant recites the following:

In pertinent part, Fed. R. Civ. P. 26(a)(2)(B) states:

Unless otherwise stipulated or ordered by the Court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i)     a complete statement of all opinions the witness will express and the basis and reasons for them; [and]

(ii)    the facts or data considered by the witness in forming them.

Fed. R. Civ. P. 26(a)(2)(B)(i-ii).

Parties must make expert witness disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D); *Pace v. State Farm Fire & Cas. Co.*, 2024 WL 409398, at *3 (S.D. Miss. Feb. 2, 2024). This Court's local rule provides, "A party must make full and complete disclosure as required by Fed. R. Civ. P. 26(a)(2) . . . no later than the time specified in the case management order." L.U. Civ. R. 26(a)(2). "An attempt to designate an expert without providing full disclosure information as required by this rule will not be considered a timely expert designation and may be stricken upon proper motion or *sua sponte* by the Court." L.U. Civ. R. 26(a)(2)(B).

As an exception to the foregoing Local Rule, Defendant notes Rule 26 allows a late disclosure to be made so long as it is made within thirty (30) days of the other party's disclosure, "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Fed. R. Civ. P. 26(a)(2)(B) or (C)." Further, Defendant relies on Fed. R. Civ. P. 37(c)(1), which states, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence in a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless. Fed. R. Civ. P. 37(c)(1); *see also Woulard v. Greenwood Motor Lines, Inc.*, 2019 WL 3311753, at *2 (S.D. Miss. Feb. 5, 2019); *McReynolds v. Matthews*, 2017 WL 5573194, at *3 (S.D. Miss. Nov. 20, 2017); *Pace*, 2024 WL 409398, at *3, citing L.U. Civ. R. 26(a)(2); *Ashford v. Wal-Mart Stores, LP*, 2013 WL 152853, at *2 (S.D. Miss. Jan. 15, 2013).

Defendant also notes that a district court is given broad discretion in formulating sanctions for a violation of its scheduling or pre-trial orders. *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996); *Geiserman v. MacDonald*, 893 F.2d 787, 790-91 (5th Cir. 1990). And, in exercising its discretion whether to exclude expert testimony as untimely, the court considers four (4) factors: (1) the importance of the witness' testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order. *Pace,* 2024 WL 409398, at *3. Finally, as discussed more fully below, defendant argues that an application of these factors to the June 26, 2024 "supplement" of Stone, dictates a finding that it be stricken.

### E. Plaintiffs' Response in Opposition

By way of opposition to Defendant's motion, Plaintiffs assert that the June 26th report of Stone is (1) merely a "supplement" of Stone's 2021 report required to be made by FRCP

26(a)(2)(E); and (2) given that it comes before the discovery deadline (albeit by only 5 days), it is timely under the rules. Specifically, Plaintiffs argue with respect to each point:

**(1) Merely a Supplement**

Here Plaintiffs argue that FRCP 26(e) provides that parties are "under a duty to supplement their disclosures in a timely manner if the party learns that in some material respect the disclosure is incomplete or incorrect …" and that the duty to supplement extends both to information included in the report and to information given during the expert's deposition. According to Plaintiffs, the purpose of the June 26, 2024, report was, as described by Stone therein, only as follows:

> During my deposition, I responded to the question about whether I had done any calculation to indicate whether or not a derailment would have occurred if the train speed was reduced to ten miles per hour by saying no, there was no way to calculate if a car was going to derail. ***I still stand by that statement***. However, I decided to look for a way to calculate if the derailment ***was more likely than not to occur at faster speeds than at slower speeds***.

Exhibit C, <u>Supplement to Expert Report of Harvey H. Stone</u> at page 2

For their part, Plaintiffs' counsel assert that Stone's supplemental report (1) "simply serves to answer one specific question raised by defense counsel in deposition;" and (2) clearly falls within the scope of Stone's initial opinion regarding excess speed being a probable cause of the subject derailment. Thus, in purported reliance on *Cooper Tire & Rubber Co. v. Farese*, Civil Action No. 3:02CV210-SA-JAD, 2008 WL 5104745 (N.D. Miss. Nov. 26, 2008), for the proposition that an additional report is merely supplementary where it only addresses an issue

already addressed in an initial report, Plaintiffs assert the June 26, 2024, Stone report is only that—supplementary. Indeed, they argue the issue addressed in the supplement to Stone's expert report was addressed by Stone on "virtually every page of his initial report."

**(2) Timeliness**

As for the timeliness of the June 26, 2024, report, Plaintiffs assert, in relevant part, "Local Rule 26 recites that a party is under a duty to supplement at appropriate intervals and in no event later than the discovery deadline established by the case management order."

According to Plaintiffs, since the June 26, 2024, supplement was disclosed 5 days in advance of the July 1, 2024, discovery deadline, it is a timely under the local rule.

**(3) The Four Factor Test**

Finally, having argued the June 26, 2024, disclosure was merely a timely made supplement, Plaintiffs maintain the four-factor test for determination of whether an untimely disclosure should be excluded is irrelevant.

**F. Defendant's Reply**

By way of reply memorandum, Defendant takes issue with both the contention that the June 26, 2024, report is merely a supplement and/or was timely made, and it undertakes to establish that the aforesaid four-factor test, as applied in the instant case, dictates that the June 26, 2024, report be stricken.

**II.      Analysis**

**A.      The Law**

**(1) What is a Permissible "Supplement"**

It is well recognized that under Federal Rule of Civil Procedure 26(a)(2)(B), expert reports must contain "a *complete statement of all opinions* the witness will express and the basis and reasons for them and must be made by the deadline set forth in the case management order." Nevertheless, Federal Rule of Civil Procedure 26(e)(1)(A) contemplates situations when a party may supplement a disclosure required by Rule 26(a) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." However, Rule 26(e) only applies to supplementation, not entirely new expert opinions. *Bailey v. Stanley Access Techs.*, 2015 U.S. Dist. LEXIS 151097, at *3 (N.D. Miss. Sept. 9, 2015) (emphasis added); *see also Ovella v. B&C Constr. & Equip., LLC*, No. 1:10CV285-LG-RHW, 2011 U.S. Dist. LEXIS 93009, at *4-5 (S.D. Miss. Aug. 5, 2011). Accordingly, if Stone's Supplemental Report is found to be a new opinion, then the Supplemental Report was due by the expert designation deadline set by the court (i.e., March 1, 2024) in its December 2023 Order Amending Scheduling Order [Doc. No. 423]. *See Cooper Tire*, 2008 WL 5104745, at *10.

As Defendant points out and the court's own research dictates, courts have made it clear that supplemental expert reports cannot be used to "fix" problems in initial reports. *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997); *Beller v. U.S.*, 221 F.R.D. 689, 691-95 (D.N.M. 2003) (supplemental reports cannot be used to buttress opinions or "shore up problems" in opinions contained in initial reports); *Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.*, No. Civ. 97-1608, 1999 U.S. Dist. LEXIS 3241, at *4 (E.D. La. 1999) (expert report discussing issues not included in initial report cannot be considered "supplementary."). Instead, supplemental disclosures are only permissible as a means of "correcting inaccuracies or filling the interstices of an incomplete report based on information

that was not available at the time of the initial disclosure." *Diaz v. Con-Way Truckload, Inc.*, 279 F.R.D. 412, 421 (S.D. Tex. 2012) (citation omitted). Accordingly, courts must distinguish "true supplementation" (e.g., correcting inadvertent errors or omissions) from gamesmanship. *Conn v. C.R. Bard, Inc.*, Civil Action No. 4:14-CV-298, 2021 WL 2328389, at *4 (S.D. Tex. Jun. 8, 2021); *Cutler v. Louisville Ladder, Inc.*, CIV. 4:10-4684, 2021 U.S. Dist. LEXIS 101094, 2012 WL 2994271, at *5 n. 43 (S.D. Tex. July 20, 2012). In doing so the court must be alert to the fact that information previously disclosed is incomplete or incorrect in some material respect *only if the expert report does not rely upon information previously unknown or unavailable to him before, in which case it is not an appropriate supplemental report*. *Conn*, 2021 WL 2328389, at *4-5 (emphasis added); *Diaz*, 279 F.R.D. at 421 (reviewing case law holding that a proper supplemental report should rely on previously unknown or unavailable information); *see also Accident Ins. Co. v. Classic Bldg. Design, LLC*, 539 F. App'x 465 (5th Cir. 2013) (Rule 26 does not condone unlimited bolstering of expert opinions or "cover" failures of omission because the expert did an inadequate or incomplete preparation). In *Cooper Tire*, the court found that if the information relied upon by an expert was available to the plaintiff at the time of the expert's initial report was prepared, a second report should not have been necessary, and that information contained in the second report should have been included in its expert's initial report. *Cooper Tire*, 2008 WL 5104745, at *13.

In a similar vein, the District Court in the Northern District of Mississippi opined that "supplemental reports are intended to be 'changes' or 'corrections' to the expert's original, timely disclosed opinion, and may not be 'material additions to the initial report.'" *Kee v. Howard L. Nations, P.C.*, 2021 U.S. Dist. LEXIS 220969, at *3-4 (N.D. Miss. Nov. 16, 2021) ; *see McReynolds v. Matthews*, No. 1:16-CV-318-HSO-MTP, at *5 (S.D. Miss. Nov. 20, 2017) (citing

*Harmon v. Georgia Gulf Lake Charles L.L.C.*, 476 Fed. Appx. 31, 38 (5th Cir. 2012). Stated differently, "providing additional information" is only supplementary if it is intended to correct an error or inadvertent omission based on information that was not available to him at the time of the initial disclosure. *Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*, W-20-CV-00073-ADA, 2022 WL 831619, at *6 (W.D. Tex. Feb. 24, 2022); *see also, Riggio v. Pruneda*, No. 1:18CV218-LG-RHW, 2019 WL 6827569, at *2 (S.D. Miss. Dec. 12, 2019) ("the rule is not a basis to make material additions to an initial report."); *Thang Quoc Pham v. Tyson Farms, Inc.*, No. 3:17-CV-125-DPJ-FKB, 2018 WL 4178029, at *9 (S.D. Miss. Aug. 30, 2018).

**(2) Timeliness**

Even if a report qualifies as a supplement, it must – in order to be timely – be made at "appropriate intervals" but in no event later than the discovery deadline. *See* L.U. Civ. R. 26(a)(5). In other words, if the supplement could have been made earlier by the expert, that is the time it is appropriate to do so. *See Dykes v. Cleveland Nursing & Rehab. Ctr.*, No. 4:15-CV-76-DMB-JMV, 2018 WL 3058870, at *4 (N.D. Miss. June 20, 2018) (As a general rule, "[a] supplemental disclosure under Rule 26(e)(1)(A) is timely if it is made as soon as possible" after the party learns of the deficiency.); *Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co.*, No. 13-cv-4106, 2017 WL 632105, at *4 (N.D. Iowa Feb. 13, 2017) (collecting cases). A party learns of a deficiency when he "should have been aware of" the need to disclose. 6 MOORE'S FEDERAL PRACTICE—Civil § 26.131[3] (2018).

In *Associated Cas. Ins. Co. v. Allstate Ins. Co.*, No. 3:07CV525-KS-JCS, 2009 WL 10722668, at *1-2 (S.D. Miss. Jan. 29, 2009), for example, on May 21, 2008, pursuant to the scheduling order in that case, plaintiffs designated two expert witnesses. Defendants thereafter made a timely designation of their experts. In advance of the October 15, 2008, discovery

deadline, defendants deposed the first expert on August 20, 2008, and the second on September 24. Three weeks later, on October 15, the discovery deadline, plaintiffs filed their "supplemental notice of service of disclosures", whereby they purported to "modestly" supplement their expert reports, by disclosing additional documentary support for previously disclosed (and unchanged) opinions. Much like the plaintiffs in the instant case, plaintiffs there maintained that their supplementation was timely under the courts' Local Rule 26.1(A)(5) since it was filed no later than the day of the close of discovery.  In that case, the court, noting that its Local Rule 26.1(A)(5), requires that parties' supplement their disclosures "at appropriate intervals... and in no event later than the discovery cutoff established by the scheduling order" explained:

> Here, the court is not persuaded that the October 15, 2008 supplementations were made in a "timely manner" as required by Rule 26(e)(1)(A). Specifically, where the [first expert's] deposition was conducted eight weeks in advance of the discovery deadline, plaintiffs should have provided his "modest" supplemental disclosure at an earlier time such that defendant would have had an opportunity to seek further discovery from him … Further, while [the second expert's] deposition was taken three weeks before the discovery deadline, plaintiffs have not attributed the timing of his supplementation to any delay in his ability to prepare it, but rather, rely on their technical reading of the rule to allow supplementation, no matter when developed, to be provided on the last day of the discovery period. Finally, concluding that a trial continuance was not feasible, the court held: the fair and expedient solution is to strike the supplemental reports.

Finally, a  construction of the local rule that would merely require disclosure of supplements  to be made by the discovery deadline in order to  be deemed timely, would make the rule's careful inclusion of the first requirement – that supplements be made at the appropriate interval – mere surplusage, and of course, it is well recognized rule of construction that legal texts are not to be construed, where feasible, in such a fashion. *See Fowler v. General Ins. Co. of America*, No. 13-2596, 2014 WL 5879490, at *3 (N.D. Tex. Nov. 13, 2014) (citing *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) (applying the rule)). *See also* Antonin Scalia and

Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts 174* (2012) ("If possible, every word and every provision [of an enactment] is to be given effect ... None should be ignored.").

**(3) If Untimely, Is It Nevertheless Justified or Harmless?**

It is the party whose designation is untimely who has the burden to demonstrate their actions were substantially justified or harmless. *Bailey* at *4; *Avance v. Kerr-McGee Chem. LLC*, No. 5:04-cv-209, at *21 (E.D. Tex. Nov. 30, 2006) (excluding late filed report where plaintiffs failed to demonstrate "'substantial justification' why the revisions and new affidavits were filed after the expert deadline…"). The determination of whether an untimely designation may be excused as justified or harmless requires an application of the facts to a four-factor test. The factors are: (1) the importance of the witness's testimony, (2) the prejudice to the opposing party of allowing the witness to testify, (3) the possibility of curing such prejudice by granting a continuance, and (4) the explanation, if any, for the party's failure to comply with the discovery order. *Daedalus,* 2022 WL 831619, at *3.

**B. Application of the Law to the Facts**

In the instant case, Stone purports to offer a host of new opinions and calculations by way of the purported June 2024 supplement. For example, he newly opines on the subject of kinetic energy, a subject not mentioned in the first report, and now even includes a formula for calculating the same. Stone undertakes to demonstrate the following formula for expressing stopping distances as a function of certain variables when he plainly testified at the deposition that a formula for stopping distances played no role in the opinions he expressed in his initial report:

$$s = v_0 \cdot t_e + \frac{v_0^2 - v_{\text{fin}}^2}{2 \cdot a_e}$$

He also includes, for the first time, 5 days before discovery ran in the case, an opinion that the longer the stopping distance of a train, the more likely it would be to continue to drag derailed train cars alongside the tracks thus causing more damage to the cars after a derailment. Also, that a train going slower will more readily derail (apparently attributable to poorer quality of track); that the higher the density of cars on a track, the less likely a derailment (apparently attributable to a higher quality track); however, if there is a derailment on such a densely traveled track, more cars are likely to actually be involved in the derailment than a lesser densely traveled track.

In contrast, Stone's initial opinion (as pertained to track class, speed, and derailment) was essentially only that the slower a train is going, the less likely it is to derail or be damaged after derailment. And, that the applicable regulations required, given the subject track's class, that the subject train not exceed 10 mph, while it was actually going 23 mph at derailment. This resulted, according to Stone's initial report, "most probably" in the train derailing and incurring damage to the car that was carrying Dicyclopentadiene (resin oil heavies). In short, this is a far cry from the host of findings, formulas, and calculations discussed above and reported by Stone in the June 26, 2024, so-called "supplement."

Moreover, even were the court here to find the new report merely a supplement, rather than a many material additions intended to bolster, and in some cases offer, entirely new opinions, it is plain that there is no information in the supplement that was not available to a degreed engineer, including Stone, as early as May 2021, when he provided his original opinions (as well as March 2024 for his second supplemental designation, and before he gave his deposition on April 19, 2024).

Nor for that matter is there any effort to explain why the purported supplement was not made until over two months after his deposition was given, at a time when only 5 days were left before the discovery deadline ran on July 1, 2024. In other words, even if this were truly a supplement, it was not made at an appropriate interval – as that phrase has been construed by the applicable authorities addressed above.

Finally, turning to the test for excusing an out of time designation, I find that though it is their burden to do so, Plaintiffs here have made no attempt to demonstrate, utilizing the four factors annunciated in the authorities discussed above, that the June 26, 2024, Stone report is either justified or harmless. On the other hand, the defendant has undertaken to carefully address each factor and have shown – and I find persuasively so – that each factor weighs in favor of excluding the June 26, 2024, Stone report. Namely, I conclude Plaintiffs' failure to argue for the importance of the June 26, 2024, report weighs in favor of disallowing it. Indeed, Stone himself, in his new report, offers only the perplexing suggestion that he just "decided to see if he could" do any calculations after he was asked if he had performed any in formulating his opinions at his deposition. I also find counsel's suggestion that the question of whether a specially retained and testifying engineering expert had done any calculations to support his opinions, was somehow wholly unanticipated and even inconceivable until after he was asked it at his deposition to be

even more of a mystery. Further, given the untimeliness of the same, the new report unquestionably prejudices Defendant who will have neither the opportunity to depose Stone on the new materials nor have an expert of its own address the same; nor is the prospect of a trial continuance in order to ameliorate the prejudice to Defendant either suggested or, at least on its face, feasible in this long pending case.

For all of the above reasons I find the motion to strike the June 26, 2024, supplement to be well taken and it is granted.

SO ORDERED, this the 1st day of August, 2024.

/s/ Jane M. Virden
UNITED STATES MAGISTRATE JUDGE